University of Illinois
2:05-cv-02132-DGB     # 35-2     Page 1 of 22
EXHIBIT "A"

Page 1 of 22
E-FILED
Tuesday, 22 November, 2005   02:30:13 PM
CLERK U.S. DISTRICT COURT, ILCD



| text only navigation | About the University | Trustees | President | Administration | find people \| everything a-z \| contact \| site map |

Organization
Bylaws
Meet the Trustees
Agendas & Materials
Public Comment at
Meetings
Search Meeting Minutes
Commercial Contracts

**Also See**

Statutes
General Rules
Nondiscrimination
Ethics Officer
Board of Trustees

**Information For**

Prospective Students
Faculty & Staff
Alumni
Donors
Media

**Home**

# ABOUT THE UNIVERSITY // POLICIES

## The General Rules Concerning University Organization and Procedure

Amended at Board of Trustees Meeting: **September 9, 2004**

ARTICLE I. UNIVERSITY ORGANIZATION

SECTION 1. THE UNIVERSITY AND THE CAMPUS
SECTION 2. FUNCTIONS OF THE UNIVERSITY ADMINISTRATION

ARTICLE II. BUSINESS ORGANIZATION AND POLICIES

SECTION 1. THE COMPTROLLER
SECTION 2. THE VICE PRESIDENT FOR ADMINISTRATION
SECTION 3. BUSINESS POLICIES AND PROCEDURES
SECTION 4. AWARD AND EXECUTION OF UNIVERSITY CONTRACTS
SECTION 5. DRAFTING AND APPROVAL OF UNIVERSITY CONTRACTS
SECTION 6. RESEARCH GIFTS, GRANTS, AND CONTRACTS
SECTION 7. OTHER GIFTS AND GRANTS, SCHOLARSHIPS AND ENDOWMENTS, NONMONETARY GIFTS
SECTION 8. TECHNICAL TESTS
SECTION 9. DELEGATION OF SIGNATURES

ARTICLE III. INTELLECTUAL PROPERTY
SECTION 1. OBJECTIVES
SECTION 2. DEFINITIONS
SECTION 3. APPLICATION
SECTION 4. COPYRIGHTS
SECTION 5. OTHER INTELLECTUAL PROPERTY
SECTION 6. TRADEMARKS
SECTION 7. INTELLECTUAL PROPERTY ADMINISTRATION
SECTION 8. PROCEEDS DISTRIBUTION

ARTICLE IV. EMPLOYMENT POLICIES
SECTION 1. TERMS OF EMPLOYMENT OF ACADEMIC AND ADMINISTRATIVE STAFF
SECTION 2. TERMS OF EMPLOYMENT OF CIVIL SERVICE EMPLOYEES
SECTION 3. WAGES OF STUDENT EMPLOYEES
SECTION 4. RETIREMENT, DEATH, SURVIVOR, DISABILITY, AND SICK LEAVE BENEFITS
SECTION 5. REGISTRATION OF STAFF MEMBERS IN UNIVERSITY CLASSES
SECTION 6. GRIEVANCE PROCEDURES FOR COMPLAINTS OF DISCRIMINATION

ARTICLE V. UNIVERSITY PROPERTY
SECTION 1. USE OF UNIVERSITY PREMISES AND FACILITIES
SECTION 2. CUSTODIANSHIP OF PROPERTY
SECTION 3. PRIVATE USE OF UNIVERSITY PROPERTY FORBIDDEN
SECTION 4. NAMING OF BUILDINGS, STREETS, AND DRIVES

ARTICLE VI. GENERAL PROVISIONS
SECTION 1. UNIVERSITY COUNCILS AND COMMITTEES
SECTION 2. ADMINISTRATIVE COMMITTEES
SECTION 3. ADVISORY COMMITTEES
SECTION 4. UNIVERSITY ARCHIVES

ARTICLE VII. AMENDMENTS

Back to Top

## ARTICLE I. UNIVERSITY ORGANIZATION
### SECTION 1. THE UNIVERSITY AND THE CAMPUS

The role of the University of Illinois in the state as a leader in public graduate and professional education rests upon its organic wholeness. It is not a loose federation of universities, nor is it a system of totally independent units. The mission to which the University is committed, and upon which its development thus far has been based, starts with an emphasis on the fundamental responsibility of the University as a whole. The specific contributions that each campus makes to the university's mission are diverse, since they reflect the needs and methodologies appropriate to different settings; but the campuses are alike in the broad nature of their public responsibilities, in their basic educational policies, and in their institutional quality; and they are integrated by a university-wide organization designed to maximize their educational effectiveness and the efficient use of their academic resources.

The campuses of the University of Illinois share common goals, even though each makes a highly differentiated contribution to the university's mission. The campuses are assisted and strengthened by intercampus cooperation and by university-wide services, while carrying out their academic functions with a high degree of delegated authority. The campuses are expected to achieve intercampus cooperation, to avoid unnecessary duplication, and to develop missions responsible to their particular orientation and setting, and to build upon and to foster faculty and staff strengths and initiatives. The campuses are encouraged to operate at qualitatively equivalent levels, even though each of them provides different services for varied clientele.

### SECTION 2. FUNCTIONS OF THE UNIVERSITY ADMINISTRATION

(a) The university administration has general responsibility for the entire operation of the University and has the following specific functions to be executed consonant with the policies and actions of the Board of Trustees:

(1) The enunciation of the mission of the University of Illinois; the development of long-range, comprehensive plans for the attainment of that mission; and the development of a plan of evaluation on a regular basis of the success of the University in meeting that mission.

(2) Seek to obtain the resources necessary to permit the support of plans and the development of facilities to meet the mission of the University.

(3) Recommend the allocation of resources, as available, to the campuses and to other units of the University within the requirements and the priorities of the long-range, comprehensive plan for the attainment of the mission of the University.

(4) The development of relationships both within Illinois and elsewhere to ensure that the University plays its appropriate role as a member of the larger educational community.

(5) The coordination of the operation of the various components of the University to ensure that the University functions as an organic university rather than as an aggregation of unrelated campuses and capitalizes upon the advantages of its resources as a system.

(6) The administration of university-wide education and support programs. Examples include the Institute of Government and Public Affairs and the University Press.

(7) The management of tasks which should be accomplished at the university level either for efficiency or to ensure the consistency necessary to permit the University and the Board of Trustees to meet their responsibilities.

(8) The development of public information programs to accomplish understanding of and support for the mission and activities of the University of Illinois.

(b) In addition to the president, the university officers are the vice presidents, including the vice president for academic affairs, the vice president for economic development and corporate relations, the vice president for administration, the chancellors, the university counsel, the secretary of the University, all of whom report directly to the president, and such additional administrative officers as shall be designated by the president after consultation with the University Senates Conference. Prior to recommending to the Board of Trustees the initial appointment of any university officer except for the president and the chancellors, the president shall seek the advice of the University Senates Conference. On the occasion of the reappointment of any university officer, the University Senates Conference may submit its advice if it so elects.

(c) Functioning under authority delegated by the president, the vice president for academic affairs is the senior academic officer of the University, serving as advisor to the president on matters of educational policy; academic programs, academic personnel actions, capital and operating budget developments; including the establishment of criteria for judgments as to priorities for resource allocation; and on such other matters as the president may designate. The vice president for academic affairs is responsible for the overall coordination of planning and budgeting at the University and also works closely with academic leaders on each campus and with other university officers to assist in the advancement of academic programs and to ensure overall coordination.

(d) Reporting directly to the president, the vice president for technology and economic development is the senior officer of the University serving as an advisor to the president on matters of intellectual property, technology commercialization, and related economic development activities. The vice president for technology and economic development is responsible for coordinating and managing the University's technology commercialization and related economic development initiatives including relevant offices, policies, and programs, and, in so doing, exercises direct line authority over the University's major offices and entities involved in technology commercialization and related economic development.

(e) The chancellor, under the direction of the president, is the chief executive officer for the campus. The chancellor has responsibilities and performs duties delegated by the president of the University. Among those responsibilities and duties are: participation in the university's overall planning, allocation, and evaluation operations; application of university-wide policies; review of academic programs and policies; student affairs; and safety of personnel and property.

(f) There may be additional administrative officers with university-wide responsibilities and duties as delegated by the president of the University. The president may make changes in titles and assignment of responsibilities of officers and may recommend to the Board of Trustees additional administrative positions as provided for in Article I, Section 2 of the University Statutes.

Back to Top

## ARTICLE II. BUSINESS ORGANIZATION AND POLICIES
### SECTION 1. THE COMPTROLLER

As an officer of the Board of Trustees, and in accordance with the Bylaws of the board, the comptroller shall:

(a) Approve for the board all expenditures for which a general or specific appropriation has been made by the board.

