E-FILED
Wednesday, 26 July, 2006  04:32:30 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

GEOFFREY W. BANT,                )
                                 )
          Plaintiff,             )
                                 )
-vs-                             )No. 05-2132
                                 )
BOARD OF TRUSTEES OF THE         )
UNIVERSITY OF ILLINOIS,          )
                                 )
          Defendant.             )


                    DEPOSITION

    The deposition of SONYA CHAMBERS, a citizen of
the State of Illinois, a witness of lawful age;
produced, sworn, and examined upon her corporeal
oath, at the Law Offices of Heyl, Royster, Voelker &
Allen, 102 East Main, Urbana, Illinois, on the 22nd
day of June, 2006, before Amy L. Prillaman Neubaum,
CSR, License No. 084-003275, in and for the County of
Vermilion and State of Illinois; as a witness in a
certain suit and matter now pending and undetermined
in the United States District Court for the Central
District of Illinois.

          APPEARANCES:

                    Mr. Nile J. Williamson
                    Attorney at Law
                    1926 Associated Bank Plaza
                    Peoria, Illinois  61602-1104
                    Appearing for the Plaintiff

                    Mr. Edward Wagner
                    HEYL, ROYSTER, VOELKER & ALLEN
                    102 East Main Street
                    Urbana, Illinois  61801
                    Appearing for the Defendant

          ALSO PRESENT:  Geoffrey W. Bant


                                        COPY

Exhibit " D "

## Page 2

1      I N D E X
2  EXAMINATION,              3
3  BY: MR. NILE J. WILLIAMSON:
4   1                        36
    2                        50
5   3                        57
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 3

1      (Commencing at 2:06 PM):
2          SONYA CHAMBERS,
3  the deponent herein, called as a witness after having
4  been first duly sworn, was examined and testified as
5  follows:
6  EXAMINATION,
7  BY: MR. NILE J. WILLIAMSON:
8      Q. Would you state your full name, your
9  resident address and your date of birth?
10     A. Sonya Chambers, 3102 Country Bend Lane,
11 Champaign, Illinois, 61822.
12     Q. I'm sorry 618 --
13     A. 22. That's the zip code.
14     Q. I didn't care about the zip code.
15     A. 8-9-67.
16     Q. And madam, would you tell me your
17 educational background briefly?
18     A. In what way?
19     Q. The year you graduated from high school,
20 where you went to undergraduate school and any
21 advance degrees.
22     A. Beaumont High School for Girls 1985;
23 University of Cincinnati 1990; Ohio State University,
24 MBA, 1996.

## Page 4

1      Q. When did you begin your work life then?
2  You may have begun it before your degrees or a little
3  bit -- you didn't go consecutively to school I don't
4  think, so were you working in between, for instance,
5  your Bachelor's degree and getting an MBA?
6      A. Yes.
7      Q. Could you tell me what you did after you
8  obtained your Bachelor's degree?
9      A. I worked at a bank.
10     Q. And what bank was that?
11     A. At the time it was called Central Trust.
12     Q. For what period of time did you do that in
13 terms of years?
14     A. Well, I interned there prior to completing
15 my Bachelor's and then I worked there afterwards post
16 Bachelor's and that would have been approximately --
17 I started at Baxter in '91.  So...
18     Q. How many years did you work there then?
19     A. At Central Trust?
20     Q. Yes, ma'am.
21     A. Inclusive of the intern?
22     Q. No, I think after you started as a
23 full-time employee.
24     A. That would be a year.

## Page 5

1      Q. Just '91 to '92?
2      A. No, I didn't say '92.
3      Q. I'm losing my time frame here.
4      A. I think so.  I left Central Trust in '91.
5      Q. At which point you did what between '91 and
6  '96?
7      A. I worked for Baxter Health Care.
8      Q. And were you working for them that entire
9  time frame?
10     A. Yes.
11     Q. So did you obtain your MBA at night or in
12 the summer while doing the full-time job?
13     A. Yes.
14     Q. Okay.  After you obtained your MBA did you
15 stop working at Baxter's?
16     A. No.
17     Q. But you stopped working at Baxter's in '96.
18     A. No.
19     Q. I didn't hear that right then either.  Tell
20 me how long you worked at Baxter's.
21     A. Baxter, no S.  And technically Baxter had a
22 spin-off, so there is a part of time where I'm with
23 Baxter, then I am with Allegiance and then when I
24 departed it was Cardinal.

## Page 6

1    Q. Could you spell Allegiance for us?

2    A. It's the same as I pledge Allegiance, so

3 A-L-L-E-G-I-A-N-C-E I believe.

4    Q. How long were you with Allegiance?

5    A. Well, let's be clear, Baxter, Allegiance

6 and Cardinal were all the same entity in terms of the

7 actual organization where I worked. The names just

8 changed, the stock just changed hands. So I want to

9 be clear. So I didn't leave an organization to go to

10 another organization.

11    Q. When you indicated '91 to '96 were you

12 including all three entities then?

13    A. I don't recall the actual spin-off years if

14 you will, but I left Baxter, Allegiance, Cardinal,

15 let's see --

16    Q. How do you say the last entity again,

17 Cardinal?

18    A. Just a moment. I want to answer your

19 preceding question. I left Baxter, Allegiance

20 Cardinal Health Care in '99.

21    Q. Okay. Spell Cardinal Health Care for me,

22 if you would.

23    A. With all due respect I don't understand the

24 relevance of the spelling.

## Page 7

1    Q. Because we need to have it correctly in the

2 record.

3      MR. WAGNER: It did sound like "CART-NO".

4    Q. We want to make sure it's correct when they

5 transcribe it.

6    A. C A R D I N A L.

7    Q. Okay. Cardinal Health Care?

8    A. Cardinal Health Care.

9    Q. And of the triumvirate of companies you

10 then talked about, for those three between

11 '91 and '99? Do I have that straight on the dates?

12    A. Eight year tenure.

13    Q. And in 1999 did you go to the University of

14 Illinois?

15    A. No, I did not.

16    Q. Where did you next move to?

17    A. Nationwide Insurance.

18    Q. How long were you with Nationwide?

19    A. Approximately nine months.

20    Q. I want to go back with you a second again

21 to -- I'll refer to them as a triumvirate. What type

22 of jobs, job or jobs did you do with those three

23 organizations?

24    A. Well, several. They were all management

## Page 8

1 related. Started off in their management associate

2 training program which led to being a transportation

3 supervisor, an inventory manager, an area logistics

4 manager, a -- I should have brought my resume. After

5 that there was a cost management position and --

6    Q. And the cost management position entailed

7 what?

8    A. Entailed what in what way?

9    Q. What was the job description?

10    A. Primarily working with our large flagship,

11 hospitals throughout the region, managing their

12 financial cost initiatives.

13    Q. Was that the first job you had with that

14 set of organizations that involved that type of

15 activity?

16    A. Which type of activity?

17    Q. Involving managing financial aspects of the

18 business.

19    A. No, in all of my roles I had P and L

20 responsibility.

21    Q. P and L means what?

22    A. Profit and loss, I had a budget.

23    Q. So finances has always been a part of your

24 work product in terms of after you've left school.

## Page 9

1    A. Yes.

2    Q. Did you cover all the jobs in that period?

3 Or I interrupted you, so...

4    A. For the most part I believe I did.

5    Q. So what did you do with Nationwide?

6    A. I was a Director of Operations for a

7 financial operation, I was part of the retirement

8 organization.

9    Q. Tell me what that entailed, what you did on

10 a day-to-day basis. Did you hire and fire people,

11 for instance, in that position?

12    A. Yes. All my positions I had hiring -- let

13 me recant that all. In the transportation, inventory

14 I had hiring responsibility. As the area logistics

15 manager I did not have direct reports. At the

16 Nationwide position I had direct reports. I've had

17 upwards to 60 direct reports.

18    Q. And then what else did you do at Nationwide

19 in addition to hiring and firing people?

20    A. I didn't say I fired anyone at Nationwide.

21    Q. I didn't say you did. You had the

22 responsibility for hiring and firing however?

23    A. If I needed to. I did not fire anyone at

24 Nationwide. I did hire at Nationwide. Oversaw the

Page 10

1 interaction between the financial operations team and
2 the sales side.
3    Q. Did you have to create budgets?
4    A. In that position, no.
5    Q. Is there anything else you can tell me
6 about that position?
7    A. In terms of?
8    Q. Job descriptions.
9    A. Without my resume, no. That was a very
10 long time ago.
11    Q. Were you working for Nationwide then just
12 in the year 1999?
13    A. Actually we need to go back because there
14 was a company that I worked for, I was a financial
15 planner, so there's a chunk of time that we need to
16 address and I came here in '01. At American
17 Express --
18    Q. Well, we covered between '91 and '99, you
19 did cover all of those jobs and employment entities,
20 didn't you?
21    A. Just a moment, please.
22    MR. WAGNER: He can withdraw the question
23 and start a new one.
24    Q. The better thing is for me to understand it

Page 11

1 and I can tell you when I don't.
2    A. But I want to address your question because
3 I left out a company that I had financial
4 responsibility, I had a financial planning practice
5 which was -- so I misspoke when I said that I went to
6 Nationwide after Baxter, the triumvirate, if you
7 will, American Express was in between there.
8    Q. When was American Express?
9    A. American Express was '99 to -- let's see,
10 started Nationwide 2000, came here -- no, that's not
11 right. It was '99 to the beginning of -- through the
12 end of 2000. I came here in 2001. I was at
13 Nationwide for 2001, January through September 2001.
14 I started at the University October 2001.
15    Q. Now when you said you were financial
16 planner, was that separate and apart from working for
17 American Express?
18    A. I was an American Express financial
19 planner.
20    Q. So you didn't mean to indicate that you
21 were self-employed as a financial planner or working
22 for anyone else, you meant American Express when you
23 referenced financial planning?
24    A. American Express financial planners, at