(b) Assist the finance and audit committee of the board in matters pertaining to the handling of funds and investments.

(c) Report to the board quarterly the financial condition and operation of the University and on other matters at times as the board may direct.

(d) Sign contracts to which the University is a party unless otherwise ordered by the board in specific cases.

(e) Perform such other functions as may be assigned by the Board of Trustees.

### SECTION 2. THE VICE PRESIDENT FOR ADMINISTRATION

Functioning under authority delegated by the president, the vice president for business and finance shall:

(a) Be the general business officer of the University and be responsible for the business functions of the campuses of the University.

(b) Devise and install suitable systems for the administrative functions of the University.

(c) Designate the place and manner in which administrative records shall be maintained.

Back to Top

## SECTION 3. BUSINESS POLICIES AND PROCEDURES

(a) No financial obligation shall be entered into except on authority of the board and after a general or specific appropriation has been made by the board allocating funds therefore, as evidenced by its records, and after having been approved by the vice president for business and finance. All allocations of funds made by the Board of Trustees, including those made from funds appropriated to the University by the State of Illinois, shall expire at the end of the fiscal year, June 30, unless otherwise especially ordered.

(b) For accounting purposes, the fiscal year of the University shall begin with the first day of July of each year and end on the thirtieth day of June next succeeding.

(c) No department or unit shall receive any monies directly unless authorized by the vice president for business and finance to do so. All monies shall be accounted for and paid over in such manner as the vice president for business and finance shall direct.

(d) The vice president for business and finance is authorized to establish and administer petty cash funds where necessary for the prompt and efficient handling of university business provided that no single fund of more than $1,000 may be established without specific action of the Board of Trustees. The board shall designate the banks in which petty cash funds in excess of $1,000 may be deposited.

(e) The vice president for business and finance is permitted to act as treasurer of student and other organizations affiliated with the University, but in so doing shall not thereby create any liability on the part of the Board of Trustees of the University of Illinois. In all cases, the accounts of these organizations shall be kept separate from the university accounts, and the funds of such organizations shall be kept apart from university funds.

(f) All employees shall be bonded in adequate amount and form, to be determined by the board, the expense thereof to be paid by the University.

## SECTION 4. AWARD AND EXECUTION OF UNIVERSITY CONTRACTS

(a) Purchases, construction contracts, and other contracts shall be awarded by the Board of Trustees in accordance with applicable state and federal law and with regulations adopted by the Board of Trustees. Contracts involving major changes in or deviations from university policy shall be approved specifically by the Board of Trustees.

(b) All contracts, other than purchase orders, shall be executed at least in duplicate, and the original thereof shall be filed with the secretary of the Board of Trustees and remain in the custody of the secretary. A report shall periodically be made to the Board of Trustees by the comptroller of all contracts executed on behalf of the University, as the board may require.

(c) Contracts relating to appointments to the staff may be executed by the secretary of the Board of Trustees. Agreements providing for the appointments of resident physicians and dentists may be executed by the chief of staff of the University of Illinois Hospital. Purchase orders issued pursuant to awards made by the Board of Trustees may be signed by the university official in charge of the purchasing activity as designated by the vice president for business and finance. Unless otherwise ordered by the Board of Trustees in specific cases, other contracts to which the University is a party shall be signed by the comptroller of the Board of Trustees and attested to by the secretary of the Board of Trustees.

(d) Procurement contracts involving expenditures of university funds are governed by *Procurement Rules of the Chief Procurement Officer for Public Institutions of Higher Education* as adopted and amended from time to time by the Board of Trustees. Other university contracts may be awarded to any business entity, including those in which a university officer or employee (or members of their immediate families) serve as major officers or primary employees

thereof or hold a significant equity interest therein, if such contract is deemed in the best interests of the University and has the approval of the president or the president's designee. Documentation of such approval shall be filed with the contract.

(e) When purchases or contracts are to be awarded by the University on the basis of sealed bids, such bids shall be opened in the presence of at least one member or officer of the Board of Trustees or a designated representative.

(f) Purchases, contracts, change orders, and leases involving payments by the University in one fiscal year in excess of such dollar amounts as the Board of Trustees may specify from time to time shall be specifically authorized by the Board of Trustees unless in the opinion of the president of the University necessity requires immediate action, in which case the president shall act to approve the transaction on behalf of the Board of Trustees and report the same promptly to the board. If the amount involved in such an emergency transaction is in excess of $500,000 but not more than $1,000,000 the president will not approve the transaction without first consulting individually those members of the executive committee of the board who can reasonably be contacted before the emergency action must be taken. Similar consultation must occur with all board members who can reasonably be contacted before presidential action on an emergency transaction of over $1,000,000.

(g) The vice president for administration is authorized to approve on behalf of the Board of Trustees purchases, contracts, leases, and contract change orders not requiring prior specific board authorization and shall report such approvals to the board as the board may direct. The requirement for specific board approval above dollar amounts the Board of Trustees may specify does not apply to the execution of or supersede previous actions of the board authorizing the execution of those types and classes of purchases, leases, and contracts which the Board of Trustees has authorized to be executed without its prior specific approval, such as farm leases, purchases of food products, grain, livestock, fertilizer, natural gas, generic commodities purchased on joint bids with other state institutions, purchases for resale to students and others, and other commodities which the board may exempt, cultural and entertainment presentations, subcontracts under contracts for research, gifts or grants, University Press publications, and any other transactions which the board may specify.

(h) The seal of the University shall be in the custody of the secretary of the Board of Trustees.

(i) The comptroller and secretary are authorized to delegate to responsible members of the staff of the University authority to execute and attest to contracts in the name of the comptroller and the secretary of the board.

(j) All bids received for a specific item or project may be rejected, without referral to the Board of Trustees, when they are considered to be excessive or unsatisfactory as follows:

> (1) By a director of purchases, when received as a result of bids solicited by such director for purchases of goods, services, equipment or commodities, such rejections to be reported to the vice president for administration.

> (2) By the president, on buildings and construction, upon the recommendation of the vice president for administration, on items over $25,000, such rejections to be reported to the Board of Trustees as the board may require.

> (3) By the vice president for business and finance, on buildings and construction on items under $25,000, such rejections to be reported to the Board of Trustees as the board may require.

(k) The comptroller is authorized to execute subcontracts for research if the costs are to be paid entirely from contract funds and the subcontracts have been approved by the University's prime contractor. In each case, the subcontract shall be reported to the Board of Trustees as the board may require.

Back to Top

## SECTION 5. DRAFTING AND APPROVAL OF UNIVERSITY CONTRACTS

(a) Contracts shall be drafted in tentative form by the university officer best acquainted with the subject matter thereof and in whose department lies the responsibility for performance and approved by the vice president for administration unless otherwise provided by the Statutes of the University or by other action of the Board of Trustees.

(b) All contracts prior to the execution thereof shall be approved as to legal form and validity by the university counsel. Such approval is to be endorsed in writing on the contract, provided that such approval and endorsement shall not be required with respect to individual contracts or extensions or renewals thereof if the form has prior approval by the university counsel as a standard and contains no substantive changes or additions other than those pertaining solely to the description of the project, the amount involved, and the term of the contract or extension.

## SECTION 6. RESEARCH GIFTS, GRANTS, AND CONTRACTS

(a) Research conducted under the auspices of the University may be supported in whole or in part through funds provided by outside entities in the form of research gifts, research grants, or research contracts. Such arrangements must be approved before acceptance by the president or the president's designee. Staff members may conduct preliminary negotiations with prospective supporters of research with the prior knowledge and approval of the department head or other appropriate administrative officer and the dean or director if required by college policy but have no authority to bind the University to enter into a contract. Such research programs shall be controlled and directed by the University and shall be conducted within the appropriate department(s) by members of the university staff. The administrative coordination of such programs shall be under the Agricultural Experiment Station for units in the College of Agricultural, Consumer and Environmenal Sciences; and the Engineering Experiment Station for units in the College of Engineering at the Urbana-Champaign campus, and the Campus Research Board for all other units of the Urbana-Champaign campus, and all units of other campuses. On a campus without a Campus Research Board, the Provost shall be responsible for such administrative coordination.

(b) Contracts for research shall specify that the results of scientific research conducted by the University, including inventions and discoveries, are the property of the University, to be used for the benefit of the University and the public, but the sponsor may receive preferential consideration in the disposition of the invention or discovery as provided in Article III, Section 7(p).