Page 12

1 that time we were independents. So self-employed.
2    Q. Were you with American Express a full two
3 years?
4    A. A little under.
5    Q. And you were with Nationwide after that?
6    A. Correct.
7    Q. For about nine months?
8    A. Correct.
9    Q. Which takes us to the University of
10 Illinois.
11    A. Correct.
12    Q. Because you went directly from Nationwide
13 to the University of Illinois?
14    A. Correct.
15    Q. That was October of 2001 that you began at
16 the University of Illinois?
17    A. Correct.
18    Q. In what position did you take at that time
19 with the University of Illinois?
20    A. Director of financial affairs.
21    Q. What was the job description of director of
22 financial affairs?
23    A. I was responsible for the financials,
24 financial operation of the administrative services or

Page 13

1 what was called administrative services at that time,
2 reporting to Van Anderson.
3    Q. Did that entail the unit that I'm going to
4 describe as printing services?
5    A. Yes, it did.
6    Q. And it entailed other units as well I take
7 it.
8    A. Correct.
9    Q. Can you describe those for me?
10    A. Printing, SMR.
11    Q. SMR?
12    A. Stores, Mailing, Receiving. Parking. Call
13 it safety compliance. Now environmental health and
14 safety was the title at that time. And Levis was
15 part of that as well.
16    Q. I didn't get the last one.
17    A. L E V I S.
18    Q. What is Levis?
19    A. It is -- it's not the faculty center, it's
20 a meeting place, a place where meetings can be held.
21    Q. Please tell me, I understand the five
22 subdivisions you've talked about or five units, if
23 you will, what did you do for them in terms of
24 director of financial affairs? What does that mean?

Page 14

1    A. That included the purchasing, it included P
2  card, which is University purchasing card.
3    Q. P C --
4    A. A R D. It included developing the budget,
5  monitoring the budget, creating the financial
6  reports, as well as invoice payment. And if I didn't
7  already say it a PO creation. Purchase order
8  creation.
9    Q. Who did you report to then as director of
10  financial affairs? Did you say that was
11  Mr. Anderson?
12    A. Van Anderson.
13    Q. And did you always report to Mr. Anderson?
14    A. Yes.
15    Q. From October '01 until today?
16    A. I reported to Van. There was a period
17  where Stores, Mailing and Receiving and printing went
18  through a merger, if you will, and subsequently after
19  that it went to Facilities and Services, when it was
20  part of Stores, Mail & Receiving I had a short-term
21  reporting relationship to Robert Kelly who went by
22  Bob Kelly.
23    Q. Do you know when that was?
24    A. I would say with reasonable confidence, not

Page 15

1  a hundred percent, that it was the -- in 2002. And
2  the only way I can confirm that a hundred percent is
3  my performance review.
4    Q. For how long in 2002?
5    A. I again would have to confirm that with my
6  performance review because it specifically would
7  provide the date.
8    Q. At this juncture you can just tell me, was
9  it a matter of two or three months?
10    A. I don't recall.
11    Q. So that would mean that even today you
12  report to Van Allen Anderson?
13    A. No, it does not.
14    Q. But that's what I asked you up until today.
15    A. And I corrected that statement by saying
16  that I reported to Robert Kelly for a period of time
17  in 2002.
18    Q. I understand that. Then you again began
19  reporting to Mr. Anderson?
20    A. No. Then I also said that we -- there were
21  two mergers, there was the merger of printing,
22  Stores, Mailing and Receiving, then there was the
23  Facilities and Services merger which occurred in
24  2003, July, at that time my reporting structure

Page 16

1  changed.
2    Q. So then who did you start reporting to?
3    A. Jeff Oberg.
4    Q. Again can you spell his last name if
5  possible?
6    A. O B E R G.
7    Q. You still report to Mr. Oberg?
8    A. Correct.
9    Q. Do you know when in 2003 that occurred?
10    A. That I began reporting to him?
11    Q. Yes.
12    A. The exact month, no. It could have been --
13  I know it was effective at the latest July '03.
14  However, it could have been sooner than that. That's
15  where the time frame becomes a little fuzzy.
16    Q. Now, at any point in time has Jeff Bant
17  ever reported to you?
18    A. No.
19    Q. At any point in time have you ever reported
20  to him?
21    A. Absolutely not.
22    Q. I never always trust my notes but does that
23  mean that since October of 2001 your title has
24  remained director of financial affairs?

Page 17

1    A. That's incorrect.
2    Q. When did it change?
3    A. With I moved to Facilities and Services.
4    Q. And that was when?
5    A. In 2003 I moved to Facilities and Services.
6  The title director of financial affairs was still in
7  effect although my job responsibilities changed and
8  it took a while for all the job titles to match the
9  change in roles that we went through the merger.
10    I said all that, I wanted to put that out
11  there because there is a point in time where my title
12  was director of financial affairs. However, I was
13  doing the work of director of procurement services,
14  so my title was director of procurement services, but
15  if you were to check with the personnel records, my
16  working title was director of procurement services
17  but if you check the official record of my title in
18  personnel it would have said director of financial
19  affairs.
20    Subsequent, probably about a year later the
21  working title and the title on the HR records
22  matched.
23    Q. That would be 2004?
24    A. Approximately.

Page 18

1  Q. So in 2004 your title changed to?
2  A. Again approximately that's the time period,
3  I would not state that emphatically. I would say
4  approximately, it was a year's time frame before that
5  occurred. That means it could have been a little
6  more or a little less, so I would not say
7  emphatically that it was 2004 that the title changed.
8  Q. When the title changed did you have two
9  titles or one title or what was the situation?
10  A. When the title changed my HR record title
11  coincided with my working title.
12  Q. Remind me again when that was.
13  A. Director of procurement services which is
14  my current title today.
15  Q. When you started actually doing the job of
16  director of procurement services did your job duties
17  change from what they had been as director of
18  financial affairs?
19  A. Yes.
20  Q. Can you tell me in what respect?
21  A. Director of procurement services meant that
22  for Facilities and Services, which is a significantly
23  larger organization than administrative services,
24  represents about 30 plus business units, I took on

Page 19

1  the responsibility for purchasing, accounts payable,
2  property accounting, P card and I had no budget
3  responsibility for all of F and S, I just had the
4  responsibility for creating my departmental
5  procurement services budget which is different from
6  the prior role under Van where I had responsibility
7  for the financial budget.
8  Q. So what you do and what you're called
9  hasn't changed since 2004, is that an accurate
10  statement?
11  A. What I do and what I am called has not
12  changed from approximately that time period of 2004.
13  And again, we would have to check the records to
14  specifically see when my title changed.
15  Q. Have you obtained pay raises in the years
16  since you became an employee of the University of
17  Illinois?
18  A. I have.
19  Q. Have they always occurred at the same time?
20  A. No.
21  Q. Do you recall the approximate dates and
22  amounts of the pay raises?
23  A. Not fully, no.
24  Q. Give me your best recollection.

Page 20

1  A. The relevance of that question?
2  Q. Actually --
3  MR. WAGNER: They are entitled to track
4  raises and compare things.
5  A. Okay.
6  MR. WAGNER: And quite frankly it's a
7  matter of in the books it's public record.
8  A. Candidly I don't recall the actual amounts
9  over the past, this will be my fifth year.
10  Q. Let me ask you what your salary was when
11  you began at the University of Illinois.
12  A. Seventy.
13  Q. Was there any bonus provision at any point
14  in time since you have been a University of Illinois
15  employee?
16  A. Bonus defined as?
17  Q. Amounts in addition to your base salary.
18  A. One time, recurring? I want to be sure I'm
19  answering your question.
20  Q. At any point in time.
21  A. Well, my definition of a bonus is something
22  that occurs once and it's a certain dollar amount and
23  you don't receive it again.
24  Q. Well, that wasn't my definition, but we'll

Page 21

1  use yours.
2  A. No.
3  Q. So you have never gotten a bonus?
4  A. No.
5  Q. You've received raises, however?
6  A. Yes.
7  Q. Have you ever received moneys in addition
8  to raises and your base salary?
9  A. No.
10  Q. What is your present salary then?
11  A. I don't know the actual amount.
12  Q. In round figures, ma'am.
13  A. Round? Eighty-two, approximately.
14  Q. So your salary increase has been
15  approximately $12,000 since you became an employee in
16  2001?
17  A. Yes, approximately.
18  Q. And at no time have you ever received a
19  bonus or a supplemental payment other than raises and
20  base salary?
21  A. I have not received any interim pay bumps.
22  Q. Have you had evaluations done since you've
23  been an employee at the University of Illinois?
24  A. Every year that I have an employee.

Page 22

1  Q. Are those written evaluations?
2  A. They are.
3  Q. Tell me who has done the evaluations.
4  A. Van Anderson, Bob Kelly, who is Robert
5 Kelly I referred to earlier, and Jeff Oberg.
6  Q. Mr. Kelly only did one evaluation I
7 imagine.
8  A. That is correct.
9  Q. The other individuals did multiple?
10  A. Correct.
11  Q. When were the evaluations done during the
12 year, if they were done at the same time.
13  A. Usually spring, summer.
14  Q. Does that mean May through August?
15  A. I may have had one or two that were in
16 September. Again I would have to pull my file. They
17 have the specific dates on them.
18  Q. Summarizing those evaluations, how have you
19 fared on the evaluations?
20  A. Very well.
21  Q. Are they done numerically, one through five
22 with different categories one through 10?
23  A. No. They are letters. As an academic
24 professional we receive letters.