(c) Except as may be otherwise specified by the Board of Trustees, the University shall not enter into an agreement with a sponsor which will give a sponsor permanently the exclusive benefits of the results of such investigation or research. The original records of any investigation shall be held by the University, but reports or copies of such records may be furnished to the sponsor. The University shall have the exclusive right to publish, at its discretion, the results of scientific investigation and research unless provided otherwise in contracts with agencies of the United States Government. No account of a cooperative research project or reprints of scientific articles resulting from the investigation shall be published by the sponsor or by any other agency except with the consent of the University. The sponsor shall not use the name of the University in any advertisement, whether with reference to a cooperative investigation or otherwise, without the prior approval of the president of the University or the president's designee.

(d) If conditions imposed by the sponsor require the waiver of established university policies with respect to reimbursement of indirect costs or rights of publication, such conditions may be accepted by the University if required by Federal law or regulation. Similar conditions may be accepted by the University for any other sponsor when the committee specified in paragraph (f) below determines such acceptance to be clearly in the interests of the University and the public.

(e) The University accepts funds for research from sponsors outside the University by an outright gift, by a grant, or by a written contract.

      (1) **Research Gifts**. Gifts for research which are limited in amount may be arranged by informal negotiations and correspondence between the sponsor and the staff member who will carry on the research, subject to acceptance as hereinafter provided. The chancellor at each campus is delegated by the president to approve and accept such gifts for the University. Financial arrangements for gifts shall be reviewed and approved by the Office of Business Affairs. Consideration of the direct and indirect costs to the University accruing on account of the acceptance of gifts shall be made at the time of budgeting the funds to be received.

      (2) **Research Grants**. Grants for research are ordinarily made to the University by foundations, associations, or other agencies which are governmental or nonprofit in character. A research grant is differentiated from a gift in that a grant usually carries certain conditions imposed by the sponsor. Applications for grants should be prepared by the staff member who will supervise the research, approved by the head or chair of the department and the dean or director if required by college policy, and presented to the Office of Business Affairs for review and approval of financial details. Applications should be accompanied by a budget which

shall give consideration to all direct and indirect costs involved. After approval by the Office of Business Affairs, applications for grants shall be considered for approval by the chair of the Campus Research Board of the Urbana-Champaign and Chicago campuses. Grants carrying conditions the legality of which may be questionable shall also be referred to the university counsel.

(3) **Research Contracts**. Contracts for research shall be used when required by the sponsor or when it is desirable to set forth the specific conditions under which funds are to be received and administered. The university standard cooperative agreement contract form shall normally be used for projects with private sponsors. Contracts prepared by the sponsors may be used for projects with agencies of the United States Government, state governments, and in some cases private sponsors.

After informal negotiations with the sponsor, the staff member who is to supervise the project shall prepare a proposal specifying in detail the research work to be carried on and the financial and other conditions. A budget shall be prepared which will provide for all direct costs of the project and the indirect costs to be reimbursed to the University. Such a proposal and accompanying budget shall be approved by the head or chair of the department and the dean or director if required by college policy and submitted to the Office of Business Affairs. After review and approval by the Office of Business Affairs, it shall be submitted for approval to the vice chancellor for research if such a position exists on the campus. It shall then be returned to the Office of Business Affairs for submission to the sponsoring agency, such submission to constitute the formal offer of the University to carry on the research subject to the university's requirements for execution of a formal contract.

If the contract is with a private sponsor and the amount involved is relatively small, the university standard contract form may be completed by the staff member and submitted with accompanying budget for university approval in accordance with procedures stated above. A proposal shall not be required under such conditions.

Contracts prepared by sponsors shall be referred to the Office of Business Affairs for examination as to financial terms and conformance with university policy.

After a proposed contract has been negotiated and reviewed by the Office of Business Affairs, it shall be approved by the department which is to conduct the investigation, the vice president for business affairs, the university counsel, and signed by the comptroller and attested to by the secretary of the Board of Trustees who may authorize responsible members of their staffs to execute contracts on their behalf.

(f) Gifts, grants, and contracts for research may provide for all or a part of the costs of a research project. When the funds from the sponsor are to cover all or substantially all of the costs, the following items should be considered in the preparation of the budget: salaries and wages, employer's contribution to the State Universities Retirement System, allowance for Worker's Compensation and Occupational Disease liability, expendable supplies, equipment, travel expenses, other direct costs, and an allowance for indirect costs to the University. The amount budgeted for indirect costs in any proposed project shall be reviewed and approved by a committee composed of the vice chancellor for research if such a position exists on the campus, if not, the provost; a representative of the appropriate research unit or department carrying on the project; and a representative of the Office of Business Affairs. In determining the amount to be budgeted for indirect costs, the committee shall give consideration to the respective benefits which will be received from the investigation by the sponsor, the University, and the public. The expenditure of funds received as reimbursement for indirect costs of research or other university activities, as cost-of-education allowances, as general-support grants ("institutional grants," "general research- support grants," etc.), or as any other category of gift or grant not restricted as to use by the donor or by other regulations of the Board of Trustees requires authorization by the Board of Trustees. This may be done either by: (1) approval as part of the university's annual budgets for operations or for capital improvements, or (2) approval during the fiscal year as an addition to the annual budget for operations or for capital improvements.

(g) The University is often requested to accept grants and contracts providing for extension work or teaching services. Policies and procedures set forth in this section and in Section 7 shall apply to such grants and contracts, except that funds appropriated by the United States Government to the Agricultural Experiment Station or the Illinois Cooperative Extension Service shall be administered by the College of Agricultural, Consumer and Environmental Sciences.

Back to Top

**SECTION 7. OTHER GIFTS AND GRANTS, SCHOLARSHIPS AND ENDOWMENTS, NONMONETARY GIFTS**

(a) **Gifts and Grants**. Gifts and grants for purposes other than research may be accepted from entities outside the University under conditions specified in this Section. Staff members may conduct preliminary negotiations with prospective donors or grantors with the prior knowledge and approval of the department head or other appropriate administrative officers, but are not authorized to bind the University to accept a gift or grant. Gifts are accepted by the president of the University who may delegate the acceptance authority to others.

(b) **Scholarships and Fellowships**. Scholarships are gratuitous payments to students to provide financial assistance during the period of their training. Fellowships are awards involving cash stipends for graduate students. In certain exceptional cases, fellowships may be granted to postdoctoral scholars. Fellowships are intended to assist the recipient pursuing educational objectives; they are not awarded for carrying on specific research and no services shall be required of a fellow by the University.

The president is authorized to accept funds for scholarships and fellowships. The president may delegate authority for accepting scholarships and fellowships to the chancellors or to the chancellors' designees.

Funds for scholarships and fellowships shall not be accepted under terms which require prohibited discrimination.

When funds are received from a donor for fellowships or scholarships, neither the University nor the student recipients shall be obligated to the donor in any way except to comply with the terms of the gift and to ensure that established academic requirements are met. The recipient of a scholarship or fellowship shall be chosen by appropriate university units in accordance with established criteria based upon scholastic attainment and financial need unless the funds are accepted under other terms.

The vice president for business and finance may receive and disburse funds for a donor who wishes to designate the recipient of a grant for financial assistance. In such circumstances, the vice president acts only as the agent of the donor; the funds thus received are not university funds; and the funds thus administered, although perhaps designated as a scholarship or fellowship by the donor, have no official university status.

(c) **Endowment Gifts**. The conditions of the gift as stated by the donor ordinarily specify the use to which the principal and income shall be put although the determination may be left to the Board of Trustees. Gifts may be received and accepted with the condition that the principal sum thereof shall be either held intact as an endowment or expended upon authorization of the Board of Trustees. The University may temporarily transfer funds to an endowment status to be invested and only the income expended. Such funds are designated as "funds temporarily functioning as endowment" or as "quasi-endowment funds."

The terms of an offer of a gift to create an endowment shall be reviewed by the department concerned, the appropriate campus administrator, the university counsel, and the vice president for business and finance. The president may accept offers of endowment funds, reporting the gift when received to the Board of Trustees as the trustees may direct. The president may delegate authority to act on such offers to the chancellors. No endowment fund money may be accepted under terms which require prohibited discrimination.

(d) **Nonmonetary Gifts**. Every offer of nonmonetary gift shall be reported by the unit involved to the chancellor of the campus concerned who is authorized to accept the gift on behalf of the president and who shall report it to the president, who shall report it to the Board of Trustees as the trustees may direct.

No object of art shall be accepted until its artistic quality has been determined.

Loans of nonmonetary property are accepted subject to the condition that the University will take reasonable care of the property but will not be responsible for loss or damage thereto unless otherwise agreed to in writing and approved by the vice president for business and finance.