Page 23

1  Q. And I don't know that I can repeat from
2 memory what those are, so maybe you can tell me on
3 the evaluations.
4  A. Tell you what an active professional is?
5  Q. What the letter grading system was.
6  A. There is no letter grading system. It's --
7 you can receive, have words such as excellent and
8 very good.
9  Q. So there's descriptive terminology?
10  A. Correct.
11  Q. And there are, I take it, various types of
12 descriptive terminology for different portions of the
13 work; in other words, I don't even want to begin to
14 guess, but there's more than one category where you
15 can be graded on the evaluations?
16  A. It's not categorized, it's a summarization
17 and pretty much start off with what they think of
18 your work for the past year and then you list out
19 your accomplishments for that year.
20  Q. And you've always received excellent
21 ratings?
22  A. Very good, excellent.
23  Q. At any point in time were you offered the
24 job of director of printing services?

Page 24

1  A. I was offered to function as the interim
2 director of printing services.
3  Q. When was that?
4  A. I would say toward the end of 2002.
5  Q. Again --
6  A. And that's -- again that's my best
7 recollection.
8  Q. And I'm going to ask you if your memory
9 will allow you to specify whether it was October,
10 November, December of that year, if you know.
11  A. It would have been after Jeff was released
12 from his responsibilities.
13  Q. So do you know the month?
14  A. What month was he relieved of his duties?
15 I believe --
16  Q. I don't know what you mean by released from
17 his responsibilities. Do you mean the notification
18 of nonrenewal, do you mean when he was told to
19 physically remove himself from the University? What
20 did you mean by that?
21  A. Where he was asked to no longer go and do
22 his day-to-day responsibilities at printing services.
23 I believe it was December.
24  Q. Of '02?

Page 25

1  A. But that's a question.
2  Q. Actually I don't know myself. But I'm
3 asking what your memory is when you were -- the offer
4 was made to you. Maybe you don't remember the month
5 at all or maybe you are going to give me direction on
6 what month it would have been at the end of 2002 that
7 you were offered the position.
8  A. I was offered the interim position after
9 Jeff was relieved of his duties, defined as going to
10 work at printing services on a day-to-day basis. The
11 reason why, and I will be very candid with you, the
12 reason why that's not in my -- I'm not keeping it in
13 the forefront because it wasn't significant to me
14 because I immediately declined because I was never
15 interested in that role.
16  Q. And the best you can do on time was it was
17 late 2002?
18  A. Correct.
19  Q. Now, who was this offer made by?
20  A. Van Anderson.
21  Q. And where did -- was it an oral
22 conversation?
23  A. Yes.
24  Q. Where did he make that offer?

Page 26

1    A. Where meaning?
2    Q. Was it in his office, was it on campus, was
3 it in Chicago?
4    A. Well, it was on campus and more than likely
5 it was in his office given that that's typically
6 where he and I met and had our one-on-one sessions.
7    Q. So it was a one-on-one conversation?
8    A. Yes.
9    Q. There wasn't anybody else present?
10    A. Correct.
11    Q. What do you recall the conversation being
12 in terms of what he said to you and what you said to
13 him?
14    A. I'm sorry?
15    (Whereupon the requested portion of the
16 record was read by the reporter.)
17    A. Asking me would I step in and be the
18 interim director of printing services and my response
19 was no thank you, not interested.
20    Q. Was that the extent of the conversation?
21    A. From what I can recall.
22    Q. So nothing else was said?
23    A. I'm not sure what you're asking.
24    Q. I'm asking if anything else was said.

Page 27

1    A. I don't recall.
2    Q. So the conversation must have taken 30
3 seconds or less?
4    A. Well, we also -- it was my normal
5 one-on-one, so we were discussing whatever issues
6 that I had or he had at the time.
7    Q. I thought I asked you to tell me that, but
8 I guess I'll rephrase it.  So there was other
9 discussion in the conversation?
10    A. The purpose of my meeting with him was to
11 address my typical issues or whatever issues I had at
12 that time or that he had, in the course of that
13 meeting, because there was not a separate meeting for
14 him to have this offer extended.  Now what those
15 other issues were I can't speak to those.
16    Q. So how long did the conversation in total
17 last then?
18    A. I can't answer that.
19    Q. Was it 10 minutes?
20    A. All I can say is that typically my meetings
21 ran from an hour to an hour and a half with him.
22    Q. And do you have any inclination that this
23 particular meeting was less or more than that time?
24    A. I don't recall.

Page 28

1    Q. Were notes kept at those meetings?
2    A. Action items.  I would say what my action
3 items were, Van took notes.
4    Q. And did he, other than on this occasion,
5 offer you the job of director of printing services?
6    A. I don't believe so.
7    Q. You're not sure on that or --
8    MR. WAGNER: I'm sorry, could you repeat
9 that last question, please?
10    (Whereupon the requested portion of the
11 record was read by the reporter.)
12    Q. Are you clear on that?
13    A. My not sure comment comes from there is the
14 actual extending which occurred in that meeting and
15 there may have been, well, in a subsequent
16 conversation did you give it any more thought.  The
17 answer is still no.
18    Q. No, that wasn't my question.  My question
19 was did he offer you the job again after that
20 occasion.
21    A. Directly do you want to take the job, no.
22    Q. Are you saying he did it indirectly?
23    A. I'm saying that it is possible, again we
24 are talking four years ago, it is possible that he

Page 29

1 could have said have you thought about it any more.
2    Q. Other than -- go ahead.
3    A. There was no need for me to -- I had no
4 desire.
5    Q. Other than Mr. Anderson did anyone else
6 offer you the position of director of printing
7 services at any point in time from the University of
8 Illinois?
9    A. No.
10    Q. Did you in fact perform the job of Director
11 of Printing Services at any point in time?
12    A. No.
13    Q. Did you occupy the office of the Director
14 of Printing Services at any point in time?
15    A. What does that mean?
16    Q. Was there an office designated for the
17 director of printing services?
18    A. Yes.
19    Q. Where was that?
20    A. There are two buildings at printing
21 services.  Jeff's office was the director's office
22 and his office was in that second building upstairs
23 by the --
24    Q. Did you ever occupy that office in terms of

Page 30

1 use?

2    A. I couldn't.

3    Q. Why not?

4    A. Allergic allergies.

5    Q. And that was an allergy to printing

6 material if I recall.

7    A. The odor, yes, the scent, as well as they

8 had at the time photographic chemicals, but that area

9 didn't affect me as much -- sometimes it would affect

10 me, but not as severely as the printing chemicals.

11 So I've been in that second building when I toured

12 during the interview and maybe one or two other times

13 at most. So I could not physically run the lay of

14 that building.

15    Q. Do you still have the allergy?

16    A. Uh-huh.

17    Q. Has it ever been identified for you? I

18 mean you said you were allergic to those items. Does

19 the allergy include other chemical items?

20    A. Other scents, yes.

21    Q. And you've had that since a child?

22    A. I've become more sensitive as I've become

23 an adult.

24    Q. Remind me how old you were in December of

Page 31

1 2002.

2    A. I would have been 30 -- this is '06, right?

3 Probably 35, 36.

4    Q. So you were 35 or 36? I thought you were

5 35.

6    A. When? Now?

7    Q. In December of 2002. But I never trust

8 myself on math.

9    A. Well, I can do the math, I just...

10    Q. I think you were 35 in December of '02 and

11 you had been working for the University of Illinois

12 for 14 months; is that correct?

13    A. I started October '01.

14    Q. So December of '02 is about 14 months. Am

15 I correct?

16    A. Approximately, uh-huh.

17    Q. You were 35 years old, correct?

18    A. I'm sorry, is that a question?

19    Q. Yes.

20    A. Yes.

21    Q. And you were an African-American female and

22 are?

23    A. I was going to say I still am.

24    Q. Had you ever had any experience at that

Page 32

1 point in time with printing operations?

2    A. Experience in terms of?

3    Q. Performing a job involving printing

4 operations.

5    A. The actual printing function?

6    Q. Yes.

7    A. No.

8    Q. Like printing services unit does at the

9 University of Illinois.

10    MR. WAGNER: Prayer to what date?

11    Q. December of 2002.

12    A. Performing printing operations as a

13 printing operator, no.

14    Q. Or overseeing such operations.

15    A. From a printing operations standpoint, no.

16    Q. What had you done in the year 2002 relating

17 to printing services?

18    A. I was the director of financial affairs.

19    Q. So did you involve yourself in the

20 day-to-day operations of the unit in terms of its

21 function as to letting jobs or performing jobs?

22    A. No.

23    Q. Your association with printing services at

24 that point in time was purely financial, is that a

Page 33

1 correct statement?

2    A. Financial and meeting with the at that time

3 the respective supervisors, discussing their -- their

4 areas from a financial perspective.

5    Q. Of printing services?

6    A. Of printing services.

7    Q. Where was your office located in the year

8 2002?

9    A. My office was located in the front building

10 on the first floor.

11    Q. And I'm not familiar when you said the

12 front building.

13    A. If you recall earlier I said there were two

14 buildings.

15    Q. Of printing services?

16    A. Of printing services. Jeff's office was in

17 the second building upstairs, which would be the

18 director's office because he was the director, and my

19 office was in the front building on the first floor.