**SECTION 8. TECHNICAL TESTS**

(a) The University may undertake specified tests using unique or special university facilities on a contractual service basis for individuals, institutions, or commercial entities (applicants). In general, such tests are justified when the desired facilities do not exist elsewhere or are not readily accessible and when the work to be performed involves only established, preexisting methods of a primarily technical nature which can be specified in advance. A technical testing contract should not be used if the work entails original, creative research. The University will not perform testing for external parties if equivalent service is known to be available and feasibly obtainable from a commercial

entity.

(b) The unit executive officer is responsible for determining the appropriateness of the work before the University accepts the contract. Such work will be arranged by the unit executive officer with the involved members of the staff in accordance with the nature of their employment as part of their service to the University unless such work is done at times when services are not required by the University. When necessary or desirable, special assistants may be employed to conduct a specified testing project. Subject to conflict of interest review and prior written approval of the unit executive officer and college dean, testing using university equipment and facilities may also be undertaken by individual members of the university faculty or academic professional employees on their own time and responsibility.

(c) A fee shall be assessed for each testing project sufficient to cover all direct and indirect costs of service rendered, including any and all facilities of the University used in carrying out the test and the technical support personnel necessary to operate it.

(d) Both the testing methods and the objectives toward which they will be applied shall be specified in writing as part of the agreement covering the testing work. The University makes no claim of ownership in observational data, measurements, or other results from such specified testing. In general, it is not anticipated that any new science or technology (and resulting intellectual property) would result from such specified testing. However, in special situations, such as when the proposed testing involves an applicant's proprietary technology or specimens or if a specific objective or application of interest to the applicant which is potentially patentable can be identified in advance, the University may agree not to seek a proprietary position in the applicant's intellectual property. Otherwise, inventions and discoveries (hereafter, "inventions") shall belong solely or jointly to the University and/or to the applicant in accordance with the U.S. laws of inventorship and Article III, Section 3. For any such invention in which the University has an ownership interest, the University will grant the applicant a limited first option to negotiate a license to use the University invention on reasonable commercial terms.

(e) The name of the University of Illinois shall not be used in publicity concerning the tests or test results without its prior written permission.

(f) Technical testing agreements shall be approved and executed in accordance with Article II, Section 5, and the policies and procedures provided for each campus by the assistant vice presidents for business affairs.

## SECTION 9. DELEGATION OF SIGNATURES

An administrative officer is authorized to delegate to another responsible staff member authority to sign official documents under conditions approved by the vice president for business and finance. Such delegation does not relieve the administrative officer of responsibility for what is done there under.

Back to Top

## ARTICLE III. INTELLECTUAL PROPERTY

- Objectives
- Definitions
- Application
- Copyrights
- Other Intellectual Property
- Trademarks
- Intellectual Property Administration
- Proceeds Distribution

## SECTION 1. OBJECTIVES

Inventions, discoveries, copyrightable works and other creative works that have the potential to be brought into practical use may result from the activities of university employees in the course of their duties or through the use, by any person, of university resources such as facilities, equipment, or funds.

The primary purpose of this intellectual property policy is to provide the necessary protections and incentives to encourage both the discovery and development of new knowledge and its transfer for the public benefit; a secondary purpose is to enhance the generation of revenue for the University and the creators. The University is guided by the following objectives:

*(i)* To optimize the environment and incentives for research and for the creation of new knowledge at the University;

*(ii)* To ensure that the educational mission of the University is not compromised;

*(iii)* To bring technology into practical use for the public benefit as quickly and effectively as possible; and

*(iv)* To protect the interest of the people of Illinois through a due recovery by the University of its investment in research.

## SECTION 2. DEFINITIONS

(a) *Intellectual Property*. The term "intellectual property" as used herein is broadly defined to include inventions, discoveries, know-how, show-how, processes, unique materials, copyrightable works, original data and other creative or artistic works which have value. Intellectual property includes that which is protectable by statute or legislation, such as patents, copyrights, trademarks, service marks, trade secrets, mask works, and plant variety protection certificates. It also includes the physical embodiments of intellectual effort, for example, models, machines, devices, designs, apparatus, instrumentation, circuits, computer programs and visualizations, biological materials, chemicals, other compositions of matter, plants, and records of research.

(b) *Traditional Academic Copyrightable Works*. "Traditional academic copyrightable works" are a subset of copyrightable works created independently and at the creator's initiative for traditional academic purposes. Examples include class notes, books, theses and dissertations, educational software (also known as courseware or lessonware), articles, non-fiction, fiction, poems, musical works, dramatic works including any accompanying music, pantomimes and choreographic works, pictorial, graphic and sculptural works, or other works of artistic imagination that are not created as an institutional initiative (as specified in Section 4(a)(2) below).

(c) *Creator*. "Creator" refers to an individual or group of individuals who make, conceive, reduce to practice, author, or otherwise make a substantive intellectual contribution to the creation of intellectual property. "Creator" includes the definition of "inventor" used in U.S. patent law and the definition of "author" used in the U.S. Copyright Act.

(d) *University Resources Usually and Customarily Provided*. When determining ownership and license rights in copyrightable works, "university resources usually and customarily provided" includes such support as office space, library facilities, ordinary access to computers and networks, or salary. In general, it does not include use of students or employees as support staff to develop the work, or substantial use of specialized or unique facilities and equipment, or other special subventions provided by the University unless approved as an exception.

Exceptions are expected in units where the tradition is to provide subvention to some faculty in the form of graduate assistants to help prepare traditional academic copyrightable works. Exceptions are also expected in situations where creators use university-provided facilities and resources in the creation of works of artistic imagination, for example, use of studios, pottery wheels, or kilns for the creation of paintings, sculpture or ceramics; use of high end computer hardware and software in the creation of artistic graphical images; and so on. Other individual exceptions may be approved on a case-by-case basis [see section 7(j)].

## SECTION 3. APPLICATION

This policy as amended from time to time shall be deemed a part of the conditions of employment for every employee of the University and a part of the conditions of enrollment and attendance at the University by students. It is also the policy of the University that individuals (including visitors) by participating in a sponsored research project and/or making significant use of university-administered resources thereby accept the principles of ownership of intellectual property as stated in this policy unless an exception is approved in writing by the University. All creators of intellectual property shall execute appropriate assignment and/or other documents required to set forth effectively ownership and rights as specified in this policy.

[SEE END NOTE 1]

This policy applies only to intellectual property disclosed after the effective date of the policy (September 3, 1998).

Back to Top

## SECTION 4. COPYRIGHTS

(a) *Ownership.* Unless subject to any of the exceptions specified below or in Section 4(c), creators retain all rights to traditional academic copyrightable works as defined in Section 2(b) above. (See, however, Sections 4(b)(2) below.)

The University shall own copyrightable works as follows:

(1) Works created pursuant to the terms of a university agreement with an external party, or

(2) Works created as a specific requirement of employment or as an assigned university duty that may be specified, for example, in a written job description or an employment agreement. Such specification may define the full scope or content of the employee's university employment duties comprehensively or may be limited to terms applicable to a single copyrightable work. Absent such prior written specification, ownership will vest with the University in those cases where the University provides the motivation for the preparation of the work, the topic or content of which is determined by the creator's employment duties and/or when the work is prepared at the university's expense. [*see end note 2*]

(3) Works specifically commissioned by the University. The term "commissioned work" is hereafter used to describe a copyrightable work prepared under a written agreement between the University and the creator when (1) the creator is not a university employee or (2) the creator is a university employee but the work to be performed falls outside the normal scope of the creator's university employment. Contracts covering commissioned works shall specify that the author convey by assignment, if necessary, such rights as are required by the University.

(4) Works that are also patentable. The University reserves the right to pursue multiple forms of legal protection concomitantly if available. Computer software, for example, can be protected by copyright, patent, trade secret and trademark.

(b) University Rights in Creator-Owned Works

(1) Traditional academic copyrightable works created using university resources usually and customarily provided are owned by the creators. Such works need not be licensed to the University.

(2) Traditional academic copyrightable works created with use of university resources over and above those usually and customarily provided shall be owned by the creators but licensed to the University. The minimum terms of such license shall grant the University the right to use the original work in its internally administered programs of teaching, research, and public service on a perpetual, royalty-free, non-exclusive basis. The University may retain more than the minimum license rights when justified by the circumstances of development.

(c) *Student Works.* Unless subject to the provisions of paragraph (a) or provided otherwise by written agreement, copyrightable works prepared by students as part of the requirements for a university degree program are deemed to be the property of the student but are subject to the following provisions:

(1) The original records (including software) of an investigation for a graduate thesis or dissertation are the property of the University but may be retained by the student at the discretion of the student's major department.