20    Q. And the front building was not where the

21 printing function was performed as I understand it.

22    A. Correct. The front building primarily was

23 a suite of offices, as well as photographic services

24 had a lab.

Page 34

1    Q. Did the photography chemicals also affect
2  your allergy?
3    A. As I stated earlier they did from time to
4  time. Not significantly. There would be times I
5  would come out of my office, walk toward the front
6  door because the lab was -- is -- was located near
7  the front door and depending on the job that they
8  did, the volume or how the -- the overhead fans,
9  fumes, not fumes, but the vacuum intake, out-take
10  air, depending on how that flowed, that could affect.
11    Q. So from October of 2001 to December of 2002
12  was your office in that front building that you've
13  described?
14    A. Yes.
15    Q. Now, after Mr. Bant left did you perform
16  functions with printing services other than the
17  financial ones you have already described?
18    A. No.
19    Q. Didn't hire or fire people, for instance?
20    A. Hire or fire?
21    Q. People in printing services.
22    A. Was I part of discussion -- no, I did not
23  hire or fire where I said you are fired.
24    Q. You were part of the discussion, however?

Page 35

1    A. I was part of discussions as it related to
2  the budget.
3    Q. Was there some person designated as
4  director after 2002 in printing services?
5    A. If you recall, I mentioned that Stores,
6  Mailing, Receiving and printing was the first merger.
7  Bob Kelly had that responsibility of that merger.
8    Q. And did he have that responsibility from
9  December 2002 on until he stopped having the
10  responsibility?
11    A. I don't recall the exact time frame.
12    Q. How long was he having that responsibility
13  as you say?
14    A. The exact time frame I can't recall.
15  However, it ended July '03 when Facilities and
16  Services came into being.
17    Q. Was your title ever consolidated to include
18  deputy director of printing services?
19    A. Of printing services?  No.
20    Q. That never appeared on your letterhead
21  then?
22    A. To be deputy director of printing services?
23    Q. Yes.
24    A. Deputy director of printing services, no.

Page 36

1    Q. Assistant director of printing services?
2    A. No.
3    Q. Was there any reference to a director of
4  printing services ever on your letterhead?
5    A. No.
6    Q. You've indicated that you were involved
7  with financial aspects of printing services once you
8  became an employee of the University of Illinois.
9  I'm going to hand you a document we're going to mark
10  Chambers Exhibit No. 1, which will consist of five
11  pages if I'm counting correctly.
12      (Whereupon Exhibit No. 1 was marked for
13  identification.)
14    Q. Now looking at Chambers Exhibit No. 1, do
15  you recognize that document?  Take a moment to glance
16  through it if you would.  Sent to Mr. Anderson and
17  copied to you; is that correct?
18      MR. WAGNER: Which pages are you referring
19  to?
20      MR. WILLIAMSON: I think every page was
21  included in the e-mail as an attachment.
22    A. I am copied.
23    Q. Yes.  And did you receive that in the
24  normal course of business as an employee of the

Page 37

1  University of Illinois at or about the time that's
2  indicated it was sent?
3    A. I would say yes.
4    Q. Do you know what the substance of the
5  document is by looking at it?
6    A. It appears to be a response to Van
7  regarding the deficit.
8    Q. And it doesn't reference numbers, does it?
9  It references activities and ideas?
10    A. There are numbers referenced.
11    Q. Does it reference deficit numbers or
12  numbers that would be saved by cost-saving
13  mechanisms?
14    A. It appears that there are not deficit
15  numbers referenced. Ah, I recant that statement,
16  first paragraph, last sentence.
17    Q. Says what?
18    A. These moneys were not included in our
19  deficit figure of $485,000.
20    Q. So Mr. Bant is identifying the deficit
21  figure at that time as $485,000; is that correct?
22    A. He's referencing the UFAS statement deficit
23  that's $485,000.
24    Q. And what do you determine that to mean?

## Page 38

1    A. That's a report that comes off of -- at the
2 time at the University UFAS was the record of the
3 enterprise wide financial system for all of the
4 transactions at the University.
5    Q. So the acronym was what again?
6    A. UFAS, U F A S.
7    Q. Meaning?
8    A. I don't recall. I don't recall.
9    Q. Standardized -- well, that's all right.
10    In any event, he's referencing by acronym a
11 way of identifying a budget amount?
12    A. Well, that acronym is not listed here, it
13 says deficit, but that is a report that's generated
14 through the system that shows what the deficit amount
15 is.
16    Q. The acronym is for the reference to the
17 report then?
18    A. The acronym is reference to the financial
19 system that is used to track or was used at that time
20 to track debits, credits, revenue, expenses.
21    Q. Was that a uniform system throughout the
22 University?
23    A. Yes.
24    Q. So it was a system both -- I mean a

## Page 39

1 reference that both you and presumably Mr. Anderson
2 would understand?
3    A. Yes.
4    Q. But as you say actually Mr. Bant did not
5 use that euphemism -- I mean the acronym when he
6 referenced the $485,000 figure.
7    A. UFAS is not located or mentioned here.
8    Q. Why do you say that it's UFAS?
9    A. I was the financial director and the UFAS
10 number did not include outstanding liabilities.
11    Q. Again, was that uniform throughout the
12 University?
13    A. What being uniform?
14    Q. If we were to look at the UFAS figure at
15 any point in time from another unit in the University
16 would they not included outstanding liabilities?
17    A. I can't answer that.
18    Q. So it's just printing and service --
19 printing services with respect to that figure at that
20 point in time?
21    A. What is just respect to that?
22    Q. The $485,000, not including outstanding
23 balances.
24    A. I would have to -- there were two -- at

## Page 40

1 that time printing services had two P and Ls, if you
2 would, one was for printing services only and then
3 the other was for photographic services. I do not
4 recall if this $485,000 was for the two rolled
5 together or separate. I would have to imagine since
6 we're typically reporting at the aggregate, I would
7 have to look at the numbers, my assumption would be
8 that that represents both together.
9    Q. And you can also make the assumption that
10 Mr. Anderson had requested of Mr. Bant mechanisms and
11 a protocol, if you will, to reduce the deficit prior
12 to this date. Is that correct?
13    A. Restate the question, please.
14    (Whereupon the requested portion of the
15 record was read by the reporter.)
16    A. One more time, please.
17    (Whereupon the requested portion of the
18 record was read by the reporter.)
19    A. So are you asking did Van Anderson ask Jeff
20 for ways to reduce the deficit prior to the date of
21 this e-mail?
22    Q. Yes.
23    A. I don't know that for sure, but I think
24 that might be a reasonable assumption given the

## Page 41

1 e-mail.
2    Q. Had you and Mr. Anderson had your own
3 discussions prior to that date that the deficit
4 should be reduced in printing services?
5    A. I would have to say yes.
6    Q. And did you make a recommendation to
7 Mr. Anderson that the deficit be reduced?
8    A. Did I make a recommendation?
9    Q. As financial officer, not a word of art.
10    A. There was not a need for me to make a
11 recommendation for it to be reduced.
12    Q. That means you didn't feel it needed to be
13 reduced?
14    A. No, it means that Van had already
15 established that as a requirement.
16    Q. So you didn't make such a recommendation to
17 Mr. Anderson?
18    A. Made the recommendation that the deficit be
19 reduced?
20    Q. Yes.
21    A. Well, I want to be clear on your question
22 in terms of did I provide recommendations for the
23 deficit to be reduced or --
24    Q. Yes.

Page 42

1   A. -- or did I recommend that it be reduced?
2   Q. Did you provide recommendations that that
3 particular deficit be reduced prior to the e-mail
4 that's identified as Chambers Exhibit No. 1.
5   A. Well, what occurred was I had the
6 responsibility to identify all financial
7 responsibility for printing services. And a document
8 was prepared that showed what that would have
9 resulted in in terms of dollar amount and it was a
10 collaborative effort in working with the other
11 supervisors at printing of what we needed to do by
12 area to reduce the deficit and that was provided to
13 Van Anderson.
14   Q. But --
15   A. Which Jeff made --
16   Q. My question I guess for the third time is
17 did you prior to that exhibit make a recommendation
18 to Mr. Anderson that the deficit in printing services
19 be reduced?
20   A. And again my response and answer is that
21 Van Anderson already had that established as a goal.
22   Q. I --
23     MR. WAGNER: I think that --
24     MR. WILLIAMSON: Do you want to chat with

Page 43

1 her?
2     MR. WAGNER: No, I understand where there
3 is some confusion I think in each of your minds.
4     MR. WILLIAMSON: No confusion on my part,
5 she is not answering the question.
6     MR. WAGNER: I think she has. In the sense
7 that if no one had been discussing the deficit and
8 Sonya was the first one to make the recommendation
9 she thinks that's your question and I think that's
10 your question too. If you're saying that did she
11 make some recommendations on how -- on how the
12 deficit could be reduced she's giving you that answer
13 and she has made recommendations on how it can be
14 reduced. But at some point it seems to me that your
15 question was did she make a recommendation that the
16 deficit be reduced at a time when nobody was
17 recommending it.
18     MR. WILLIAMSON: You are reading so much
19 more into what I -- the simple question I asked her,
20 I am entitled to get an answer and I don't want to do
21 it in a court proceeding, I really don't.
22     MR. WAGNER: We're not -- we're not trying
23 not to give you the answer. I mean I'm understanding
24 your question the same way Sonya is and so, you know,