(2) The University shall have, as a condition of the degree award, the royalty-free right to retain, use and distribute a limited number of copies of the thesis, together with the right to require its publication for archival use.

(d) *Copyright Registration and Notice.* University-owned works should be protected by copyright notice in the name of the Board of Trustees of the University of Illinois. Such copyright notice should be composed and affixed in accordance with the United States Copyright Law. Registration of the copyright for university-owned works shall be in accordance with the operational guidelines and procedures established by the vice chancellor for research on each campus. The University may also decide to release a work to the public domain and if so, should so indicate.

(e) *University Press Publications.* The University Press shall be responsible for copyright registration of works owned by the University and published by the Press and for administering contracts with its authors. Such contracts shall define the rights and obligations of the author and the University and shall be processed as are other university contracts.

(f) *Compliance with the Copyright Act.* University units that administer activities involving any usage regulated by the Copyright Act are responsible for knowing applicable regulations, monitoring their continuing evolution, and conducting their programs in full compliance with the applicable laws and regulations.

### Back to Top

### SECTION 5. OTHER INTELLECTUAL PROPERTY

*Ownership.* Except as otherwise specified herein or by the University in writing, intellectual property shall belong to the University if made: (1) by a university employee as a result of the employee's duties or (2) through the use by any person, including a university employee, of university resources such as facilities, equipment, funds, or funds under the control of or administered by the University. (See also Section 4(a)(4) above.)

### SECTION 6. TRADEMARKS

Trademarks and service marks are distinctive words or graphic symbols identifying the source, product, producer, or distributor of goods or services. Registration of trademarks or service marks, at the state or federal level, shall be approved by the appropriate campus or university level officer. Proceeds received from commercialization of a mark that is related to an intellectual property license will be shared with all creator(s) of the associated property as specified in Sections 8(b) and 8(c) below. For proceeds received from commercialization of a mark that is licensed independently and is not directly related to an intellectual property license, the share that would normally be distributed to the creator(s) will be assigned to the unit(s) from which the trademark or service mark originated. Except as provided herein or unless subject to prior written agreement between the creator(s) and the University, the University will not share the proceeds from commercialization of a mark with the individual(s) who created the mark.

### SECTION 7. INTELLECTUAL PROPERTY ADMINISTRATION

(a) *Disclosure.* All intellectual property in which the University has an ownership interest under the provisions of this policy and that has the potential to be brought into practical use for public benefit or for which disclosure is required by law shall be reported promptly in writing by the creator(s) to the designated campus officer through the appropriate unit executive officer(s) using the disclosure form provided by the campus. The disclosure shall constitute a full and complete disclosure of the subject matter of the discovery or development and identify all persons participating therein. The creator(s) shall furnish such additional information and execute such documents from time to time as may be reasonably requested.

(b) *Evaluation and Exploitation Decisions.* After evaluation of the intellectual property and review of applicable contractual commitments, the University may develop the property through licensing, may release it to the sponsor of the research under which it was made (if contractually obligated to do so), may release it to the creator(s) if permitted by law, or may take such other actions as are determined to be in the public interest. Exploitation by the University may or may not involve statutory protection of the intellectual property rights, such as filing for patent protection, registering the copyright, or securing plant variety certification.

(c) *Questions Related to University Ownership.* In the event there is a question as to whether the University has a valid ownership claim in intellectual property, such intellectual property should be disclosed in writing to the University by the creator(s) in accordance with Section 7(a). Such disclosure is without prejudice to the creator's ownership claim. The University will provide the creator with a written statement as to the university's ownership interest.

(d) *Informing Creators of Decisions.* The University will inform principal creators of its substantive decisions regarding protection, commercialization and/or disposition of intellectual property which they have disclosed. However, specific terms of agreements with external parties may be proprietary business information and subject to confidentiality restrictions.

(e) *University Abandons Intellectual Property.* Should the University decide to abandon development or protection of university-owned intellectual property, ownership may be assigned to the creator(s) as allowed by law subject to the rights of sponsors and to the retention of a license to practice for university purposes. The minimum terms of such license shall grant the University the right to use the intellectual property in its internally administered programs of teaching, research, and public service on a perpetual, royalty-free, non-exclusive basis. The University may retain more than the minimum license rights, and the assignment or license may be subject to additional terms and conditions, such as revenue sharing with the University or reimbursement of the costs of statutory protection, when justified by the circumstances of development.

(f) *Commercialization by Creator(s).* The University may, at its discretion and consistent with the public interest, license intellectual property to the creator(s) on an exclusive or non-exclusive basis. The creator(s) must demonstrate technical and business capability to commercialize the intellectual property. The creator(s) may be required to assume the cost of statutory protection. Agreements with creators will be subject to review and approval of conflict of interest issues in accordance with applicable university policy.

(g) *University's Acceptance of Independently Owned Intellectual Property.* The University may accept assignment of intellectual property from other parties provided that such action is determined to be consistent with the public interest. Intellectual property so accepted shall be administered in a manner consistent with the administration of other university-owned intellectual property.

(h) *Consulting Agreements.* Employees engaged in external consulting work or business are responsible for ensuring that agreements emanating from such work are not in conflict with university policy or with the university's contractual commitments. Such employees should make their university obligations known to others with whom they make such agreements and should provide other parties to such agreements with a statement of applicable university policies regarding ownership of intellectual property and related rights.

Back to Top

(i) *Statement by Creators.* The creators of intellectual property owned by the University under the terms of this policy may be required to state that to the best of their knowledge the intellectual property does not infringe on any existing patent, copyright or other legal rights of third parties; that if the work is not the original expression or creation of the creators, the necessary permission for use has been obtained from the owner; and that the work contains no libelous material nor material that invades the privacy of others.

(j) *Administrative Responsibility.* The president has ultimate authority for the stewardship of intellectual property developed at the University. Pursuant to Article I, Section 2, Paragraph (d) the vice president for technology and economic development has direct line authority for University offices and entities involved in technology commercialization and related economic development. In consultation with the vice president for academic affairs and vice chancellors for research, the vice president for technology and economic development will establish operational guidelines and procedures for the administration of intellectual property, including but not limited to determination of ownership, assignment, protection, licensing, marketing, maintenance of records, oversight of revenue or equity collection and distribution, approval of individual exceptions, and resolution of disputes among creators and/or unit executive officers.

(k) *Campus Responsibility.* Each campus may establish an office which has responsibility for administering university policies regarding intellectual property as defined herein.

(l) *Contractual Authority.* Licenses, options for licenses and other agreements related to commercialization or exploitation of intellectual property will be granted in the name of the Board of Trustees of the University of Illinois. All such contracts shall be executed in accordance with Article II of these General Rules.

(m) *Administrative Guidelines and Procedures.* General guidelines and procedures for the administration of intellectual property shall be established by the president in consultation with the University Intellectual Property Committee (as specified in Section 7(n) below) and the campuses. Detailed operational guidelines and procedures for the administration of campus-based responsibilities shall be established by the vice chancellor for research on

each campus.

(n) *University Intellectual Property Committee.* The University Intellectual Property Committee shall be appointed annually by the president to make recommendations to the president regarding procedures, guidelines, and responsibilities for the administration and development of intellectual property and such other matters as the president shall determine.

(o) *Appeals.* After following the administrative guidelines and procedures established by each campus, the university creator or unit executive officer may appeal to the University Intellectual Property Committee to seek resolution of complaints or questions regarding the matters addressed in this article.

(p) *Preferential Treatment of Sponsors.* Sponsored research agreements shall provide that all intellectual property developed as a result of the sponsored research project shall belong to the University unless otherwise specified in writing. The sponsor may receive an option to license such resulting intellectual property on terms to be negotiated, said option to be exercised within a specified period following the disclosure of the intellectual property. When the nature of the proposed research allows identification of a specific area of intellectual property or application which is of interest to the sponsor, the University may accept research agreements with terms which entitle the sponsor to specific commercial rights within the defined field of interest. Otherwise, the specific terms of licenses and rights to commercial development shall be based on negotiation between the sponsor and the University at the time of exercise of an option by the sponsor and shall depend on the nature of the intellectual property and its application, the relative contributions of the University and the sponsor to the work, and the conditions deemed most likely to advance the commercial development and acceptance of the intellectual property. In all cases where exclusive licensing is deemed appropriate, such license agreements shall require diligent commercial development of the intellectual property by the licensee. The University may also determine, on a case-by-case basis, that it is in the university's interest to assign ownership of resulting intellectual property to the sponsor as an exception to this policy when circumstances warrant such action, in accordance with guidelines established by the University Intellectual Property Committee.