Page 44

1 explain to me how my understanding is wrong.
2     MR. WILLIAMSON: It's a material issue of
3 the case. I have asked her if she ever made a
4 recommendation to Mr. Anderson in 2002 or after she
5 became a UI employee I should say, from the time she
6 became a UI employee as to whether the deficit in
7 printing services should be reduced.
8     Now if she would give me an answer to the
9 question I have several more questions after that,
10 when, why and how. And she hasn't answered the
11 question so I can't ask her the when, why and how.
12     MR. WAGNER: Okay. So --
13     MR. WILLIAMSON: Why don't we try one more
14 time, maybe some gestalt will happen and we can get
15 to where we can be.
16     MR. WAGNER: In all honesty I am
17 understanding the question the same way Sonya is.
18     MR. WILLIAMSON: Tell me your understanding
19 and I will tell you why it's not correctly being
20 understood. I want to know if she ever made a
21 recommendation up until December of 2002 that the
22 budget deficit in printing services be reduced to
23 Mr. Anderson.
24     MR. WAGNER: And that would include either

Page 45

1 in my mind or in your mind a recommendation even
2 though someone had already established that the
3 deficit is going to be reduced.
4     MR. WILLIAMSON: Of course, she can give
5 whatever answer she wants to, she's the witness.
6     MR. WAGNER: Just do the best you can. Did
7 you ever have any input or did you ever give any
8 input to Van as far as deficit reduction? We'll take
9 it from there.
10   A. That's a different question.
11     MR. WAGNER: I know. Just let him --
12     MR. WILLIAMSON: We'll try that one, it
13 will be a better way to approach it.
14   A. I believe I have answered that by stating
15 that there was a document that was prepared where --
16 and Jeff was a part of that, his name is on that
17 document, where we collaboratively responded to Van's
18 request of how we're going to reduce the deficit.
19   Q. I understand that, I know that. Forget
20 that document when you answer the question. I want
21 to know if at any other point in time by writing or
22 in an oral manner you made a recommendation to
23 Mr. Anderson the budget be reduced.
24   A. That document is my response.

Page 46

1  Q. That's your -- that was the only time then
2  that you made such a recommendation collaboratively
3  or otherwise?
4  A. When you say only time --
5  Q. Only time, yeah. One time, was that the
6  only one time?
7  A. I'm not understanding.
8  Q. You do have an MBA and I think you can
9  probably understand when I'm asking you things.
10  MR. WAGNER: I'm interpreting his questions
11  I think the same way you are. Why don't you tell
12  him, was the deficit reduction idea discussed between
13  you and Van prior to doing this report? And just
14  tell him as much as you can about any discussions
15  involving the deficit and its reduction. Was it a
16  point when you first started in October '01? And as
17  far as overhearing conversations, she's not refusing
18  to answer the question. I understand your question
19  the same way she does.
20  Just tell him the first time you are aware
21  of any conversations involving the deficit that
22  involved you and Van even though other people might
23  not have been there.
24  MR. WILLIAMSON: My word was

Page 47

1  recommendation. She has identified the report ad
2  nauseam at this point and I understand the report,
3  collaborative effort, et cetera, that's way past the
4  radar screen at this point.
5  I want to know if she personally made any
6  other recommendation at any point in time other than
7  that report to Mr. Anderson that this deficit be
8  reduced. After all, she is the financial person
9  involved with this unit.
10  MR. WAGNER: But it's impossible to answer
11  if someone has already established --
12  MR. WILLIAMSON: No, it isn't.
13  MR. WAGNER: Let me finish in order to help
14  the situation here. If she shows up on the scene and
15  everybody is talking about a deficit and how to
16  reduce it, how does anybody need to make the
17  recommendation when they are working to reduce it?
18  MR. WILLIAMSON: We'll get to that, the
19  judge will get to that. I am entitled to ask factual
20  questions from this witness that are material issues
21  in the case.
22  MR. WAGNER: To help him out tell him what
23  occurred as far as the deficit and he can go on from
24  there and reask the same question or understand what

Page 48

1  you're trying to tell him.
2  A. My position was created because of the
3  financial state of printing services, as well as the
4  need to have direct support for the other financial
5  side of the house.
6  Q. I don't know that that was an answer to any
7  question that's pending, but is there anything else
8  you wanted to add to that?
9  A. I'm following Ed's direction which was to
10  provide background regarding the financials. And the
11  reason the role was created was because the operation
12  was not running efficiently from a financial
13  perspective.
14  Q. And I assume then that you were also
15  responsible for making recommendations as to what
16  needed to be done to reduce the deficit since that
17  was the purpose for creating your position.
18  A. As stated before, that information was
19  provided after a comprehensive review and it was
20  submitted via the report that I referenced, which is
21  the deficit reduction plan.
22  Q. And is that the only time you made that
23  recommendation either in collaboration with other
24  people or by yourself?

Page 49

1  A. That was the report that was submitted that
2  summarized the recommendations.
3  Q. I know that. Please answer my question.
4  MR. WAGNER: I think she just did.
5  Q. Is that the only time, ma'am, that you made
6  a recommendation with respect to the deficit other
7  than the report? I mean including that report. Was
8  that the only time?
9  A. The report was submitted and the report was
10  reviewed.
11  MR. WAGNER: Did you make any
12  recommendations as far as reducing the budget prior
13  to the report being submitted?
14  A. Does that include in the process of
15  developing the report because --
16  MR. WAGNER: Sure. Sure. Don't worry
17  about what he's saying, go ahead and answer right
18  now. Don't wait for him.
19  A. I honestly don't -- I'm not understanding
20  his question because I believe I answered the
21  question.
22  MR. WAGNER: I understand it the same way
23  you understand it. Prior to the actual report being
24  finalized and submitted were there any other

Page 50

1  discussions before that in connection with doing the
2  report or otherwise where the deficit reduction was
3  discussed?
4      A. Yes. Van and I discussed the deficit
5  reduction as well as I have discussed the deficit
6  issues with the other supervisors. It was a known
7  weight present in the organization.
8      MR. WAGNER: Okay.
9      A. And still is today.
10     MR. WAGNER: Okay. That's all. Let him
11 ask the next question.
12     MR. WILLIAMSON: This will be 2.
13     (Whereupon Exhibit No. 2 was marked for
14 identification.)
15     Q. Do you recognize Chambers Exhibit No. 2?
16     A. Okay.
17     Q. Did you receive a copy of that particular
18 e-mail?
19     A. It says I was cc'd.
20     Q. Pardon me?
21     A. It says that I was copied on it.
22     Q. Yes. Other than that you don't know? You
23 don't recall seeing it, for instance?
24     A. I would imagine that I have -- I received

Page 51

1  it and that I saw it four years ago.
2      Q. There are two different figures being used
3  within a short period of time between Exhibits 1 and
4  2 as to the amount of the deficit, would you agree?
5      A. Yes.
6      Q. Mr. Bant is referring to $485,000 and
7  Mr. Anderson is referring to $845,808, is he not?
8      A. He is.
9      Q. Do you know why there is two different
10 figures being used?
11     A. I do.
12     Q. Why is that?
13     A. That represents a true cash deficit.
14     Q. What represents a true cash deficit?
15     A. The $846,000 rounded.
16     Q. Who determined that figure?
17     A. I did collaboratively.
18     Q. With who?
19     A. With members of the printing services
20 staff.
21     Q. What did that figure represent?
22     A. Do you have the report?
23     MR. WAGNER: I don't. And if you need the
24 report to say so, just tell him and tell him you

Page 52

1  don't know, but do the best you can.
2      A. I would need the report to provide you the
3  details.
4      Q. And I'm not asking you the details, I'm
5  saying what did that figure represent? You can give
6  me a summary statement as a financial person as to
7  what the figure represents.
8      A. It represents the cash -- it represents all
9  of the payments, the net of what was expected for
10 printing services to receive as revenue and the
11 expenses that printing services should pay.
12     Q. And if I understand the e-mail correctly,
13 Mr. Bant is given a period of time of 36 months to
14 ensure that the deficit will be retired; is that
15 correct?
16     A. Yes.
17     Q. Does retired mean made zero?
18     A. That's my understanding.
19     Q. Did you know that the debt as of March
20 31st, 2005, in printing services was $950,000?
21     A. No, I did not.
22     Q. Please take that as a correct assumption.
23 Did any heads roll on March 31st, 2005, in the
24 Department of Printing Services because the debt was

Page 53

1  $950,000?
2      MR. WAGNER: Objection as to form. Please
3  answer if you can.
4      Q. If you know.
5      A. Not to my knowledge.
6      Q. Was Mr. Meachum terminated on that date
7  because the deficit was $950,000 as of March 31st of
8  2005?
9      A. I cannot answer that.
10     Q. Because you weren't involved in that
11 personnel decision?
12     A. Correct.
13     Q. Were you involved in the personnel decision
14 to terminate Mr. Bant?
15     A. No, I was not.
16     Q. Mr. Anderson made that decision
17 exclusively?
18     MR. WAGNER: Objection as to form. Go
19 ahead.
20     Q. If you know.
21     A. I do not know.
22     Q. Did he tell you?
23     A. Tell me what?
24     Q. That he made that decision?

Page 54

1    A. Van told me that Jeff was relieved of his
2  duties.
3    Q. When did he tell you that?
4    A. Again, as I stated earlier, I don't recall
5  the exact date.
6    Q. Didn't ask you for the exact date, as I
7  stated earlier. I'd like to know the year, for
8  instance.
9    A. My best guess is the end of 2002.
10   Q. And did he tell you why?
11   A. Did he tell me why? I can't answer that
12 either.
13   Q. You don't remember?
14   A. The why?
15   Q. You don't remember?
16   A. Do I remember the exact -- do I recall Van
17 Anderson telling me why he relieved Jeff of his
18 duties?
19   Q. Yes.
20   A. The specific reasons, no, I do not.
21   Q. Not even specific reasons, do you recall
22 any reference that Mr. Anderson made as to why he
23 terminated Mr. Bant?
24   A. Management capability.