(q) *Exceptions to Policy.* Recommendations for exceptions to the provisions of the policy in this article shall be made by the University Intellectual Property Committee to the president for presentation to the Board of Trustees. For individual exceptions, see Section 7(j).

Back to Top

## SECTION 8. PROCEEDS DISTRIBUTION [see end note 3]

(a) *Proceeds.* For purposes of this policy, "proceeds" shall refer to all revenue and/or equity, as defined below, received by the University from transfer, commercialization, or other exploitation of university-owned intellectual property.

(1) *Revenue.* "Revenue" shall mean cash from payments including, but not limited to, royalties, option fees, license fees or from the sale of the university's equity interest.

(2) *Equity.* "Equity" shall include, but not be limited to, stock, securities, stock options, warrants, buildings, real or personal property, or other non-cash consideration.

(b) *Revenue Distribution.* When revenue is received by the University, all out-of-pocket payments or obligations (and in some cases, a reasonable reserve for anticipated future expenses) attributable to protecting (including defense against infringement or enforcement actions), marketing, licensing or administering the property may be deducted from such income. The income remaining after such deductions is defined as net revenue.

(1) *Creator's Share.* The creator (or creator's heirs, successors, and assigns) normally shall receive forty percent (40%) of net revenue. If there are joint creators, the net income shall be divided equally among them absent a mutual agreement to the contrary.

(2) *Originating Unit's Share.* The originating unit normally shall receive twenty percent (20%) of net revenue. If a creator is affiliated with more than one originating unit or if there are joint creators from different units, the originating unit(s) share shall be divided among such units as agreed in writing by the responsible unit

executive officers.

(3) *University's Share.* The University normally shall receive forty percent (40%) of net revenue. Distribution of the university's share shall be allocated in support of its technology transfer activities and academic and research programs as determined by the vice chancellor for research.

(c) *Equity Distribution.* In any instance wherein the University executes an agreement with a corporation or other business entity for purposes of exploiting intellectual property owned by the University and the University receives or is entitled to receive equity, such equity or the proceeds of the equity shall be shared among the creator(s), the originating unit(s), and the University in the same proportions as revenue distributions (except as specified in Section 8(d) below).

(d) *Exceptions When the Creator(s) Have No Entitlement.* If the University accepts research support in the form of a sponsored research agreement or unrestricted grant as part of the consideration in an intellectual property license in lieu of an option fee, license fee or royalty, the creator(s) shall have no entitlement to receive a share as personal income. For the subset of equity that is buildings, real or personal property, or other non-cash consideration, the creator(s) shall have no entitlement to receive a share as personal income.

(e) *Special Distributions.* Special facts or circumstances may warrant a different distribution of proceeds than specified above and such distributions will be determined on a case-by-case basis under the authority of the vice chancellor for research.

(f) *Revenue from Actions for Defense or Enforcement of Intellectual Property Rights.* When the University receives revenue from third parties that results from successful actions for the purpose of defending or enforcing the university's rights in its intellectual property, such revenue may first be used to reimburse the University (or the sponsor or licensee, if appropriate) for expenses incurred in such actions. The creator(s) and their originating unit(s) shall be entitled to recovery of lost royalties from the remaining net revenue, in the same proportions as specified in Section 8(b) above. The remaining net revenue shall be allocated in support of the university's technology transfer activities and academic and research programs as determined by the vice chancellor for research.

Back to Top

## ARTICLE IV. EMPLOYMENT POLICIES
### SECTION 1. TERMS OF EMPLOYMENT OF ACADEMIC AND ADMINISTRATIVE STAFF

(a) The terms of employment of the academic and administrative staff, as defined in the University of Illinois Statutes shall be explicitly stated by the nominating officer, indicating that services are required for:

(1) The academic year, which shall consist of two semesters.

(2) Twelve months, including allowable vacation.

(3) The summer session.

(4) Other stated periods.

(b) The teaching staff shall be appointed with services required for either the academic year or for twelve months. Those who are appointed for the academic year shall be free for other employment, either in the University or elsewhere, during the summer months, except that they shall report for any departmental meetings before registration and render all services requested of them in connection with registration and the preparation of materials and reports for the academic year. No vacation benefits accrue on appointments with services required for the academic year.

(c) The administrative, research, and extension staffs generally shall be appointed with services required for twelve months, including allowable vacation. Allowable vacations for those appointed for twelve months shall consist of 24 working days per appointment year. Vacation shall be arranged to accommodate the convenience of the staff member and the requirements of the unit. Vacation may be accumulated up to a maximum of 48 working days. During a partial-year appointment, vacation shall be prorated. Vacations taken during the holiday recesses, other

than the actual holidays recognized by the University, shall be considered a part of the annual vacation allowance of 24 days. Holidays recognized by the University shall be New Year's, Martin Luther King Day, Memorial Day, Independence Day, Labor Day, Thanksgiving, Christmas, and such other days as may be determined by the president of the University.

(d) Procedures for the determination of compensation for services for periods less than the full academic year shall be approved by the appropriate chancellor and by the president.

(e) Members of the staff required to render services during the academic year may be employed in the summer session or to perform research or other services during a period not exceeding two months and receive for each month of such service additional compensation at the monthly rate of one-ninth of the full-time rate paid for services required during the preceding academic year. Such employment may be for longer periods during the summer only upon the advance approval of the chancellor. Staff members required to render services for twelve months, with allowable vacation, shall not receive additional compensation for services rendered during the summer. For staff members rendering services partly on a twelve-month basis and partly on an academic-year basis, this regulation applies only to the twelve-month portion.

(f) Full-time employees shall not receive compensation for services in excess of a normal schedule within the University except for a reasonable amount of instruction in continuing education courses or grading of special examinations (outside regular course work), all to be done at a time that does not conflict with other university duties. Exceptions may be made to this rule only with advance approval of the chancellor. These exceptions should be held to a minimum.

(g) All staff members rendering services on a twelve-month basis with allowable vacation shall be compensated in twelve equal monthly installments.

(h) Staff members with the exception of assistants rendering services during the academic year shall be compensated in twelve monthly installments or on a pro rata basis for shorter periods. Assistants shall be compensated in monthly installments during the period over which services are rendered.

(i) In case of termination of service of members of the academic and administrative staff, the following rules shall govern the determination of salaries:

(1) Services required for twelve months, with allowable vacation:

a) After the first month of service, a pro rata share of earned vacation shall be paid.

b) A pro rata reduction in final salary payment shall be made for any vacation taken but not earned

(2) Services required for the academic year: Total payments shall equal a percentage of the annual salary determined by the services rendered in relation to the academic year established for the campus

(j) All employees of the University, unless excepted by the president, are required to present medical evidence of their capability to safely perform the duties necessarily associated with the position that is being sought. The form in which this evidence is to be presented will be prescribed by the director of the health service at each campus. Employees securing a rating of "unemployable" may not be employed except on approval of the president. As deemed necessary by the directors of the health services, new employees are required to be immunized against communicable diseases. Employees of the University whose duties require them to handle food products shall be subject to periodic medical examinations given under the supervision of the directors of the health services, and no individual shall be employed in duties of this nature who shows evidence of any communicable disease.

(k) Failure on the part of an employee to take any required physical examination after being notified to do so shall serve to make the university employment contract inoperative and salary payments shall cease.

(l) Upon request, an academic staff member shall be granted, without loss of salary, bereavement leave of up to three work days due to the death of a member of his or her immediate family or household and one work day due to the death of a relative outside the immediate family. Leave beyond these amounts may be approved under special circumstances. However, such additional leave will normally be taken without pay or be charged to accrued vacation. Substantiation of the reason for bereavement leave may be required.

"Immediate family" shall be interpreted to be: father, mother, sister, brother, spouse, and child of the employee. Also included as immediate family are mother-, father-, brother-, sister-, son-, and daughter-in-law, as well as grandchildren and/or grandparents (includes grandparents-in-law). Biological, adopted, foster, legal wards, step or in loco parentis relationships are considered as immediate family under this policy. "Relative outside the immediate family" shall be interpreted to be: aunt, uncle, niece, nephew, or cousin of the employee. For purposes of application of the Bereavement Policy, relationships existing due to marriage will terminate upon the death or divorce of the relative through whom the marriage relationship exists. Current marital status will be defined in accordance with Illinois State law.

(m) Upon request, an eligible academic staff member shall be granted, without loss of salary, parental leave of up to two weeks immediately following the birth of a child, or upon either the initial placement or the legal adoption of a child under 18 years of age. An employee must have completed six continuous months of employment in order to be eligible for parental leave, which is limited to one leave per academic appointment year. An employee who resigns employment before or at the expiration of the parental leave normally shall be required to reimburse the University for the cost of wages paid during the leave.