Page 55

1    Q. That's what he said to you?
2    A. No, that is not -- again I stated that I do
3  not recall exactly what he said to me.
4    Q. So you're paraphrasing?
5    A. You asked me to think about what the
6  reasons would have been and that's my summation
7  because as I stated I do not recall if Van -- what
8  Van said to me specifically regarding why he let Jeff
9  go. Quite frankly that wasn't my concern.
10   Q. Are you aware of any reason Mr. Bant was
11 let go other than the budget deficit?
12     MR. WAGNER: Objection as to form. Please
13 answer.
14   A. I would stick with my assumption being,
15 again, the management overall of the operation.
16   Q. So there were more things involved other
17 than the budget deficit?
18   A. Again, I would summarize it as management
19 of the overall operation.
20   Q. Did you make any observations yourself as
21 to Mr. Bant's management qualities as director of
22 printing services?
23   A. I have my personal perspective.
24   Q. What was that?

Page 56

1    A. That Jeff knew printing, he was in the
2  industry for years, however when it came to running
3  the business from a business principle, making sure
4  it's running at a profit, there was a gap.
5    Q. What do you mean by there was a gap?
6    A. We were not -- printing services was not
7  recovering its cost, hence the deficit, whether it
8  was the $846,000 rounded cash deficit or if it was
9  the accrual deficit of $485,000 rounded.
10   Q. Did you ever have any discussions with
11 Mr. Anderson or any other University of Illinois
12 employee that the Department of Printing Services
13 should be eliminated at any point in time?
14   A. There were discussions as to the viability
15 of printing services.
16   Q. When did those occur?
17   A. They were during -- well, actually they
18 occurred during this period of time of looking at the
19 deficit, they occurred I would say during the time of
20 evaluating how we're going to come out of the
21 deficit, how printing services is going to come out
22 of the deficit.
23   Q. And did you make any recommendations in
24 that regard?

Page 57

1    A. Whether to close printing or not?
2    Q. Yes.
3    A. No.
4    Q. So you just listened?
5    A. I did not make a recommendation for
6  printing to be closed.
7      (Whereupon Exhibit No. 3 was marked for
8  identification.)
9    Q. Handing you what's been marked Chambers
10 Exhibit No. 3. Do you recognize that document?
11   A. Yes.
12   Q. What is that?
13   A. It's a note from Van to Jeff and me.
14   Q. And what is the substance of the e-mail?
15   A. Van communicating that there is a shorter
16 time frame to eliminate the deficit.
17   Q. It's moved from 36 months to 18 months in
18 one fell swoop; is that correct?
19     MR. WAGNER: Objection as to form. Please
20 answer if you can.
21   A. That's what it appears to, yes.
22   Q. Nine days after the exhibit which was
23 marked as Exhibit No. 2; is that correct? I have my
24 math wrong again. 31 days in January.

Page 58

1    A. Well, it's 12 days roughly.
2    Q. 12 days. Is that correct?
3    A. Yes.
4    Q. Did you have any input into that decision
5    to lower the time frame in which the deficit was to
6    be eliminated from 36 months to 18 months?
7    A. No.
8    Q. And your first knowledge of it I take it
9    was the exhibit itself as you are looking at Exhibit
10   No. 3?
11   A. I can't answer that.
12   Q. You don't remember?
13   A. Okay. I don't recall.
14   Q. Would you look at Exhibit No. 2 again? Do
15   you see in the middle of the page that Mr. Anderson's
16   indicated that Mr. Bant is to have a discussion with
17   him on Wednesday, January 30th at 9:00 AM?
18   A. Yes.
19   Q. Did you participate in that particular
20   meeting?
21   A. I don't recall.
22   Q. You don't know one way or the other?
23   A. Again, that's...
24   Q. Is that a meeting where notes would be

Page 59

1    taken?
2        MR. WAGNER: Objection to the form,
3    speculation. Answer if you can.
4    A. Van typically took notes in his meetings.
5    Q. And I guess counsel's right, it is
6    speculation. What I meant was if you had been there
7    would you have taken notes in your normal practice.
8    A. If there were action items for me to act on
9    I would have.
10   Q. So you don't know if this meeting took
11   place and you don't know if you attended, is that a
12   fair statement?
13   A. At this moment sitting in this room,
14   without being able to review notes, review files,
15   correct.
16   Q. One other item I wanted to ask you about in
17   Exhibit 2, Mr. Anderson goes so far as to do the math
18   for Mr. Bant, doesn't he? He tells him that that
19   means that in 36 months he needs to reduce operating
20   costs and increase monthly revenues approximately
21   $23,500 monthly; is that correct?
22   A. That is what's written there.
23   Q. Do you know why he did that?
24   A. I do not.

Page 60

1    Q. You didn't participate in that decision
2    then either?
3    A. No.
4    Q. Do you know any reason why people operating
5    at this level of academia would need to tell another
6    what amount of money that would take when he is
7    identifying the deficit and the time?
8        MR. WAGNER: Objection as to form.
9    Q. And you may or may not. I'm just curious.
10       MR. WAGNER: Same objection as to form.
11   Answer if you can.
12   A. Perhaps stating it in a different way.
13   Q. Did you feel that was sarcasm on the part
14   of Mr. Anderson?
15       MR. WAGNER: Objection as to form,
16   speculation. Answer if you can.
17   A. No.
18   Q. Do you think he really thought he needed to
19   tell Mr. Bant how much that would mean monthly that
20   the 36 months for $845,000 meant?
21   A. I don't know what Van thought.
22   Q. And he never discussed that with you
23   either?
24   A. Discuss what with me?

Page 61

1    Q. The reference to the $23,500 a month.
2    A. I do not believe so. However, it is not
3    uncommon in financial reports and documents to take
4    an aggregate number and to make it into a monthly
5    number.
6    Q. Did you find it unusual for Mr. Anderson to
7    be discussing the deficit of this particular unit
8    with Mr. Bant at the time that he did it?
9    A. At the time he did what?
10   Q. Had the discussion with him.
11       MR. WAGNER: Now are you talking about this
12   January 24, Exhibit No. 2?
13   Q. Yes, the exhibits we have been looking at.
14   Talking about the time frame he's having the
15   discussion, did you find that to be unusual?
16   A. I'm not clear on the question.
17   Q. Well, in your experience had that ever been
18   done in January before, a discussion of deficits?
19   A. Well, that was my first January there
20   because I started October 1, so I --
21   Q. Now you have five years. Has it been done
22   since in January?
23       MR. WAGNER: Answer if you can.
24   A. Each month there are financial numbers

Page 62

1 presented, reports are generated and each month you
2 know from a reporting standpoint, accrual, where you
3 are as a unit. So it is not uncommon in any month
4 for a person to review and discuss the financials.
5    Q. That's done on a monthly basis then?
6    A. It depends on the unit. The reports are
7 available on a monthly basis. Now the depth of
8 discussion that occurs, I can't speak to that.
9    Q. Did Mr. Bant ever indicate to you anything
10 else about -- I say did Mr. Anderson ever indicate to
11 you anything else about Mr. Bant's performance other
12 than what we have discussed so far?
13    A. Outside of the general management of the
14 business?
15    Q. Other than what we've discussed so far.
16    A. Outside of the management of the business,
17 no.
18    Q. I asked you earlier if you ever used the
19 word deputy director on your letterhead. Did you
20 ever use that reference in e-mails that you would
21 send?
22    A. You asked me if I was a deputy director of
23 printing services ever.
24    Q. No, what I'm asking you now is did you ever

Page 63

1 use the reference deputy director of printing
2 services on e-mails you sent at any point in time
3 while you have been employed at the University of
4 Illinois?
5    A. Deputy director of printing services, no.
6    Q. What was that answer?
7       (Whereupon the requested portion of the
8 record was read by the reporter.)
9    Q. Did you ever use any reference on your own
10 e-mails to associate director, assistant director,
11 acting director, interim director or deputy director
12 when you would send e-mails as a University of
13 Illinois employee?
14       MR. WAGNER: Of printing services?
15       MR. WILLIAMSON: I didn't ask that at this
16 point.
17    A. I was a brief moment deputy director with
18 the merger with printing and Stores, Mailing and
19 Receiving.
20    Q. Deputy director of what?
21    A. That I don't recall. I believe -- I don't
22 recall the formal name that the merger -- and the
23 merger of Stores, Mailing and Receiving and printing
24 was so short. When I say short, it was a very fluent

Page 64

1 process.
2    Q. But was it deputy director then of printing
3 services?
4    A. I'm pretty confident that it was not.
5    Q. Deputy director of what then?
6    A. Again, I do not recall the official term of
7 Stores, Mailing and Receiving with the merger of
8 printing. And quite -- if I recall correctly, the
9 Stores, Mailing and Receiving merger was a function
10 of Bob Kelly having the responsibility as the
11 interim, if you will, of printing, he was already the
12 director of Stores, Mailing and Receiving. I
13 functioned continuously from a financial standpoint.
14       And so that -- we still have a consistency,
15 my title from an HR perspective remained director of
16 financial affairs until the title in HR was changed
17 to director of procurement services.
18    Q. So did you ever hire staff for printing
19 services?
20    A. My pause is because I am thinking and
21 trying to recollect if I hired anyone to what was
22 called the fast team, just my direct reports as a
23 director of financial affairs.
24    Q. After having taken the pause what is your

Page 65

1 answer?
2    A. I'm still pondering because I want to give
3 you an honest answer. And I believe -- I don't
4 believe I did any extra help hire for my team at that
5 time.
6    Q. I didn't ask you at that time, I said did
7 you ever.
8    A. But you are asking for printing services,
9 correct?
10    Q. Yes.
11    A. And at that time that was the role that I
12 functioned as.
13    Q. Again, it's a simple question, I don't
14 think you are giving an answer. Did you ever hire
15 staff for printing services?
16    A. As a director of financial affairs and the
17 team of people that reported to me I do not believe
18 that I did. And I wanted to make sure that the extra
19 help hiring that I did, it was not in that role.
20 That's what I'm processing.
21    Q. Did you ever prepare or approve budgets for
22 printing services?
23    A. Submitted budgets, yes.
24    Q. How many years did you do that?