Back to Top

### SECTION 2. TERMS OF EMPLOYMENT OF CIVIL SERVICE EMPLOYEES

All employment of civil service employees is controlled by the law and the rules governing the State Universities Civil Service System of Illinois. These include provisions for employment on merit through a system of examinations, the establishment of job classifications and the assignment to such classifications of all positions, and the establishment of appropriate salary rates or ranges for each classification. Detailed University rules and regulations for civil service staff members are promulgated and published in the *Policy and Rules--Nonacademic*, as adopted and amended by the Board of Trustees.

### SECTION 3. WAGES OF STUDENT EMPLOYEES

All student employees are to be paid on the basis of classification and scale of wages approved by the chancellor at each campus.

### SECTION 4. RETIREMENT, DEATH, SURVIVOR, DISABILITY, AND SICK LEAVE BENEFITS

University policy provides for sick leave with the payment of salary in case of illness or other disability for specified periods as described below. In addition to the benefits provided by the University, a system of retirement, death, survivor, and disability benefits is established by the law creating the State Universities Retirement System of Illinois, a state agency separate and distinct from the University of Illinois.

(a) **Participation in State Universities Retirement System**. With certain exceptions, University employees are required to participate in the State Universities Retirement System.

(b) **Sick Leave Benefits**. The University of Illinois provides sick leave benefits as follows:

(1) **Civil Service Employees**. Sick leave with full pay is granted in the amounts and in accordance with eligibility criteria set forth in the *Policy and Rules--Nonacademic* for those employees subject to the act creating the State Universities Civil Service System.

(2) **Academic or Administrative Staff**. Academic and administrative staff members (with the exception of medical residents and postdoctoral research associates) who are participants in the State Universities Retirement System or the Federal Retirement System, and who are appointed for at least 50 percent time to a position for which service is expected to be rendered for at least nine consecutive months, earn sick leave as provided in this subparagraph (2). Medical residents, postdoctoral research associates, SURS annuitants, and other academic and administrative staff members who are not participants in the State Universities or Federal Retirement Systems, and those who are appointed for less than 50 percent time and/or for less than nine consecutive months earn sick leave of 13 work days for each appointment year, no part of which will be cumulative, and the 13 days will be prorated for those on part-time appointments, or on appointments for less than a full appointment year.

Under the Public Act 90-65 and actions of the Board of Trustees, one-half of the number of days of unused sick leave earned and accumulated between January 1, 1984 and December 31, 1997, is eligible for payment upon an employee's death, retirement, resignation, or other termination of employment.

Academic or administrative staff members who, on December 31, 1983, had an unused balance of accumulated sick leave, retained the same to a maximum of 180 work days, which may be utilized either (1) for establishing service credit in the State Universities Retirement System; or (2) for sick leave before all sick leave earned and accumulated on or after January 1, 1998 is utilized by the staff member. Unused sick leave earned by an academic or administrative staff member between January 1, 1984 and December 31, 1997, may be accumulated up to a maximum of 240 work days, and upon termination of employment, a staff member may designate the portion of the accumulation (up to one-half) to be paid pursuant to Public Act 90-65, and the remainder thereof will be utilized for establishing service credit in the State Universities Retirement System. Pre-January 1, 1984 and post January 1, 1998, accumulations of sick leave are to be utilized in full prior to the utilization of January 1, 1984 through December 31, 1997, accumulations.

Effective January 1, 1998, academic and administrative staff members who are participants (except for medical residents, postdoctoral research associates, and annuitants in SURS or the Federal Retirement System) in the State Universities Retirement System or Federal Retirement System, and who are appointed for at least 50 percent time to a position for which service is expected to be rendered for at least nine consecutive months, will earn sick leave of 12 work days for each appointment year, the unused portion of which shall accumulate without maximum. If these 12 days are fully utilized in any appointment year, up to 13 additional work days will be available for extended sick leave in that appointment year, no part of which 13 days shall be cumulative or eligible for payment. No additional sick leave is earned for a summer appointment. In the case of an appointment for less than a full appointment year, and in the case of a part-time appointment, the 12 days cumulative and the 13 days noncumulative leave shall be prorated.

In the event the 25 days of earned and extended sick leave described above, or any proration thereof, are exhausted in an appointment year, any balance of leave accumulated before January 1, 1984, will be available for use. After that amount is depleted, any balance of sick leave accumulated on or after January 1, 1998 will be used. After that amount is depleted any balance of sick leave accumulated between January 1, 1984, and December 31, 1997 will be used.

No deduction of time from sick leave is made at a time when a staff member is not expected to furnish regular service to the University. Sick leave may be used for illness of, injury to, or need to obtain medical or dental consultation for the staff member, the staff member's spouse, children, parent, or members of the household. A staff member may use sick leave for pregnancy. Following the adoption or birth of a child, sick leave may be used for a period of time, not to exceed twelve weeks, to care for that child.

After an academic or administrative staff member has exhausted the 12 days of cumulative earned sick leave, the 13 days of noncumulative extended sick leave in an appointment year, the unused sick leave accumulated before January 1, 1984, the unused sick leave accumulated after January 1, 1998, and the sick leave accumulated between January 1, 1984 and December 31, 1997, and subject to the approval of the president, or chancellor as appropriate, a staff member who has completed at least three full years of service may be granted noncumulative sick leave with full pay for a period (including the annual and extended leaves and accumulations described above) not to exceed one-half of the staff member's appointment year. (In the case of staff members of university administration offices, the president will act.)

A staff member who within 120 days completes a direct transfer to the University of Illinois from another state agency or employer will receive a credit for the balance of unused and uncompensated sick leave accrued at the state agency or employer from which the employee is transferring. Such transferred sick leave credit will be treated in the same manner as sick leave accumulated by University of Illinois employees prior to January 1, 1984. The transferring staff member will accrue compensable sick leave at the beginning of employment with the University only until December 31, 1997, after which time all sick leave accrued will be noncompensable.

Academic or administrative staff members who return to university employment within two years of an earlier separation from university employment and who upon return are eligible for compensable sick leave under this section shall have restored as sick leave accumulated prior to January 1, 1984, regardless of when it was earned, any sick leave which was not compensated to such individuals or used to establish service credit in the State Universities Retirement System at the time of the prior separation from university employment only until December

31, 1997, after which time all sick leave accrued will be noncompensable.

Reporting on use of sick leave will be made at the unit level and recorded centrally as required.

(c) **Death, Disability, and Survivor Benefits**. For employees of the University, other than students paid on an hourly basis and personnel whose principal employment is outside the University with at least six months' service who are not members of the State Universities Retirement System or any other publicly supported retirement system which pays a death benefit, a death benefit of an amount set by an appropriate authority is payable by the University. For employees who are members of the State Universities Retirement System, death, disability, and survivor benefits are provided by that system.

Back to Top

## SECTION 5. REGISTRATION OF STAFF MEMBERS IN UNIVERSITY CLASSES

With approval of the head of the employing unit, members of the academic, administrative, and civil service staffs of the University and of approved university-related agencies may register in university courses for which they are eligible for admission and in which space is available. Under certain conditions, such employees may be exempt from payment of one or more of the usual charges for tuition or fees.

Waiver of tuition and service fees is granted for all members of the academic and administrative staff, excluding graduate assistants, whose appointments are 25 percent or more of full-time service. Academic and administrative staff members who qualify for tuition waivers are exempt from the service fee. Under this practice, such staff members will not have access to the benefits provided by the fee unless they wish to pay for them as do other faculty and staff who wish to gain access to these services.

For graduate assistants, waiver of base-rate tuition, i.e., the in-State graduate (not professional) tuition rate, is granted for all university graduate assistants on appointment for at least 25 percent but not more than 67 percent of full-time service; a waiver of service fees is granted to those graduate assistants on appointment for at least 25 percent of full-time service.

The Board of Trustees has authorized the president of the University or his or her designee(s) to award a limited number of tuition and fee waivers for graduate students and report to the Board on the number authorized, by campus, as part of the annual budget and tuition setting process.

Tuition and fee waivers are also extended to members of the nonacademic staff in accordance with the rules and policies set forth in *Policy and Rules--Nonacademic*.

## SECTION 6. GRIEVANCE PROCEDURES FOR COMPLAINTS OF DISCRIMINATION

Procedures shall be developed for each campus and for university administration offices in accordance with guidelines approved by the Board of Trustees for the prompt, fair, and definitive resolution of grievances concerning alleged discrimination by the University on the basis of race, sex, national origin, religion, age, handicap, or status as disabled veteran or veteran of the Vietnam era.