Page 66

1    A. For the period of time that I was the
2 director of financial affairs for printing services.
3    Q. Remind me when that was again.
4    A. October '01 through -- well, even with the
5 merger of printing and Stores, I was still submitting
6 the financial budget. I would have to say through
7 the '03, July '03 or June '03 because Facilities and
8 Services, my role changed July '03 to director of
9 procurement services.
10    Q. In that same time frame did you ever attend
11 meetings on behalf of printing services?
12    A. In what capacity?
13    Q. Ma'am, I don't know. You are the one doing
14 it so you can't ask me in what capacity. I asked if
15 you ever attended meetings for printing services.
16    A. The meetings I attended was in my capacity
17 as director of financial affairs.
18    Q. So you did attend meetings for printing
19 services?
20    A. As the director of financial affairs.
21    Q. You held meetings for printing services
22 staff obviously.
23    A. As the director of financial affairs.
24    Q. For what period of time did you do that

Page 67

1 again from October of 2001 through July of 2003?
2    A. July 2003 Facilities and Services was in
3 place and I was in a different capacity.
4    Q. So you were holding meetings for printing
5 services during that time frame?
6    A. There was a period of time where it was
7 just printing services, director of financial
8 affairs. There was a small period of time where I
9 reported to Bob Kelly who was over printing services
10 and Stores, Mailing and Receiving from a merger
11 standpoint.
12    Q. So your answer is what?
13    A. I believe I've answered the question.
14    Q. Again, I'm listening to your answer and I
15 don't discern that you answered the question.
16    MR. WAGNER: I thought she did, but answer
17 it again, let's just go ahead and answer it again.
18 The question was did you hold meetings for printing
19 services staff --
20    Q. Actually it was attend meetings. She
21 already answered the one about holding meetings.
22    MR. WAGNER: Okay. For sure she answered
23 that one, but let's answer it again. Did you attend
24 meetings for printing services as director of

Page 68

1 financial affairs?
2    A. As director of financial affairs, yes.
3    Q. (By Mr. Williamson)  you have people
4 reporting to you as their supervisor during that time
5 frame, October 2001 to July 2003?
6    A. The financial side of the house, yes.
7    Q. Did you have people in printing services
8 reporting to you?
9    A. No.
10    Q. And when you say the financial side, do you
11 mean people who are working for printing services
12 that were involved in finances?
13    A. Correct.
14    Q. Who would that be?
15    A. The positions or the people specifically?
16    Q. People's names.
17    A. Cheryl Cooley. Jenny -- I don't remember
18 Jenny's last name at the moment. Billy Reid.
19    Q. R E E D?
20    A. I believe it's an I in there.
21    Q. R E I D.
22    A. Pam Harper. And Georgetta Jones.
23    Q. These people all work for printing
24 services?

Page 69

1    A. Yes, on the financial --
2    Q. What about Duane Fitch, F I T C H?
3    A. He worked at printing services.
4    Q. Did he report to you?
5    A. No.
6    Q. Cathy Davis?
7    A. At printing services?
8    Q. Yes.
9    A. She did not report to me.
10    Q. Kelly Woodward?
11    A. At printing services, did not report to me.
12    Q. Dave McCall?
13    A. At printing services, did not report to me.
14    Q. Now, did any of those individuals report to
15 you at all for any reason? Did you supervise any of
16 those individuals?
17    A. Cathy Davis reported to me under Facilities
18 and Services, under procurement -- as a director of
19 procurement services.
20    Q. Anyone else of the people I asked about?
21    A. No. I stand corrected. Pam Harper came
22 over to my team after the Facilities and Services
23 merger occurred. Pam came first, Cathy came
24 subsequently.

**Page 70**

1    Q. When you started at Illinois in October of
2  2001, were you paid by a particular department, your
3  salary?
4    A. Van Anderson.
5    Q. A department or a unit, were you paid by a
6  particular department or unit?
7    A. Yes.
8    Q. Which one would that be?
9    A. A portion of my salary came from printing
10  on the printing budget and then a portion of my
11  salary came from Van's area.
12    Q. What area would that be?
13    A. Administrative services.
14    Q. Did that change at all after you became a U
15  of I employee?
16    MR. WAGNER: Her salary? I didn't
17  understand.
18    Q. The allocation of her salary.
19    A. I am in a different department now.
20    Q. Since the transition in July of 2003?
21    A. I don't know the actual time of the dates
22  of when the -- the ledgers changed because it was all
23  part of the merger process. So I can't give you the
24  definitive answer of when and in what ledgers it

**Page 71**

1  moved from and to and when because when I came to
2  Facilities and Services I didn't have that
3  responsibility. That was
4  another person's responsibility.
5    Q. What did it change to?
6    A. Well, now I'm part of my own department's
7  budget, procurement services.
8    Q. And are you saying you don't know if that
9  occurred in July of 2003, a month or two before, a
10  month or two after or that it occurred in a different
11  year?
12    A. A different year because there was a
13  period -- the merger that we went through was so
14  intricate in terms of the books, that's why the HR
15  titles took a while to change to represent the
16  working titles, that is also why the budget -- the
17  first year of my department I didn't manage that
18  budget directly, if you will. That's the best answer
19  I can give because there was a -- the departments
20  were being formed, the -- how the moneys were going
21  to flow were being formed and there was a separate
22  director of -- it -- his title was director of
23  financial affairs actually, it's associate director.
24    Q. But you do know that from October '01 to

**Page 72**

1  July of '03 a part of your salary was paid out of the
2  budget in printing services; is that correct?
3    A. I would agree with that statement.
4    Q. And what portion of your salary was paid
5  out of printing services in terms of percentage?
6    A. The actual percentage I do not recall. I
7  would -- but I would say the majority of it.
8    Q. 75 percent?
9    A. Again, I can't give the exact percentage.
10    Q. So it's more than 50 percent?
11    A. I would say that's fair.
12    Q. Would you look at Chambers Exhibit No. 1
13  again for me? On the front -- first page, the e-mail
14  itself, with your cc on it, after your name there's
15  the letter L. What does that designate?
16    A. My middle name.
17    Q. Which is?
18    A. Lanette.
19    Q. If you could spell that for her.
20    A. L A N E T T E.
21    Q. So that's the only time I have ever seen
22  that and you're normally not designated by a middle
23  initial.
24    A. Correct.

**Page 73**

1    Q. That's not a code for anything else?
2    A. No.
3    MR. WILLIAMSON: I don't have anything else
4  right now.
5    MR. WAGNER: We'll reserve signature.
6    (Concluding at 3:46 PM)
7  AND FURTHER THE DEPONENT SAITH NOT
8    (Signature Reserved)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 74

1  STATE OF ILLINOIS    )
                        )
2  COUNTY OF VERMILION)

3

4      I, Amy L. Prillaman Neubaum, a Certified
   Shorthand Reporter, in and for the County of
   Vermilion, State of Illinois, do hereby certify that
5  SONYA CHAMBERS, the deponent herein, was by me first
   duly sworn to tell the truth, the whole truth and
6  nothing but the truth, in the aforementioned cause of
   action.
7      That the foregoing deposition was taken on
   behalf of the Plaintiff, at the Law Offices of Heyl,
8  Royster, Voelker & Allen, Urbana, Illinois, on the
   22nd of June, 2006;
9      That said deposition is a true record of the
   testimony given by the deponent and was taken down in
10 stenograph notes and afterwards reduced to
   typewriting under my instruction; and that it was
11 agreed by and between the witness and attorneys that
   said signature on said deposition would not be
12 waived.
       I do hereby certify that I am a disinterested
13 person in this cause of action; that I am not a
   relative of any party or any attorney of record in
14 this cause, or an attorney for any party herein, or
   otherwise interested in the event of this action, and
15 am not in the employ of the attorneys for either
   party.
16     IN WITNESS WHEREOF, I have hereunto set my hand
   this 27th day of June, 2006.
17

18     _____
       AMY L. PRILLAMAN NEUBAUM, CSR
19

20

21

22

23

24

---

Page 75

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF ILLINOIS
2                  STATE OF ILLINOIS

3
   GEOFFREY W. BANT,          )
4                             )
        Plaintiff,            )
5                             )
   -vs-                       )No. 05-2132
6                             )
   BOARD OF TRUSTEES OF THE   )
7  UNIVERSITY OF ILLINOIS,    )
                              )
8       Defendant.            )

9

10     This is to certify that I have read the
   transcript of my deposition taken in the
11 above-entitled cause, and that the foregoing
   transcript taken on June 22, 2006, accurately states
12 the questions asked and the answers given by me, with
   the exception of the corrections noted, if any, on
13 the attached errata sheet(s).