Back to Top

## ARTICLE V. UNIVERSITY PROPERTY
## SECTION 1. USE OF UNIVERSITY PREMISES AND FACILITIES

(a) The use of university premises and facilities shall be subject to all applicable state and federal laws and shall also be in accord with the actions of the Board of Trustees.

(b) The use of university premises and facilities by individuals other than in connection with university educational or research programs will be permitted only under regulations formulated and administered by the appropriate chancellor and approved by the president.

(c) The president of the University is authorized to make such traffic and parking regulations and such changes therein as conditions may warrant from time to time and may delegate such authority to the chancellors.

## SECTION 2. CUSTODIANSHIP OF PROPERTY

(a) Under the State Property Control Act, the president of the University is accountable to state officials for the

supervision, control, and inventory of all university property subject to that act. In discharging these and other responsibilities, the president is authorized to specify or to deputize the chancellors and other university officers to specify procedures and responsibilities for the supervision, control, and inventory of all university property.

(b) Unless otherwise specified, the supervision, control, and inventory of university personal property shall be the responsibility of the head of the unit to which the property is assigned. An inventory of all such property shall be maintained in a manner determined by the comptroller and the comptroller may require reports concerning the same. The individual responsible shall report to the comptroller all items of university personal property which are of no further use to the unit, and the comptroller may transfer the same to another unit or direct other disposition.

(c) Land which has been assigned by the Board of Trustees to a college or department for particular use or for a definite period may not be used for any other purpose or beyond the period designated without authorization by the Board of Trustees. The assignment of land, equipment, or any other property to a department or division does not give the department a title to the same, but only the right to use as long as necessary for accomplishing the function of the department or division; and the use of land or equipment or other property shall not exclude its use, at the same time, for other purposes by other departments or divisions of the University on approval of the president provided that any such second use shall not interfere with the efficient utilization of said land, equipment, or other property for the purpose for which it was first assigned.

### SECTION 3. PRIVATE USE OF UNIVERSITY PROPERTY FORBIDDEN

No one connected with the University in any capacity shall use for any personal purpose any university property of whatever description, and no one shall be permitted to remove from the buildings or grounds any property belonging to the University, even though it may seem to be of no value, unless it be temporarily removed pursuant to some well-established regulation, or with the approval of the appropriate chancellor or the vice president for administration in the instance of university-level property.

### SECTION 4. NAMING OF BUILDINGS, STREETS, AND DRIVES

(a) Buildings given to the University may be named for the donors of funds for the same or for donors whose individual contributions have been crucial in the financing of such buildings.

(b) Buildings should be named in such a way as to denote their general use as a matter of convenience to students as well as to visitors except as provided for in paragraphs (d) and (e) below.

(c) Residence halls may be named for donors of funds for such halls; for distinguished former members of the Board of Trustees; and for distinguished members of the University faculty, especially those who were identified with some phases of student life outside the classroom.

(d) Buildings and other campus facilities may be named for deceased or retired former members of the University faculty in accordance with guidelines issued by the president of the University. Living former members of the faculty must have been retired from the University of Illinois for at least ten years.

(e) Buildings may be named for distinguished persons in the public life of the state or nation.

(f) Except as provided for in paragraphs (a), (c), or (d) above, buildings and other campus facilities shall not be named for living persons.

(g) Plaques or tablets may be installed in buildings in recognition of distinguished members of the university staff whose services were identified with the functions of said buildings with the approval of the appropriate chancellor or the chancellor's designee.

(h) The designation of names of buildings, streets, and drives shall be exclusively within the authority of the Board of Trustees. A building name may include a designation such as auditorium, center, gymnasium, hall, institute, school, or laboratory.

Back to Top

### ARTICLE VI. GENERAL PROVISIONS
### SECTION 1. UNIVERSITY COUNCILS AND COMMITTEES

The president is authorized to establish and to appoint the members of university councils and committees to serve

as advisers on educational and other service programs affecting all campuses and to provide for intercampus relationships in such matters.

### SECTION 2. ADMINISTRATIVE COMMITTEES

The president of the University is authorized to appoint such administrative and other committees or boards as are necessary for assistance in discharging the president's duties as the official advisor to and executive agent of the Board of Trustees.

### SECTION 3. ADVISORY COMMITTEES

The president of the University may recommend to the Board of Trustees the appointment of consultative committees to advise the colleges and schools and other divisions of the University.

### SECTION 4. UNIVERSITY ARCHIVES

(a) The University Archives, a division of the Library under the direction of an archivist on each campus, is the depository for records having research or historical value and includes records transferred to its custody. The University Archives also includes professional and personal manuscripts of members of the academic and administrative staffs and records of faculty and student organizations that may be given to the University for preservation and use.

(b) Records produced or received by any agency or employee of the University in the transaction of university business become university property. For the purposes of this paragraph, records shall be defined as including all documents, correspondence, accounts, files, manuscripts, publications, photographs, tapes, drawings, or other material bearing upon the activities and functions of the University or its officers and employees.

No university records shall be discarded or destroyed except upon the prior approval of the archivist pursuant to the finding and recommendation by the administrative unit involved that such records have no further administrative value. The archivist shall withhold the approval of any such action until satisfied that the records involved have no value for other administrative offices and that they need not be retained for legal reasons, as determined by appropriate officers. Where appropriate, the archivist may arrange for the transfer of records to the University Archives as an alternative to destruction.

(c) Pursuant to the State Records Act, Illinois Compiled Statutes, 5 ILCS 160/16, 17, and 18, January 3, 2003, the university archivist shall forward approved requests for permission to discard or destroy records to the president and to the State Records Commission for their approvals.

(d) The archives of the university-level administration shall be under the jurisdiction of the archivist at the Urbana-Champaign campus.

Back to Top

### ARTICLE VII. AMENDMENTS

*The General Rules Concerning University Organization and Procedure* document supplements and is subordinate to the University of Illinois *Statutes*. In the event of conflict between the provision of the *General Rules* and the *Statutes*, the *Statutes* shall prevail.

*The General Rules* are adopted by the Board of Trustees acting on the advice of the president of the University. The board may make changes in *The General Rules* after consultation with the president of the University. Before providing such advice or consultation, the president shall consult with the University Senates Conference, which shall give due regard to the provisions of Article XII, Section 4 of the University of Illinois *Statutes*. However, consultation with the conference is not required when because of exceptional circumstances a proposed action of the Board of Trustees would authorize a deviation from *The General Rules* for a specific transaction.

Note: The University of Illinois *Statutes* and *The General Rules Concerning University Organization and Procedure* make reference to and/or are supplemented by a variety of internal policy documents as well as federal and state statutes and regulations. References within the *Statutes* and *The General Rules* to external documents or statutes will be noted in the indexes currently being developed for the two documents. Policy documents internal to the University exist in various forms: some printed as pamphlets, e.g., *Policy on Patents and Copyrights* and *Policy and Procedures on Academic Integrity in Research and Publication*; some as extensive, comprehensive publications such as *Policy and Rules* (Civil Service); some updated yearly, e.g., *Guidelines for Sabbatical Leaves of Absence*; some unique to each campus, e.g., *Campus Administrative Manual*.

Use the following URL addresses to access the **Statutes** and T**he General Rules Concerning University Organization and Procedure**.

http://www.uillinois.edu/trustees/rules.html

http://www.uillinois.edu/trustees/statutes.html

Back to Top

**END NOTES**

1 The creator's obligation to assign rights to the University is subject to the provisions of the Illinois Employee Patent Act, which provides in part:

*A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of the state and is to that extent void and unenforceable. The employee shall bear the burden of proof in establishing that his invention qualifies under this subsection.*[Return to reference.]

2 Provisions (1) and (2) under Article III, Section 4. Copyrights, (a) Ownership define those works that fall within the scope of university employment as that term is used in the definition of "work made for hire" in the U.S. Copyright Statute (see Title 17, USC, Section 101).[Return to reference.]

3 These proceeds distribution provisions shall apply only to revenue and equity received from agreements for commercialization that are executed subsequent to the effective date of this policy (September 3, 1998). Unless otherwise agreed in writing between the University and the creator(s), distribution of income for commercialization prior to the effective date of this policy shall be in accordance with the policy in effect at the time the agreement was approved. Where no policy exists (e.g., for equity), this policy shall prevail.[Return to reference.]

Back to Top

08-19-04

University of Illinois at Chicago
Search UIC

University of Illinois at Springfield
Web Policy
Search UIS

University of Illinois at Urbana-Champaign
Policies & Procedures Manuals
Campus Administrative Manual
Search UIUC

© Copyright 2004 The Board of Trustees of the Universityof Illinois | Web Privacy Statement

Search