14

15     _____
          SONYA CHAMBERS
16

17

18 Subscribed and Sworn before me
   this _____ day of
19 _____, 2006.

20 _____
   Notary Public

21

   RETURN TO:
22
   AREA WIDE REPORTING
23 301 WEST WHITE ST.
   CHAMPAIGN, IL 61820
24

From: g-bant@staff.uiuc.edu [mailto:g-bant@uiuc.edu]
Sent: Friday, January 11, 2002 4:33 PM
To: Anderson, Van
Cc: Chambers, Sonya L (Facilities & Services)
Subject: deficit reduction plan

Van,
Attached are two files that describe the reasons for the deficit and
describe the actions taken and proposed to deal with the deficit. We need
your direction in order to set goals for the three year plan.
Have a good weekend,
Geoff

Geoffrey W. Bant, Director
University of Illinois at Urbana-Champaign
Office of Printing Services
54 E. Gregory Drive
Champaign, IL 61820
(217)244-4675 FAX (217)244-7277
g-bant@uiuc.edu



Chambers #1

**Reasons for existence of the deficit**

*Past year: 7/01/00-6/30/01*

Fund Balance adjustments not processed

> At end of year closing 1-1-10166 (State) had $161,237. These funds were transferred from AITS for accrued benefits, vacating Armory site, and Dick Hardman retirement compensation. Account 1-2-20141 (ICR) had $24,808. These monies were not included in our deficit figure of $484,782.75.

> Our annual compensation of $36,000 for employing Jeff Stevenson was not processed before the close of the year. This request has now been made.

Organizational issues

> New agreement for production of Farm Income Tax Book required us to purchase paper but not recoup cost till 2002. $68,000

> .
> Unexpected retirement expense due to Larry Lutz retirement and benefits payout in Printing Division.

Decline in Revenue

> First year of responsibility for AITS Mainframe printing operation saw dramatic decline in volume (10,704,000 copies down) with no decline in cost for staff or equipment. This resulted in a loss of $71,000.

> Microfilm unit lack of revenue resulted in loss of $22,460

> Printing Division declined in revenue due to heightened competition from the private sector and equipment problems.

> Campus Publishing Services (Class readings packets/copyright) declined in volume due to competition from commercial copy shops, which ignore copyright payments, and because the Library moved to an electronic reserve system that was free of copyright costs.

> Library IBM lasers printing system equipment costs of $5,642/mo. without revenue to support resulted in a loss of $44,807.

### Actions taken to eliminate the deficit

*Current:*

Price adjustments

> Mainframe Printing renegotiated prices with AITS to cover dramatic decline in volume and recover deficit from past year. Continue to monitor volumes.

> Price increases for Printing Division of 5% were put into effect in January 2002 to cover salary and materials increases.

> Photographic Services adjusted prices for under-priced services and trimmed marginal service offerings.

> Campus Publishing Services (copyright services) adjusted prices for copyright transactions done for UIS and UIC to recover full costs.

> Convenience Copier Division renegotiated agreements with users who were not meeting contracted volumes.

Staff

> Larry Lutz, superintendent of printing, retired and was not replaced.

> Staff in Printing Division retired (Carolyn Fitch, Steve Hauersperger) and were not replaced.

> Three staff members in the Administrative division went from 100% to 50% time (Alan Reif, Yolanda O'Conner, Steve Wachala)

> IBM laser printers equipment and service payments ended in August 2001. Service contract was not renewed.

> Library Graphic Services Undergrad site trimmed hours open during finals and combined staffs with Campus Publishing Services to reduce student payroll.

Organizational Adjustments

> Transferred Microfilm unit to Library, July 1, 2001

> Photo drop boxes were installed in residence halls to increase revenue from film processing.

> Quick Copy Division closed two copy centers during fall of 2001. These closings will be reflected in lower equipment costs starting in July 2002.

Campus Publishing Services has, with the approval of legal counsel, adjusted their copyright policy to permit them to compete on a more even playing field with the private sector. Copyright payments have declined significantly and volume is starting to return.

*Proposed and future deficit reduction actions*

Cost reduction

Directly purchase all paper from the Illinois Public Higher Education Consortium (IPHEC) contract rather than through Campus Stores saving an average 20% markup.

Explore possibility of reassuming delivery of Printing Division products from Mailing Services or renegotiating price of service.

Reduce Xerox expense by renegotiation of contract, elimination of some service offerings and contracting with other vendors for certain equipment components. Will yield savings starting July 2002.

Analyze pricing in all areas to assure full recovery of costs.

Adjust pricing and contractual agreements in Convenience Copier Division to assure full recovery of costs on each machine placed.

Staff reductions:

Postpone reorganization plan of hiring of two assistant directors, but proceed with hiring accountant.

Renegotiate manning clause with GCIU in Printing Division to permit some presses to be staffed with less operators.

Do not replace Lolita Perdue, personnel manager, when she retires in March. Redistribute her duties to other managers and clerical staff.

Do not replace staff in Printing Division retiring or moving to disability until justified by volume increases. Possible retirements Dec. 2002 (Jim Ward, Tom Grimes, Billie Whitehead) and disability (Dennis McDermith).

Increase Revenue:

Increased marketing efforts targeting departments using off campus vendors for printing, copying and photographic services.

06/21/08  11:12 FAX 2173449295        HEYL,ROYSTER-URBANA                    ☒009

Conduct process analysis of Printing Davison to permit the production of more work without increasing staffing.

Promote all services to potential users.

Organizational Adjustments

Quick Copy will close a third copy center before July 1, 2002. This closing will be reflected in lower equipment costs starting in July 2002.

Quick Copy Division will be moving its main production center from 1805 S. Wright to 54 E. Gregory. This will permit equipment and staff savings as they can coordinate work and supervision with Digital Color, Printing Division, and Mainframe Printing. Savings will be reflected starting July 2002.

Investigate the possibility of using Copy Center Xerox equipment to produce work for Mainframe printing. Savings would be reflected starting July 2002.

> From:       Anderson, Van
> To:    Bant, Geoffrey W.
> Cc:    Chambers, Sonya
> Subject:       Deficit Reduction Plan
>
> Geoff:
>
> I had a chance to meet with Sonya today to go over the Office of
> Printing Services deficit as of 12/31/2001. That deficit stood at
> $845,808 on that date. Therefore, I need you to complete your deficit
> reduction plan that includes:
>
> 1) A statement as to the reason for the existence of the deficit
> (beyond our earlier discussions, you need to provide information
> explaining the deficits in each Ledger 3 account);
>
> 2) The actions that will be taken to eliminate the deficit including
> how each of your Ledger 3 deficits will be handled; and,
>
> 3) Specific benchmark targeted balances for the deficit account for
> each quarter (quarters ending March 31, June 30, September 30, and
> December 31) until the deficit is eliminated.
>
> Your plan needs to ensure that the deficit will be retired within 36
> months (by December 31, 2004). Please note that this is six months
> beyond the original date the Provost's office was allowing as they are
> wanting units to clear deficits within three fiscal years with this
> fiscal year counting as year one. Before implementing your plan, we
> will need to discuss and agree on the plan. Please have your plan
> completed for discussion on Wednesday, January 30th at 9:00 a.m.
> Please allow two hours. We will meet in my office.
>
> To clear the deficit in 36 months that means that on average, monthly
> revenues must meet all operating costs and pay down approximately
> $23,500 on the deficit. This is an immense task and all necessary
> measures (i.e., revenue enhancement and expenditure reduction) must be
> taken to achieve the goal. Please understand that this means that all
> expenditures must be scrutinized very closely. Please make sure that
> all nonessential expenditures are stopped immediately. This would
> include conferences, seminars, equipment upgrades, etc. unless prior
> approval is obtained from me. Please let me know what those
> expenditures are and the impact on the unit.
>
> As you move to increase your business productivity, please remember
> that Printing Services must not enter into competition with local
> vendors.
>
> I look forward to discussing your deficit reduction plan next
> Wednesday.
>
> Van
>
>
> Van Allen Anderson, Ph.D.
> Associate Vice Chancellor for Administration
>     and Human Resources
> Swanlund Administration Building, MC-304
> 601 East John Street
> Champaign, Illinois 61820
>
> Phone: (217) 244-4457   FAX: (217) 244-0752
>           E-mail: van@uiuc.edu
>

EXHIBIT

Chambers #2

**From:** Anderson, Van [mailto:van@uiuc.edu]
**Sent:** Tuesday, February 05, 2002 10:00 AM Page 27 of 27
**To:** Bant, Geoffrey W.; Chambers, Sonya L (Facilities & Services)
**Cc:** Neukomm, Karie
**Subject:** Deficit Elimination Plan: Timetable Reduction
**Importance:** High

Geoff and Sonya:

I just finished meeting with Dr. Colbert. He has asked that we be very aggressive in the deficit elimination plan for Printing Services. He has asked that we look at ways to eliminate the deficit in eighteen months or sooner (i.e., by the end of FY2003 or sooner) with sooner being preferred (he would like all his units out of deficit prior to his leaving the university).

Please have some ideas ready for discussion this afternoon on ways to accomplish this task.

Thank you!

Van

Van Allen Anderson, Ph.D.
Associate Vice Chancellor for Administration
    and Human Resources
Swanlund Administration Building, MC-304
601 East John Street
Champaign, Illinois 61820
Phone: (217) 244-4457    FAX: (217) 244-0752
        E-mail: van@uiuc.edu


EXHIBIT
Chambers #3