KIPLING MEACHUM **E-FILED**
Wednesday, 26 July, 2006 04:33:09 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

GEOFFREY W. BANT,                      )
                                       )
            Plaintiff,                 )
                                       )
-vs-                                   )No. 05-2132
                                       )
BOARD OF TRUSTEES OF THE               )
UNIVERSITY OF ILLINOIS,                )
                                       )
            Defendant.                 )


### DEPOSITION

The deposition of KIPLING MEACHUM, a citizen of the State of Illinois, a witness of lawful age; produced, sworn, and examined upon his corporeal oath, at the Law Offices of Heyl, Royster, Voelker & Allen, 102 East Main, Urbana, Illinois, on the 22nd day of June, 2006, before Amy L. Prillaman Neubaum, CSR, License No. 084-003275, in and for the County of Vermilion and State of Illinois; as a witness in a certain suit and matter now pending and undetermined in the United States District Court for the Central District of Illinois.

APPEARANCES:

        Mr. Nile J. Williamson
        Attorney at Law
        1926 Associated Bank Plaza
        Peoria, Illinois  61602-1104
        Appearing for the Plaintiff

        Mr. Edward Wagner
        HEYL, ROYSTER, VOELKER & ALLEN
        102 East Main Street
        Urbana, Illinois  61801
        Appearing for the Defendant

    ALSO PRESENT:  Geoffrey W. Bant

COPY

Exhibit "_E_"

Page 2

1   INDEX
2
3   EXAMINATION,                3
    BY: MR. NILE J. WILLIAMSON:
4   EXAMINATION CONDUCTED:         86
5   BY: MR. EDWARD WAGNER:
6   (No exhibits marked)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1       (Commencing at 8:56 AM)
2           KIPLING MEACHUM,
3   the deponent herein, called as a witness after having
4   been first duly sworn, was examined and testified as
5   follows:
6   EXAMINATION,
7   BY: MR. NILE J. WILLIAMSON:
8       MR. WILLIAMSON: Normal stenographic
9   stipulation?
10      MR. WAGNER: Yes.
11      MR. WILLIAMSON: Will your client waive
12  signature?
13      MR. WAGNER: No, we'll reserve signature.
14  Q. Would you state your name, residence
15  address and date of birth, please?
16  A. Kipling Pike, P I K E, Meachum, I live at
17  804 Lakeshore Drive in Tuscola. I was born October
18  26th, 1951.
19  Q. Do you go by the name Kip?
20  A. Yes, I do.
21  Q. I'll call you Mr. Meachum; is that correct?
22  A. That's fine.
23  Q. What do you prefer?
24  A. Kip's fine.

Page 4

1   Q. In any event, can you give me a brief if
2   not immodest description of your educational
3   background?
4   A. I attended Champaign schools through high
5   school and then attended the University of Illinois.
6   I enrolled in 1969, graduated in 1973 with a major in
7   Bachelor of Science in Liberal Arts and Sciences. My
8   major was Biology with a minor in Physics and
9   Chemistry.
10  Q. Did you obtain any advance degrees beyond
11  that point?
12  A. No, I did not.
13  Q. Did you go back to school for any reason
14  after 1973?
15  A. I audited a geology class in I think the
16  fall of 1974. And that was it. Since then I have
17  attended a number of continuing education institutes
18  and schools and that type of thing.
19  Q. That was my next question. We don't
20  necessarily have to know exact details, but can you
21  give me a general idea of the types and number of CLE
22  courses you have attended and for what reason I might
23  add.
24  A. Okay. Most of the courses I attended were

Page 5

1   taken in direct relation to my job or to, you know,
2   extend my knowledge of how to do my job. From the
3   period 1975 until probably 1993 I was a member of the
4   Environmental Management Association, I attended
5   numerous annual conferences and institutes that they
6   would conduct to further my knowledge related to the
7   work I was doing at that time. I was on their Board
8   of Directors for a while and served in a local
9   chapter as an officer.
10      I attended institutes of the Association of
11  Physical Plant Administrators, APPA, there were three
12  of them, leading to a certification that right now I
13  don't remember the name of, but --
14  Q. Now are these thus far that you have talked
15  about all courses designed for the specialty of
16  environmental situations?
17  A. At the time I was -- that I was attending
18  the Environmental Management Association conferences
19  I was either the assistant superintendent of building
20  services or the superintendent of building services
21  at the University of Illinois, which was a position
22  related to custodial services and that was the
23  primary focus of the Environmental Management
24  Association was buildings and grounds. I was working

## Page 6

1  in the operation and maintenance division at the
2  University of Illinois.
3      After I became the superintendent of
4  building services, the supervision or the leadership
5  of the operation and maintenance division allowed me
6  to attend the APPA conferences and I attended --
7      Q. APPA is an acronym for what?
8      A. Association of Physical Plant
9  Administrators. And I attended conferences in
10 Colorado Springs, Dallas, Ft. Worth, I think, and San
11 Diego, to obtain the APPA certification I referred to
12 earlier. It was an advanced program for physical
13 plant administrators.
14     Q. And then I take it you eventually started
15 attending CLE conferences that were not related to
16 environmental or custodial issues?
17     MR. WAGNER: Let me object to the use of
18 the CLE. Lawyers usually use that, but it's like a
19 continuing --
20     MR. WILLIAMSON: He used it I thought,
21 that's why I was repeating it.
22     MR. WAGNER: I thought it was in your
23 initial question.
24     A. I didn't use it.

## Page 7

1      Q. (By Mr. Williamson) What reference did you
2  use? Mr. Wagner may be right, CLE, continuing legal
3  education is probably something I --
4      MR. WAGNER: We can just agree when the
5  term CLE was used we mean continuing education.
6      A. I thought you were referring to CEUs.
7      Q. And that is continuing education --
8      A. Education units.
9      Q. All right. That's probably a much better
10 way to phrase it.
11     In any event, did you attend CEUs other
12 than ones dealing with environmental or custodial
13 issues for physical plants?
14     A. Yes, I went to -- there were subregional
15 groups of APPA called MAPPA, Midwest Association of
16 Physical Plant Administrators. There were a couple
17 of those organizational annual meetings that I
18 attended, and I attended a couple APPA annual
19 conferences. I'm not sure of the number, I think it
20 was at least two, one -- I know one was in Montreal
21 where they presented physical plant programming of an
22 entirely unrelated nature to custodial and grounds.
23     Q. And then after that, up until now.
24     A. After that, following my departure from

## Page 8

1  what is now Facilities and Services, it used to be O
2  and M, now my focus has shifted to my current duties.
3      Q. Why don't you tell me did you start working
4  at the University of Illinois immediately after your
5  graduation in 1973?
6      A. I started with the Illinois State
7  Geological Survey in August of '74 and then I moved
8  to the operation and maintenance division in November
9  of '75.
10     Q. Was that initial job then an adjunct of the
11 University of Illinois? In other words, was the
12 University of Illinois your employer initially?
13     A. No, the state of Illinois was officially my
14 employer.
15     Q. When did you first become employed by the
16 University of Illinois?
17     A. November of '75.
18     Q. And give me again a rather brief
19 description of the types of jobs you've had at UI
20 since that time.
21     A. I was initially hired into a management
22 training program, it was a two year program. My
23 title was the assistant superintendent of building
24 services trainee. I completed that program early,

## Page 9

1  somewhere between 15 and 18 months, so I was moved
2  into the status position of assistant superintendent
3  of building services. I essentially lost the trainee
4  title.
5      Q. When was that?
6      A. Started with -- started in the trainee
7  position on November 30th of 1975 and it would have
8  been I think February, March of '77 that I moved into
9  the status position, I'll say spring of '77.
10     Q. By status position you mean you at that
11 point became a manager of building and grounds if I
12 can use that term?
13     A. I was assigned to the custodial unit. The
14 purpose for my hire was to eventually replace the
15 person who held the title of assistant superintendent
16 of building services and he was responsible for just
17 the custodial unit.
18     Q. What did that job entail?
19     A. When I held the assistant -- when I
20 initially held the assistant superintendent of
21 building services title I was responsible for
22 overseeing some of the daily operations of the
23 custodial unit, I was primarily responsible for all
24 of the discipline and the personnel actions and

Page 10

1 hiring that was done within the unit.
2    Q. Did you fire as well?
3    A. Yes.
4    Q. How long were you in the assistant
5 superintendent position?
6    A. Until I want to say the summer of 1984.
7 About two years after I got rid of the trainee title,
8 the gentleman who was in that position retired and I
9 was placed in direct oversight of the entire
10 custodial operation, which we were supervising
11 that -- the budget was about seven million dollars
12 and we had roughly I'll say 350 employees which
13 included maybe 25 members of supervision.
14    Q. Now, is that in 1984 that you're
15 referencing?
16    A. No.
17    Q. Seven million budget, 350 employees?
18    A. That's in -- that's probably 1978.
19    Q. Okay.
20    A. '78, '79.
21    Q. Did it grow from that point on?
22    A. Yes, it did.
23    Q. What happened in the summer of '84?
24    A. I went to my boss with a request that if I

Page 11

1 was going to be responsible for the entire unit and
2 collective bargaining negotiations and essentially
3 the whole ball of wax I felt like I deserved to be
4 reclassified to the superintendent of building
5 services.
6    Q. And at that point in time was the
7 superintendent job vacant or was somebody given that
8 title and not performing their responsibilities?
9    A. There was an individual who had served in
10 that capacity. As the superintendent of building
11 services he had responsibility for numerous units.
12 He had the grounds unit, the waste hauling unit, the
13 drivers and the operating engineers.
14       When he retired they hired the person I
15 just referred to as my boss and gave him the title of
16 superintendent of operations, which left
17 superintendent of building services title vacant. I
18 felt like the superintendent of building services
19 title was more applicable to what I was doing since
20 it was the building services unit that I was
21 supervising.
22    Q. So your wish was granted at that point?
23    A. Yes, I was reclassified to the
24 superintendent of building services, like I say I

Page 12

1 think it was mid summer of 1984.
2    Q. And given a pay raise?
3    A. Yes.
4    Q. And so how long did you serve in that
5 position?
6    A. I was superintendent of building services
7 until I believe May of 1998.
8    Q. And what happened at that time?
9    A. My boss, who by that time was the assistant
10 director for operations, they had reclassified him,
11 he retired, I applied and interviewed for his job and
12 was promoted to --
13    Q. Assistant director for operations?
14    A. The title was assistant director for
15 operations I believe. So I assumed his job.
16    Q. Of what?
17    A. Of the operation and maintenance division.
18 I'm not sure I understand the question.
19    Q. Well, I am assuming the University of
20 Illinois may have more than one Assistant Director of
21 Operations?
22    A. Yes. They probably do.
23    Q. And so I'm asking what the end of that
24 title is, for what --

Page 13

1    A. It was for the operation and maintenance
2 division.
3    Q. And again, this involved a pay increase?
4    A. Yes, it did.
5    Q. And what was changed as to your duties as
6 of May of 1998?
7    A. I assumed responsibility for -- I already
8 had responsibility for custodial, but I was placed in
9 an oversight role to supervise the operations group,
10 which consisted of custodial, grounds, the waste
11 transfer station, the operating engineers, and the
12 garage and car pool.
13    Q. So the number of employees you supervised
14 increased?
15    A. Yes, to about 550, and the budget was 18 to
16 20 million.
17    Q. How long did you serve in the position of
18 assistant director for operations?
19    A. Till, I got to get my dates right, the
20 spring of 2003. I'm going to say -- I'll say around
21 May of 2003.
22    Q. And what happened at that time?
23    A. The University was dealing with some very
24 strident budget cuts from the state and there had

Page 14

1 been some organizational things change at upper
2 levels within the administration. Duties and units
3 were being reassigned or, you know, conglomerated, if
4 you will, to try to eliminate redundancy and save
5 money. In the winter of 2002 I was asked to serve on
6 a transition team to reorganize the operation and
7 maintenance division.
8        And let me just explain, the operation and
9 maintenance division had already been through one
10 reorganization, up until sometime 2001 it was called
11 operation and maintenance, then they accreted a unit
12 from within University administration --
13        Q. What was that word you used?
14        A. Accreted.
15        Q. I don't think I'm familiar with that word.
16        A. A unit within the University administration
17 was reassigned to operation and maintenance
18 responsibility and they became Planning, Construction
19 and Maintenance, PC and M, and they held the title or
20 the name of PC and M until this latest transition
21 group that I was assigned to completed their work and
22 then they were officially known as Facilities and
23 Services.
24        So I was placed on this transition team to

Page 15

1 help redefine and reorganize Planning, Construction
2 and Maintenance into Facilities and Services.
3        Q. Now, this transition team you were put on
4 in the winter of 2002, this -- again I'm going to use
5 the word physical plant, just because it's easier for
6 me to understand, you're still talking about a job
7 that existed within the physical plant of the
8 University of Illinois, a subdivision of it as you
9 pointed out, and you were at that point Assistant
10 Director of Operations; is that correct? And that's
11 what your concern was and job duties were?
12        A. That's essentially correct. Somewhere in
13 that transition between O and M and PC and M the
14 direct reports to the Executive Director of Planning,
15 Construction and Maintenance were retitled directors.
16 So I was actually the Director of Operations.
17        Q. Director of Operations as opposed to
18 Assistant Director of Operations?
19        A. That's correct.
20        Q. Did you obtain another pay increase at that
21 point?
22        A. No.
23        Q. So you served on the transition team and I
24 take it that service resulted in something happening

Page 16

1 in May of 2003 as you've indicated?
2        A. That's correct.
3        Q. What was that?
4        A. I was reassigned to be the Director of
5 Printing Services and the Director of Emergency
6 Planning.
7        Q. Who reassigned you into those two positions
8 in May of 2003?
9        A. Dr. Jack Dempsey.
10        Q. And did he have conversations with you
11 about that reassignment?
12        A. Yeah.
13        Q. How many?
14        A. You want me to just tell you what happened,
15 okay?
16        Q. Well, you might for my own benefit again
17 tell me how many conversations you had with
18 Dr. Dempsey regarding this change in job status.
19        A. I had one.
20        Q. And where did that take place?
21        A. I'm not sure of the exact date, I'm going
22 to say --
23        Q. Where did it take place?
24        A. I'm sorry. In his office.

Page 17

1        Q. So you're not sure of the exact date. It
2 was before May of 2003 I take it.
3        A. That's correct.
4        Q. April?
5        A. Well, it would have been the April and May
6 time frame. I don't have an exact date.
7        Q. How long did the meeting last?
8        A. 10 to 15 minutes.
9        Q. And who was present?
10        A. Just Jack and myself.
11        Q. And so what was said at that meeting by
12 Dr. Dempsey and yourself?
13        A. The transition team had completed its work
14 as far as how the reorganization of Planning,
15 Construction and Maintenance would occur to become
16 Facilities and Services. I was asked to attend a
17 meeting in his office. I did not know what the exact
18 nature of the meeting was, but I presumed it would be
19 talking about what I would be doing from that point
20 on.
21        When I was asked to serve on the transition
22 team we were all told as a group that we didn't
23 necessarily need to worry about job security, we
24 would have a job when we were done but it probably

**Page 18**

1 wouldn't be what we were doing now because of the
2 scope of the magnitude of things that needed to be
3 addressed.
4    I went to Jack's office, you know, there
5 were the normal informal conversation and Jack
6 informed me that it was his opinion that I would
7 serve best as the director of campus parking.  I
8 responded to Jack, I said that's fine with me, you
9 know, I heard some things about parking, knew that
10 there were some challenges there and, you know, I
11 left his office understanding that I would be the
12 director of campus parking.
13    Q. Now, I guess since you didn't take that job
14 we don't have to have a long discussion about it.
15 Campus parking means what it says, the director of
16 campus parking regulates who parks on campus lots,
17 both the employees --
18    A. Among other things.
19    Q. -- and the maintenance and the overseeing
20 of campus lots, is that an accurate statement?
21    A. Yes.
22    Q. But you indicated to Dr. Dempsey you didn't
23 want to do that job?
24    A. No, I didn't.  I told him I would be very

**Page 19**

1 happy.
2    Q. You left his office thinking you were going
3 to do that job?
4    A. Yes, I did.
5    Q. But you didn't do it?
6    A. That's correct.
7    Q. Why is that?
8    A. I can't answer that question.
9    Q. What happened?  Were you called shortly
10 afterwards, told you weren't going to be doing that
11 job?
12    A. There was a staff meeting held, hold staff
13 meetings on Thursdays, there was an expanded staff
14 meeting that was held --
15    Q. Staff meeting of whom?
16    A. Facility -- well, I'm trying to think of
17 the right term to use to refer to it.  At that time
18 it was still Planning, Construction and Maintenance,
19 but upper level administrators within Planning,
20 Construction and Maintenance, which would become
21 Facilities and Services.
22    Q. Which was still within the purview of your
23 former job, your existing job?
24    A. Yes.  They hold those meetings on Thursday.

**Page 20**

1 So there was an expanded staff meeting of the
2 senior -- these upper level administrators.  There
3 were about 20 to 25 of them I'll say, I don't know
4 the exact number.  So I went to the staff meeting on
5 Thursday morning and it was announced that I would be
6 the Director of Printing Services.
7    Q. Who announced that?
8    A. Dr. Dempsey.
9    Q. So he was in that meeting as well?
10    A. Yes.
11    Q. How long after the meeting you had had with
12 him did that occur, that staff meeting?
13    A. My memory is two to three days.
14    Q. Now, the transition team you've talked
15 about earlier, did that transition team have any
16 relationship with Printing Services to your
17 knowledge?
18    A. Not that I recall.
19    Q. Did it discuss alterations in printing
20 services, consolidations, any aspect of the business
21 operation of printing services?
22    A. Did not discuss as I recall anything to do
23 with the internal workings of printing services.  We
24 addressed the fact that there were financial problems

**Page 21**

1 there, we discussed --
2    Q. When did you do that?
3    A. At some point during the transition
4 meetings.  We discussed the nature of the work that
5 they do, the end product that they turn out.
6    Q. I don't mean to interrupt you again.  So
7 this transition team in fact was discussing numerous
8 departments of the University of Illinois?
9    A. Not at the University of Illinois, but of
10 the units that would ultimately be assigned to be
11 under the umbrella of this new organization, which is
12 going to be called Facilities and Services.  Our job
13 as the transition team was to identify as closely as
14 possible the like functions, the similar functions or
15 the similar work products or the nature of the work
16 that they do to come up with a refined and
17 streamlined organizational chart that would more
18 effectively and more productively address what F and
19 S would ultimately be called upon to deliver to the
20 University in terms of its mission critical services.
21    Q. In 2003 what did printing services do and
22 under what umbrella was it?
23        MR. WAGNER: I'm sorry, was that -- in what
24 time in 2003?

Page 22

1    Q. I said in 2003.
2       MR. WAGNER: Not May, 2003, just any time?
3    Q. No. It was a compound question too.
4    A. Okay. Understand that in 2003 prior to my
5  arrival there I didn't know what printing services
6  did.
7    Q. Because you had never had any involvement
8  with printing services at that point?
9    A. That's correct.
10   Q. Nor had you had any interaction for any
11 reason?
12   A. That's correct.
13   Q. Your job as director of operations simply
14 did not dovetail, if you will, with anything printing
15 services did?
16   A. That's correct, unless we went to them with
17 a printing job, which was done by someone that worked
18 in my operation and I had --
19   Q. Was printing services located in one
20 particular physical plant in 2003?
21   A. Again, I had no direct knowledge
22 necessarily of Printing Services' structure.
23   Q. I'm just asking -- I'm asking you now.
24   A. In hindsight I can tell you that printing

Page 23

1  services had numerous locations around campus,
2  numerous physical locations around campus. They were
3  not assigned to the physical plant service building
4  where my office was.
5       My understanding of the organizational
6  arrangement is that they were a unit that reported
7  directly to Dr. Charles Colbert, who was the vice
8  chancellor of administrative affairs.
9    Q. Can you spell that for Amy, please?
10   A. C O L B E R T.
11   Q. And he is no longer with the University as
12 I understand it.
13   A. That's correct. Part --
14   Q. Talking about 2003?
15   A. Pardon?
16   Q. We are talking about 2003?
17   A. Yes. Part of what brought about the
18 transition of Planning, Construction and Maintenance
19 to Facilities and Services was the retirement of
20 Dr. Colbert and an upper level administrative
21 decision not to replace his position, the vice
22 chancellor for administrative services and human
23 resources I believe. I may not be correct on that
24 title.

Page 24

1    Q. Did he retire in 2003?
2    A. I'm going to say it was in that time frame.
3  I don't remember the exact date.
4    Q. Could it have been 2004 then?
5    A. No, I don't believe so. I think he was
6  gone.
7    Q. In 2003?
8    A. Uh-huh.
9    Q. That's a yes?
10   A. Yes.
11   Q. Getting back then again to the staff
12 meeting you're talking about, Dr. Dempsey indicated
13 for the first time you were going to be Director of
14 Printing Services and Emergency Planning? Did he
15 identify both titles at that point?
16   A. I was going to carry two titles, the
17 Director of Printing Services and the Director of
18 Emergency Planning.
19   Q. And when were you given direction as to
20 what those two jobs entailed?
21   A. I was not -- I was not given any direct
22 instruction as to what the job at printing services
23 entailed other than I would be assigned to oversee
24 the work of that unit and hopefully bring it around

Page 25

1  to a state of financial stability.
2    Q. And who told you that?
3    A. Dr. Dempsey.
4    Q. At that same staff meeting?
5    A. As I recall, no. There was -- I don't
6  recall a specific meeting, but I'm going to say there
7  was a general discussion between Dr. Dempsey, Pam
8  Voitik, who was the director of campus services out
9  of this transition, and myself as to the direction
10 that printing services should go.
11   Q. And was that within a few days of the staff
12 meeting you're talking about?
13   A. Yes.
14   Q. So Pam Voitik was there, Dr. Dempsey was
15 there and you were there. Where did that meeting
16 take place?
17   A. At the physical plant.
18   Q. Can you be more specific?
19   A. I don't recall. I don't recall.
20   Q. Was anybody else present?
21   A. Not that I recall.
22   Q. And so that was the first time you were
23 given your job duties essentially and told what the
24 emphasis should be?

Page 26

1    A. That's correct.
2    Q. Was it suggested by either of those
3 individuals at that time that there was a financial
4 problem in printing services?
5    A. I was made aware that there was a
6 substantial deficit at printing services at that
7 time.
8    Q. And how was deficit defined?
9    A. Little over a million dollars.
10    Q. By that I mean was it suggested to you that
11 funding had been lost? How was the deficit defined
12 to you?
13    A. You mean as to how it was created?
14    Q. Yes, sir.
15    A. I don't know that I was given any specifics
16 as to why it was created. My understanding from what
17 I had heard about printing services during the
18 transition planning meetings and subsequent to that
19 was that the unit had been running a deficit for a
20 period of years. The campus was concerned about it.
21 They were very close to a decision to simply close
22 the unit. That was one of my concerns when I was --
23    Q. Let me stop you there.
24    A. Okay.

Page 27

1    Q. Who told you -- who was close to closing
2 the unit?
3    A. In the discussion that I had with -- in
4 discussions that I had with Dr. Dempsey and Pam
5 Voitik, I was given a very clear indication that
6 there were concerns about the deficits being run by
7 the unit, and that there were questions as to whether
8 or not it was a viable service to be retained by the
9 campus and continue.
10    Q. This is in the same meeting you've told me
11 about?
12    A. Yes, and in just other meetings I had been
13 at where printing services and other units on campus
14 were discussed. And the issue was whether or not it
15 would -- was able to be turned around.
16    Q. Didn't other units at University of
17 Illinois in 2003 have deficits?
18    MR. WAGNER: Object to the form. Answer if
19 you can, please.
20    A. I have no direct knowledge of that.
21    Q. So you're saying that you did have
22 discussions about other units in 2003, but the only
23 unit that was discussed with a deficit was printing
24 services?

Page 28

1    A. I'm going to say that's correct.
2    Q. So these two individuals identified the
3 deficit of printing services at about a million
4 dollars?
5    A. A little over a million dollars.
6    Q. And what was the budgeting year? Was that
7 through June 30th of each year?
8    A. The fiscal year runs from July 1 to June
9 30th.
10    Q. So they were indicating to you in May of
11 2003 that the deficit of printing services was a
12 million dollars and that was the end of the fiscal
13 year?
14    MR. WAGNER: That's not what he said. I
15 object to the form. Answer if you can.
16    MR. WILLIAMSON: First of all, I am not
17 aware of any objection to the form of the question
18 under the Federal Rules that's viable in this case,
19 but if you are going to make an objection it's
20 probably better not to say that's not what he said.
21    MR. WAGNER: Why is that? Because he said
22 it was a little over a million dollars and you are
23 changing his testimony, so I object to the form.
24    MR. WILLIAMSON: He is the one testifying.

Page 29

1    MR. WAGNER: You are the one that's
2 testifying.
3    MR. WILLIAMSON: He can give the
4 explanation he wants, but the point is it's not good
5 to say that's not his testimony.
6    MR. WAGNER: So you're saying it's better
7 for you to change his testimony and try to trick him
8 and be dishonest?
9    MR. WILLIAMSON: Certainly not.
10    MR. WAGNER: Knock it off. Please answer
11 the question.
12    MR. WILLIAMSON: Don't tell me to knock it
13 off, Counsel. That won't work well in this
14 situation.
15    Q. (By Mr. Williamson) In any event, if I do
16 make factual statements which are incorrect, and it's
17 possible I could do that, please tell me because I'm
18 not trying to mislead you. It's -- it may be things
19 that I'm not remembering properly and as to the --
20 was the figure a million dollars?
21    MR. WAGNER: Same objection as to form.
22 Answer if you can.
23    A. The deficit I was given to understand was
24 slightly over a million dollars.

Page 30

1  Q. Now, is that the language, again I don't
2  want to put words in your mouth, did they say 1.1,
3  1.2 or was it the language slightly over a million
4  dollars?
5  A. I don't recall.
6  Q. All right. And what I'm asking again is
7  that deficit is identified in May, which is within
8  six weeks or so of the end of the fiscal year; is
9  that correct?
10  A. Yes.
11  Q. And when you're having this meeting with
12  those two individuals and you are told that you are
13  going to be Director of Printing Services, was that
14  the reason they gave you they wanted you to be
15  Director of Printing Services was to eliminate that
16  deficit?
17  A. When I found out I was assigned as the
18  Director of Printing Services I went to Dr. Dempsey
19  immediately and I asked him whether or not I was
20  going down there to close the unit or to keep it
21  open. He informed me that I was going down there to
22  keep it open.
23  Q. And let me go back with you a second. This
24  is another meeting obviously, it's not Dr. Dempsey

Page 31

1  and Pam Voitik, I know I'm not -- maybe not
2  pronouncing her name correctly, this was another
3  meeting?
4  A. Not a meeting, I went to his office and
5  asked him the question and left.
6  Q. All right. It was just you and he at that
7  time?
8  A. Yes, unless you want to count his secretary
9  who was, you know, standing in the doorway, I mean
10  she was at her desk. I'm standing in Dr. Dempsey's
11  doorway asking him this question.
12  Q. All right. Was that the extent of the
13  conversation then that you've just told me?
14  A. Yes, it was.
15  Q. So you -- go ahead.
16  A. When he told me I was going down to keep it
17  open I said that's good, that's information I need
18  because if I'm going down to close it, I'm going to
19  take one management style in there; if I'm going down
20  to keep it open I'm going to take another management
21  style in there which is to develop a team, come up
22  with some solutions and try to try our best to keep
23  it open.
24  Q. So in May of 2003 you had literally your

Page 32

1  first involvement with printing services?
2  MR. WAGNER: Objection as to form again.
3  Please answer if you can.
4  A. Restate the question.
5  (Whereupon the requested portion of the
6  record was read by the reporter.)
7  A. My first direct involvement with printing
8  services was probably in June of 2003.
9  Q. That's when you moved in to a different
10  office to assume control?
11  A. Made my first visit to the building.
12  Q. Okay.
13  A. My office remained in the physical plant
14  until July of 2003.
15  Q. All right. Now, if I can go back with you
16  a second, you also were given the title of Director
17  of Emergency Planning in May of 2003.
18  A. That's correct.
19  Q. What did that job entail?
20  A. The area of emergency planning was
21  responsibility that had previously been assigned to
22  the vice chancellor for administrative affairs.
23  There had been an individual in his unit who was
24  responsible for doing most of the emergency planning

Page 33

1  type work on campus, which encompassed everything
2  from planning for Y2K to developing potential
3  response plan to situations like SARS, West Nile
4  virus, to interagency collaboration with emergency
5  management coordinators within the county and the
6  cities, managing the overall elements that would be
7  important to the University in terms of handling a
8  crisis situation that might come to campus,
9  developing information related to how the campus
10  would function from an administrative basis and
11  identifying who would be in charge of what.
12  That individual was reassigned, and this is
13  probably some time in 2002. Jack Dempsey asked me if
14  I would be interested in taking that role on because
15  it was being reassigned to -- I think at that time it
16  was still the operation and maintenance division. I
17  told him that I would do that, would be happy to do
18  that. I have had experience prior to that as far as
19  emergency planning goes and so I accepted a role --
20  Q. You had prior experience on emergency
21  planning?
22  A. Yes.
23  Q. And when was that?
24  A. You can go all the way back to '70, the

Page 34

1 late 1970s, if you will, because of my role being in
2 charge of custodial, when there would be issues that
3 would impact the campus and its ability to operate we
4 were a critical part of that emergency response,
5 whether that was floods, fire, snow. As the director
6 of operations I would -- I was responsible for
7 getting all the late night phone calls when things
8 were going wrong, if will you, and they needed
9 employees from our unit to respond to issues on
10 campus.
11      There were several, I say several, there
12 were at least two major fires in the 1980s, there
13 were two major floods where the Boneyard overflowed,
14 an ice storm in 1990, snow storms that, you know,
15 have impacts on campus operations. So there were
16 numerous times when I was called to attend
17 administrative level meetings to discuss what the
18 campus response would be.
19      In January of 2001 -- let me back up. I
20 was involved in helping plan the Y2K response for the
21 operation and maintenance division. In 1990 the
22 director, Terry Ruprick, asked me to start the F and
23 S safety committee, which that has some elements of
24 overseeing, you know, potential emergency --

Page 35

1      Q. I don't mean to interrupt you, but I can
2 see where you did have some rather significant
3 experience in emergency planning because of your
4 prior job. So that would be an obvious reason why
5 you would be picked in May of 2003 to do -- be
6 director of emergency services; is that correct?
7      A. Director of Emergency Planning.
8      Q. Emergency planning, I'm sorry.
9      What I'm curious about generally is moving
10 forward from May of 2003, what percentage of your
11 time then was spent being Director of Emergency
12 Planning versus Director of Printing Services?
13      A. Not enough.
14      Q. I mean they're both full-time jobs
15 apparently. Is that a fair statement?
16      A. When I moved to printing services in July
17 my intent was to spend three to four days a week
18 working on printing service matters and one to one
19 and a half days a week maybe doing emergency
20 planning.
21      Q. Did it work out that way?
22      A. It was pretty much full-time printing
23 services. I would say 90 to -- 85 to 90 percent of
24 my time the first year was spent on printing service

Page 36

1 matters.
2      Q. Did somebody else perform the job of
3 Director of Emergency Planning during that period of
4 time?
5      A. No. I put in extra time if needed.
6      Q. How many hours a week were you working from
7 that period in the first year after July of 2003 in
8 both jobs?
9      A. I don't have a good handle on that.
10      Q. I mean is it more than 60?
11      A. No.
12      Q. And obviously it isn't a situation where
13 you have to check in or do a punch card or be
14 responsible for anybody for your hours, is it?
15      A. No.
16      Q. So did you physically move into an office
17 in July of 2003 to perform the function of Director
18 of Printing Services?
19      A. Yes, I did.
20      Q. Where was that?
21      A. I forget the room number. I think it was
22 the old director's office, first floor hall, east
23 wing, north side.
24      Q. Of what?

Page 37

1      A. The printing services building.
2      Q. So you said there were numerous physical
3 locations for printing services, but there was a
4 physical plant for printing services?
5      A. That building is located 54 East Gregory.
6      Q. And was that a dedicated building, were
7 there only printing services performed in that
8 building?
9      A. That was the main location and it housed at
10 least three of the primary services offered by
11 printing services.
12      Q. In the building, I don't know how big the
13 building is, was there any other department of the
14 University of Illinois or unit of the University of
15 Illinois other than printing services?
16      A. No.
17      Q. So it was a dedicated building?
18      A. That's correct.
19      Q. And what then did you focus on in that
20 first year at printing services?
21      A. My first I'll say two to three, maybe four
22 months was to find out as much about printing
23 services as I can, get to know the people, learn as
24 much about the operation and the function of the

Page 38

1 place as I could, get a handle on any problems that
2 might have existed, make observations as to things
3 that we could change, maybe come to grips with issues
4 that would help us create the financial stability
5 that was needed to keep it open.
6     Q. The deficit, and correct me if I'm wrong,
7 is then determined by the amount of money allocated
8 to printing services at the beginning of the fiscal
9 year versus the amount of money spent by printing
10 services and with income at the end of the fiscal
11 year? Excuse my rather rudimentary description of
12 this.
13     A. And I'm going to say that's incorrect
14 because there were no funds allocated to printing
15 services, it was a wholly self-supporting unit which
16 I think is what put it on the radar screen of the
17 administration with respect to its financial
18 performance.
19     Q. When you were Director of Printing Services
20 there was no money allocated?
21     A. I believe that's correct.
22     Q. Right. But you don't know what the
23 allocation was for prior years I take it?
24     A. That's correct.

Page 39

1     Q. So the basis for determining the budget in
2 printing services was how much money printing
3 services made during the fiscal year versus how much
4 it spent in operation?
5     A. That's how I approached it.
6     Q. And what happened then in the -- you went
7 in in July of 2003, so that's the beginning of the
8 fiscal year, and you were still there on June 30th of
9 2004, if I recall.
10     A. Yes.
11     Q. What happened to the budget during that
12 year?
13     A. I don't have a recollection as to what our
14 budget position was on June 30th of 2004.
15     Q. I'm not asking you for exact figures. Did
16 you run in the red or the black if you recall?
17     A. I think we were slightly in the black. If
18 we weren't in the black we were real close to break
19 even. The amount of loss on an annual basis had been
20 reduced is my recollection.
21     Q. Because it had been a little over a million
22 the prior year?
23     A. The deficit balance the prior year was
24 slightly over a million dollars. I don't remember

Page 40

1 the exact number.
2     Q. And after your first year it was close to
3 being even?
4     A. That's what I recall.
5     Q. Now, the services to be provided by
6 printing services was determined by whom when you
7 began as director in July of 2003?
8     A. I'm sorry. Could you say that again?
9     Q. Yeah. It was an awkward question.
10     How -- were you given orders to do work by
11 other units in the University, did you solicit
12 orders? How did -- how was it determined the amount
13 of work printing services did while you were director
14 that first year?
15     A. The amount of work that we did was solely
16 determined by the amount of work that the customers
17 brought us.
18     Q. Who were the customers?
19     A. University faculty, students, auxiliary
20 units, academic units.
21     Q. And this is the University of Illinois
22 printing services, so the customers were all related
23 to the University of Illinois then in the first year
24 when you were director?

Page 41

1     A. Pretty much. There were some groups that
2 were, I think they called them allied agencies that
3 had an affiliation with the University, but they
4 weren't necessarily located on campus that we did
5 work for.
6     Q. Now, when you referred earlier to the fact
7 that the unit was self-sustaining, printing services
8 would do a job for another unit at the University of
9 Illinois and bill them for doing the job; is that
10 correct?
11     A. Yes.
12     Q. And the money would be paid from one unit
13 to printing services?
14     A. Yes.
15     Q. Who determined the value of the job?
16     A. Printing services.
17     Q. And that was true throughout the time you
18 were director?
19     A. Yes.
20     Q. Just remind me again, when did you stop
21 being Director of Printing Services?
22     A. April 1 of -- March 31st, 2005.
23     Q. Let me try and get my math right. Is that
24 a year and a half or thereabouts, actually about 20

Page 42

1 months?

2    A. A year and nine months.

3    Q. All right. When you left on March 31st of
4 2005, what was the financial status of the printing
5 services unit at that point?

6    A. My recollection is that the deficit was
7 under a million dollars.

8    Q. So in the year -- fiscal year 2005 there
9 was another million dollar deficit at the time you
10 left?

11    MR. WAGNER: Objection as to form. Please
12 answer if you can.

13    A. There was not another million dollar
14 deficit. The deficit --

15    Q. I'm only referring to the prior reference
16 to slightly over a million when you went in.

17    A. The deficit balance that had been slightly
18 over a million dollars had been reduced to under a
19 million dollars. And my recollection is that it was
20 $900,000 to $950,000.

21    Q. All right. And I'm, again, trying to
22 understand our reference to deficits. I earlier
23 understood that since it was a fiscal year involved
24 in the operation that at the end of the fiscal year

Page 43

1 on paper the deficit would be eliminated or are you
2 saying that's not the case?

3    A. Say that again.

4    Q. Well, again you'll have to excuse my lay
5 interpretation of this, but if the fiscal year runs
6 to June 30th of each year and we're talking about
7 June 30th of 2003, wouldn't the deficit, whatever it
8 had been up until that time, be eliminated on paper
9 because you are starting a new fiscal year?

10    A. No, it's a carry over deficit.

11    Q. So it's a constant reference to either
12 being above or below -- having a deficit or not
13 having a deficit?

14    A. That's correct.

15    Q. And what happens then on the books when
16 there is a net profit for the year? Is that carried
17 over as well?

18    A. As a fund balance I would assume it would
19 be.

20    Q. I'm curious when you changed directors at
21 what point in time is one director responsible for
22 the deficit or profit versus, you know, the actions
23 of the prior director. I'm trying to figure out how
24 that's going to come into play.

Page 44

1    A. I'm not sure I can answer that. I'm not
2 sure if there is a question there, but I'm not sure
3 if I can answer it. When I was --

4    Q. There was a question, but --

5    A. When I went down to be the Director of
6 Printing Services, I assumed responsibility for the
7 financial situation as it existed and my
8 responsibility was to do everything I could to
9 improve it and bring it back to a profitable
10 organization if I could do that.

11    Q. Now, again, you correct me when I'm saying
12 this in a manner you don't agree with. When you left
13 then on March 31st, 2005, you must have reduced the
14 deficit from June 30th of 2003 by about $200,000
15 because when you came in it was slightly over a
16 million, when you left it was slightly under a
17 million. Is that an accurate statement?

18    A. Yes.

19    Q. Okay. How else does printing services
20 control their deficits or profitability other than
21 the amount they charge for jobs?

22    A. How they organize, manage and run their
23 operation.

24    Q. But if one were running a deficit in any

Page 45

1 business, can't you simply increase the cost of
2 services you are providing?

3    A. Yes, you can, unless that's going to make
4 you noncompetitive.

5    Q. How could you be noncompetitive
6 intra-University when you are dealing with other
7 University units?

8    A. The University units as a whole are not
9 required to use Printing Services' products. They
10 can go anywhere they want.

11    Q. And go to an outside vendor?

12    A. Yes.

13    Q. So if Printing Services' price is not
14 competitive, they're not going to use it.

15    A. They have that opportunity.

16    Q. Did you as director increase the cost of
17 jobs to be done by printing services in order to
18 eliminate the deficit you have talked about?

19    A. In the offset area we conducted a review of
20 the estimating standards that were being used to
21 estimate jobs to make sure that they reflected our
22 cost of doing business. So my recollection is that
23 that resulted in an increase in some of those rates.

24    Q. So the protocol for estimating jobs was

Page 42 - Page 45

Page 46

1 altered during your directorship?
2    A. We altered the estimating standards if you
3 want to call that a protocol, yes.
4    Q. How did you alter the estimating standards?
5    A. Changed them to reflect the actual cost of
6 doing business.
7    Q. And again, since I'm not familiar with the
8 estimating standards, tell me how you did that. What
9 was the old standard versus the new standards that
10 you changed?
11    A. I don't remember specifics. I asked a lady
12 who was familiar with working in printing services
13 and was familiar with how to conduct an estimating
14 standards review to take a look at that.
15    Q. Who was that?
16    A. Kelly Woodward. She worked with a group of
17 people to develop a set of recommendations.
18    Q. And, again, can you verbalize how those --
19 what the end result of those recommendations were?
20    A. I think there were upward adjustments in a
21 number of our estimating standards, it's possible
22 that some of them -- some of the costs went down.
23    Q. So you raised the price of doing jobs and
24 of course at the same time you were trying to lower

Page 47

1 costs within the department?
2    A. That's not the only way to lower costs.
3    Q. I didn't mean to say it was, but did you
4 also lower costs of operating the printing services
5 unit during the time you were director?
6    A. Yes, sir.
7    Q. How did you do that?
8    A. One of the first things I did was implement
9 a hiring freeze on all positions. Anybody who
10 resigned was terminated or left.
11    Q. Let me stop you there again. I don't mean
12 to keep interrupting. Was there a hiring freeze in
13 effect on an all University basis in July of 2003?
14    A. There were various hiring freezes during
15 that period of time. Whether or not there was one in
16 existence in July of 2003 I don't know. The -- my
17 instructions to the unit heads that we would not
18 replace positions was intended to cover any period of
19 time where there would not be a hire -- a general
20 hiring freeze by the University.
21    Q. When did you institute that hiring freeze?
22    A. Mid August of 2003.
23    Q. And did that remain in effect the rest of
24 the time that you were director?

Page 48

1    A. I'm not sure I understand the question.
2    Q. Did the hiring freeze that you instituted
3 remain in effect until March 31st, 2005?
4    A. No.
5    Q. When was it lifted?
6    A. We hired I think some copy operators, maybe
7 promoted some folks to different copy operator status
8 and then hired replacements for them. I believe in
9 spring we hired --
10    Q. Excuse me, spring of 2004?
11    A. 2004. We hired some extra help press
12 operators, put them in extra help positions, I think
13 in the summer of 2004.
14    Q. So --
15    A. And I believe we put -- we instituted flex
16 time press operators in the offset division in the
17 fall of 2004.
18    Q. Other than that it remained in effect, I
19 mean in other words --
20    A. No, at that point in time I had told the
21 individuals -- we had had I think the number was 27
22 or 28 people leave the operation and I felt like it
23 was time to begin reviewing each departure at that
24 point on an individual case by case basis. So I told

Page 49

1 the unit heads if you feel like at this point in time
2 that you absolutely must replace somebody, then, you
3 know, put your material together, bring your case to
4 me, we'll discuss it, I'll see whether or not that's
5 something I want to recommend to Miss Voitik and we
6 will consider starting to replace people as they
7 leave.
8    Q. Pam Voitik remained your own supervisor
9 throughout this time frame, did she not?
10    A. I reported to Pam as the Director of
11 Printing Services, I reported to Jack Dempsey as the
12 director for emergency planning.
13    Q. I'm glad you pointed that out. Was there
14 much activity as Director of Emergency Planning
15 during the time frame you were director of printing
16 services? I understand what you earlier said about
17 the time you allocated.
18    A. I simply tried to prioritize the work that
19 needed to be done on emergency planning and focused
20 on that. There were some critical issues related to
21 agreements with local hospitals and stuff like that
22 that we worked out.
23    Q. Was there any major event which occurred in
24 that time frame?

Page 50

1    A. No, the only thing we had were changes in
2 the home land security threat level alert status and
3 the campus had to undertake certain actions as a
4 result of those increases in changing from orange to
5 red.
6    Q. I'm digressing, but did the Director of
7 Emergency Planning have interaction with the campus
8 police?
9    A. Yes. Yes.
10    Q. But it was just interaction, you didn't
11 supervise them or direct their activities?
12    A. No.
13    Q. Did you focus on anything other than the
14 budget during the time you were Director of Printing
15 Services?
16    A. Yes. I tried to get out of the office
17 routinely to walk through the satellite locations for
18 the copy centers, to walk through the areas within
19 the main location there at 54 East Gregory to get to
20 know the people, spent considerable amount of time in
21 the offset division. There was -- there was a
22 feeling within offset that the previous director did
23 not have a good relationship with the individual in
24 charge of printing and --

Page 51

1    Q. Who was that?
2    A. Larry Lutz. I'll call it a personality
3 conflict.
4    Q. Can I ask you to spell Mr. Lutz's last
5 name?
6    A. L U T Z.
7    Q. You said there was a feeling. Why did you
8 say that?
9    A. That was -- that was the impression I got
10 from talking with the staff, the comments that I was
11 given were that the previous director did not spend a
12 lot of time there. He and Mr. Lutz did not get
13 along.
14    Q. Did Mr. Lutz tell you these things?
15    A. No, Mr. Lutz was gone.
16    Q. Okay. Who did tell you those things?
17    A. Various staff members within the offset
18 division.
19    Q. And who would they be?
20    A. Jeff Gallagher, and I'll just give you what
21 the organizational structure was. Jeff Gallagher was
22 printing superintendent.
23    Q. Did he tell you that?
24    A. I'm going to say yes, among other people.

Page 52

1 I believe that Robin Gray expressed that opinion.
2    Q. That would be G R E Y?
3    A. G R A Y.
4    Q. Thank you.
5    A. I don't remember his first name, Boyd.
6 Mr. Boyd. I guess I would just offer it was
7 consensus of opinion.
8    Q. When you began as Director of Printing
9 Services were you aware of any criticism of that unit
10 as to the quality of the work they were performing?
11    A. Did you say prior to going there?
12    Q. No, when you began.
13    A. When I began I was aware that that was part
14 of the discussion prior to my arrival, that the unit
15 was having difficulty in meeting quality standards of
16 work for many of its customers and as a result many
17 of them were leaving. Focusing on improving the
18 quality of the work, impressing upon the press
19 operators the need to assure the delivery of a
20 quality product was one of the things that I kept in
21 the forefront of most of my conversations with them.
22       I tried to hold regular meetings with the
23 unit heads, in the offset division I even held
24 meetings with the employees themselves to try to keep

Page 53

1 them informed of what we were doing, I was attempting
2 to form a team and get some buy-in.
3    Q. Were there any specific examples you could
4 give of shoddy quality of work at the time you became
5 director?
6    A. I don't remember any specific examples
7 right now. There were several jobs that at the end
8 of the press run, you know, we had to pitch.
9    Q. That isn't unusual, is it? I mean if you
10 had to pitch them that doesn't mean it's shoddy work,
11 you're correcting mistakes.
12       MR. WAGNER: Objection as to form. Please
13 answer.
14    A. It's unusual if your press operation should
15 have known better. The issue of quality work and
16 performing quality work and not making stupid
17 judgment calls came into play. There were a couple
18 of press operators that we suspended for unacceptable
19 quality of work, among other things.
20       And the unit as a whole was not accustomed
21 to I'll call it a stern disciplinary presence. And
22 we had to take some actions to get people's
23 attention.
24    Q. Were employees of printing services members

Page 54

1  of a union?
2      A. Yes, they were.
3      Q. More than one collective bargaining unit?
4      A. Yes.
5      Q. How many?
6      A. I think there were three.
7      Q. Can you name them for us?
8      A. Graphics International Union, I don't know
9  what the local is; AFSCME; and I don't recall the
10  union for the copy operators. The Graphics
11  International and Copy Operators represented the bulk
12  of the people there.
13      Q. Each different Collective Bargaining
14  Agreement I take it had arbitration provisions if
15  there were disputes between members of the unit and
16  management?
17      A. Yes. Grievance procedures that included
18  arbitration.
19      Q. That could result in arbitration.
20          And what was your own situation in terms of
21  being director as to the number of grievances that
22  were filed when you were director?
23      A. In my first six months we had maybe a
24  grievance a month.

Page 55

1      Q. So that would be six in six months.
2      A. That's not an exact number, but the union
3  was very active let's say.
4      Q. Was this one of the three unions?
5      A. Yes.
6      Q. Which one?
7      A. Most of that came from Graphics
8  International Union, whatever it was.
9      Q. These are the typesetters you talked about?
10      A. Yeah, offset print operators, typesetters.
11  I don't recall all the different positions
12  represented.
13      Q. And then the last, trying to do the math,
14  the last 13 months you were director?
15      A. The level of union activity fell way off.
16  One of the things that I strived to do as the
17  director was to impress upon not only the employees
18  but the union officers themselves of the critical
19  need to begin some semblance of order, if you will,
20  to deliver a quality product, eliminate specific
21  language within the bargaining agreement, work
22  together as a team to try to turn this unit around.
23          There was a clause in the contract which
24  required us to assign three press operators to a

Page 56

1  press where I had visited a press operation in
2  Bloomington, Illinois, they were using two or less
3  people to run that same press, we were required to
4  run three by the Collective Bargaining Agreement. I
5  told them we have to absolutely have that staffing
6  clause out of the agreement.
7      Q. Was it taken out of the agreement?
8      A. Yes, it was.
9      Q. During the first six months you were
10  director then did the number of grievances filed
11  against management and printing services increase,
12  decrease or remain the same from the prior six
13  months?
14      MR. WAGNER: I'm sorry, could you repeat
15  that question, please?
16      (Whereupon the requested portion of the
17  record was read by the reporter.)
18      MR. WAGNER: Thank you.
19      A. I have no specific recollection. I don't
20  know what it was before I got there. I was under the
21  impression that it was a fairly active union when it
22  came to representing the people and grieving things
23  that went wrong, but I don't know.
24      Q. Now, you've indicated that you were

Page 57

1  concerned as Director of Printing Services, one,
2  about the budget obviously, two, about the number of
3  employees and, three, about the quality of services.
4  And again if I'm inaccurately stating that, please
5  remind me. Was there anything else in terms of your
6  ambit of directorship that you were concerned about?
7      A. One of the first things that I noticed is
8  that the unit had a fleet of ten vehicles. I used to
9  supervise a garage and car pool so I knew that, you
10  know, on a -- for such a small unit that seemed to be
11  like a large number.
12          The status of the vehicles in terms of
13  their appearance and state of repair could only be
14  classified as poor. In looking at the financial end
15  of things and what it might cost to maintain a fleet,
16  there had been no funds set aside, the unit was not
17  making money, no funds to repair, maintain as they
18  should be or replace those vehicles. So we made a
19  strategic decision to eliminate them.
20          We reduced the number I think to three.
21  The unit also was paying for 24 hour parking spaces
22  around its facility for its customers, which is maybe
23  a nice thing to do, but represents a significant
24  cost, so we eliminated those spaces.

Page 54 - Page 57

Page 58

1  Q. What type of cost factor was that on a
2  monthly basis?
3  A. I think $700 a year.
4  Q. A year?
5  A. A year.
6  Q. Getting back to the vehicles, you say you
7  reduced it. Did you buy three new vehicles or did
8  you use three of the ten that were there?
9  A. Got rid of seven and kept the best three as
10 I recall.
11 Q. And the unit simply didn't need to operate
12 with ten vehicles then as far as you were concerned?
13 A. No, they did not. Deliveries that they
14 were making and the pickups that they were making,
15 that they had to do from 54 East Gregory we could
16 easily do with three vehicles. We also arranged with
17 I think it was Stores, Mail & Receiving to conduct
18 the on campus pickups of jobs coming in and then we
19 encouraged customers to bring the jobs directly to
20 us.
21 Q. So you started paying Stores to do
22 delivery?
23 A. We worked out an agreement with them that
24 involved reimbursement at a substantially reduced

Page 59

1  price as far as maintaining a fleet of ten vehicles.
2  Q. Do you know what that was monthly?
3  A. I'm not remembering the actual number, the
4  figure that sticks in my head is that we -- I think
5  we reduced our vehicles costs by like seven to ten
6  thousand dollars.
7  Q. The unit then paid for the maintenance on
8  the vehicles, paid for the gas on the vehicles and
9  paid for the insurance on the vehicles?
10 A. We were responsible for the fuel and the
11 maintenance and the replacement.
12 Q. Not for the insurance?
13 A. I don't recall that we were responsible for
14 the insurance.
15 Q. When the vehicles got fuel, did they go to
16 University pumps or they went to private --
17 A. Went to garage and car pool.
18 Q. But you had to reimburse the garage and car
19 pool?
20 A. We paid the garage and car pool for the
21 fuel.
22 Q. Well, that's what I meant. Was it a
23 reduced cost?
24 A. Yes. Less than $3 a gallon.

Page 60

1  Q. I would hope so then.
2  So you think that you saved on an annual
3  basis seven to ten thousand dollars by reducing the
4  fleet of vehicles and obviously their operation and
5  maintenance?
6  A. That's my recollection.
7  Q. Do you know what the reimbursement cost to
8  stores was after the vehicle fleet was reduced?
9  A. I don't have that number.
10 Q. A range of three or four thousand dollars a
11 year?
12 A. Maybe five thousand.
13 Q. So then that reduction in cost as a result
14 of the decrease in vehicle fleet numbers and
15 operation was about $5,000 a year or less?
16 A. The net reduction in cost to printing
17 services was, as I recall, was in the order of seven
18 to ten thousand dollars a year by going to Stores,
19 Mail & Receiving to pick up and deliver these
20 products.
21 Q. All right. And I didn't understand that.
22 So you had already factored in what the previous cost
23 was to run the ten vehicles versus the cost of then
24 reimbursing Stores and that's where you arrived at

Page 61

1  the figure of a net reduction of seven to ten
2  thousand dollars annually?
3  A. That's what I recall.
4  Q. All right. Is there anything else that you
5  directed your attention to that -- other than you
6  have indicated at this point?
7  A. A couple of things. One of the main issues
8  was the status of the equipment in the offset
9  printing division. There were -- one of the things
10 that I was given to -- one of the things I quickly
11 realized is that there was no money set aside for the
12 repair or replacement of any of the offset equipment.
13 These were pieces of equipment that run in the tens,
14 hundreds, tens and hundreds of thousands of dollars
15 or in the case of the largest unit, probably millions
16 of dollars. No significant repair work or deferred
17 maintenance work had been performed on any of the
18 equipment.
19 We set about to identify what some of those
20 more critical needs were, asked the supervisor in the
21 printing shop to identify that, especially on the
22 Miller six color press, which was the largest unit
23 there.
24 Q. Miller is M I L L E R?

Page 62

1   A. That's correct. We identified numerous
2 items that needed to be repaired or replaced.
3 Identified a vendor to do that. And I think the time
4 frame was around the semester break period in
5 December-January of 2003, 2004. We -- and we may
6 have deferred that until summer. But we did about
7 $50,000 worth of repair work to the Miller six color
8 press. That was the first significant repairs that
9 had been made on that in a long time.
10   Q. Did you take this money out of the general
11 budget then?
12   A. We had -- I mean there was no general
13 budget in the sense that the University provided us
14 money.
15   Q. I meant the unit budget.
16   A. I went to Pam Voitik --
17   Q. General budget of the unit.
18   A. I went to Pam Voitik and I said, you know,
19 we need to spend some money on repairs and
20 maintenance on the six color press, it's going to be
21 about $50,000 and here's what it is, can I have your
22 authorization to go ahead and do that because that's
23 going to be an expense to the unit, meaning we need
24 to generate $50,000 in revenue to cover it. I got

Page 63

1 permission to do that.
2   Q. So the money for the $50,000 came within
3 printing services, it wasn't given to you from an
4 outside source?
5   A. That's correct. It would come from
6 money -- it would come from revenue we generated.
7   Q. Was there any basis -- you earlier said
8 there was no funds set up for maintenance of
9 equipment or buying equipment. How would one go
10 about setting up such a fund given the budget deficit
11 you've talked about?
12   A. You would review the estimating standards
13 and make sure that it included a figure for repair,
14 maintenance and replacement of equipment.
15   Q. So that when you bid jobs you'd be bidding
16 in a component to put in that fund?
17   A. And you would set it aside.
18   Q. Were you able to do that before you left as
19 director of printing?
20   A. We had included it when we -- when we
21 reviewed the estimating standards in the fall of 2003
22 we included a cursory number in the billable hourly
23 rate for our estimating of a dollar per hour so that
24 every job that we did, however many hours it took,

Page 64

1 one dollar times that number of hours theoretically
2 went into a fund for repair, replacement of
3 equipment.
4   Q. And was there ever a dedicated fund created
5 when you were director for that type of replacement?
6   A. I'm not sure it was in place by the time I
7 left. It was one of the recommendations that I left
8 behind.
9   Q. Now, during the time you were Director of
10 Printing Services did you have a written contract
11 with the University of Illinois as to your
12 employment?
13   A. I'm going to answer that and say yes. I'm
14 an academic professional employee, which makes me an
15 at will employee, so I serve in this position as long
16 as the University wants me to.
17   Q. But did you have an annual written contract
18 regarding your employment with University Illinois?
19   A. I think we sign a contract every year.
20   Q. And what were the dates effective if you
21 recall?
22   A. I don't recall specifically, I think it
23 reflects the academic year which if I am correct is
24 September through August.

Page 65

1   Q. So it's not the fiscal year?
2   A. No.
3   Q. Curious don't you think? I mean in terms
4 of comparing one's efficiency and whatever on the job
5 that there is a different time for the contract,
6 personal contract year versus the fiscal year?
7   MR. WAGNER: Objection as to form. Please
8 answer if can.
9   A. That's the University's business, not mine.
10 I mean it's HR policy on the academic side of the
11 house I would say.
12   Q. And did you get annual written reviews
13 yourself as Director of Printing Services or
14 evaluations if you like that term?
15   A. I received one review as I recall while I
16 was Director of Printing Services.
17   Q. Has the University's policy about doing
18 evaluations been the same for as long as you've been
19 an employee?
20   A. I think so.
21   Q. And what is that policy?
22   A. My understanding is that policy is for all
23 employees, academic and staff to receive one
24 evaluation per year.

Page 66

1    Q. At a particular time of the year?
2    A. I'm not sure if the policy stipulates a
3  particular time. Of the reviews I have received they
4  have typically been in the spring.
5    Q. April or May or earlier?
6    A. I'm going to say April/May. I think there
7  may even be a deadline, June 1 or June 30 deadline.
8    Q. Let me then project with you, you received
9  a written evaluation in April or May of 2004 as
10 Director of Printing Services?
11    A. I don't remember the actual date.
12    Q. But you did get one in 2004?
13    A. Yeah.
14    Q. You probably didn't get one in 2005 because
15 you only served three months in 2005, am I correct?
16    A. I did not get one in 2005. I served from
17 September of '04 to 2005 in that second academic year
18 if you will.
19    Q. And you did not get one I take it also in
20 2003 then? Again it was past the spring when you
21 were appointed.
22    A. I don't believe I got one in 2003.
23    Q. Now --
24    A. Could we --

Page 67

1    Q. I've asked you about printing services.
2  Did you get evaluations in 2003 and 2005 for other
3  jobs?
4    A. I don't believe I received an evaluation in
5  2003 that I recall. I received one in 2005 as I
6  recall. That's a little bit difficult in terms of my
7  memory because of the transition over to full-time
8  Director of Emergency Planning in April, but I
9  remember sitting down with Chief Clark and discussing
10 status, performance and objectives. Whether or not
11 that was an actual academic evaluation or not I'm a
12 little bit unclear on.
13    Q. Now your own contract that you referred to
14 runs for one year as you said.
15    A. That's correct.
16    Q. Is there any reference in it to renewal?
17    A. I don't recall what the actual contract
18 says. The understanding that I have having been an
19 academic employee is that there are requirements for
20 the University as far as renewal goes and if they are
21 not going to renew a contract they're required to
22 notify me a certain number of months in advance of
23 the contract renewal period and depending on how long
24 I have served, then I'm -- if they choose not to

Page 68

1  retain my services I'm given a terminal notice and I
2  may have either six months or 12 months to continue
3  to serve and give me an opportunity to find another
4  job.
5      (Whereupon a break was taken and the
6  deposition continued as follows:)
7    Q. (By Mr. Williamson) On your evaluation as
8  Director of Printing Services, who did that?
9    A. Pam Voitik, V O I T I K.
10    Q. How did you do generally on that evaluation
11 in terms of numerical or whatever reference she made?
12    A. Above average to excellent as I recall.
13    Q. When you referenced the deficit earlier,
14 I'm going back to the spring of 2003, was this a
15 deficit that was told to you by Jack Dempsey?
16    A. It was told to me by Jack Dempsey and then
17 borne out by the financial paperwork I was given.
18    Q. That was my next question. Did you ever
19 see objective documentation of that deficit?
20    A. Yes.
21    Q. And how -- what was that?
22    A. It's in the form of I'll say standardized
23 budget reports that F and S was in the process of
24 adopting at that point to allow all of their units to

Page 69

1  track their fiscal performance.
2    Q. Facilities and Services?
3    A. Facilities and Services.
4    Q. Did they have a uniform -- I'm sure they
5  must have had a uniform manner of each unit reporting
6  month to month financial situations.
7    A. Yes, they did. Again that was one of those
8  things that like F and S was in transition, you know,
9  they were bringing in new units, new units that were
10 wholly self-supporting, they were being combined in
11 this larger unit so they needed to develop some new
12 format reporting schemes if you will, so I think the
13 financial services side of the house was in the
14 process of, you know, trying to make those
15 arrangements to provide meaningful information to the
16 operating units.
17    Q. Now, did they do -- did each unit or did
18 printing services do month-to-month financial
19 statements when you were director?
20    A. Yes.
21    Q. And was that the case before as well?
22    A. I think it was.
23    Q. In other words, this wasn't something that
24 you innovated, it was a procedure prior to your

Page 70

1  coming as director?
2      A. I would say yes.
3      Q. And again, I continue to be confused, when
4  you did those month-to-month statements, let's say
5  you'd have a good June, let's say you made money in
6  June, printing and services made money, did that
7  month-to-month financial statement show that you made
8  money in June but then continue to show a deficit
9  from, you know, an unidentified period in the past?
10     A. The month-to-month statements would reflect
11  I'll call it a profit and loss for that particular
12  month. If there was a profit, my recollection is the
13  deficit would come down. If there was a loss the
14  deficit would go up. And we had good and bad months.
15     Q. But there's always this large figure up
16  there that's either a deficit or a profit in other
17  words? That's --
18     A. Like a --
19     Q. Just ongoing.
20     A. In our case it was like a cloud hanging
21  over the whole unit. Everybody was aware of it,
22  everybody was concerned about the potential impacts
23  if we weren't able to reduce it or eliminate it.
24  They were concerned about their jobs. So everybody

Page 71

1  was more or less keeping an eye on it. And I was
2  trying to keep people informed.
3      Q. On March 31st, 2005, that large cloud was
4  again close to a million dollars?
5      A. It was under a million dollars.
6      Q. Right. That's why I say close to a million
7  dollars. You can give a figure if you like because I
8  certainly don't know myself.
9      A. I think I said earlier, as I recall, I
10  think it was between $900,000 and $950,000.
11     Q. Okay. Do you know what it is now by
12  chance?
13     A. No, I don't.
14     Q. Has your involvement with printing services
15  stopped since March 31st of 2005?
16     A. My direct involvement has, aside from the
17  occasional times when I run into people and have an
18  opportunity to interact with them.
19     Q. What happened on March 31st, what job did
20  you move to at that point?
21     A. I was approached by Dr. Dempsey in December
22  of '04 about the possibility of doing the emergency
23  planning portion of my job on a full-time basis. The
24  University was considering making that a full-time

Page 72

1  position. He inquired as to my interest and I told
2  him that I would certainly be willing to do that.
3      Q. When you took the planning -- printing
4  services job in July of 2003, did you get a raise
5  with those two job descriptions you indicated?
6      A. Not that I recall.
7      Q. Did you then get a raise in March of 2005
8  when you became the full-time Director of Emergency
9  Planning?
10     A. No. The raises for the academic people are
11  typically given out in August, you're notified of
12  them in August.
13     Q. Well, maybe I have been misstating my
14  questions then. I mean it's June of 2006. Tell me
15  the last three August dates as to whether you've
16  received raises, that would be August of '05, '04 and
17  '03.
18     A. I received an increase in August of '05,
19  there was a -- I'm trying to remember the campus
20  financial position at the time. I think there was a
21  very small increase in August of '04 and I do not
22  recall one in August of '03.
23     Q. '03 was a particularly bad year for the
24  University of Illinois financially I take it.

Page 73

1      MR. WAGNER: Objection as to form. Please
2  answer if you can.
3      A. As I recall there was several bad years,
4  probably starting in 2000 or 2001 and going on
5  through 2003, some carryover in 2004, it was just
6  terrible for the University of Illinois.
7      Q. Three and a half to four years then?
8      A. About three years probably, two to three
9  years.
10     Q. And so there was an ongoing financial
11  situation for the entire University at that time?
12     MR. WAGNER: Same objection as to form.
13  Please answer.
14     A. That's my recollection.
15     Q. When you left your prior job in July of
16  2003, you may want to say it's earlier than that,
17  what was the financial situation with that unit?
18     A. Overall the financial situation was stable,
19  the custodial group and the grounds group had taken
20  significant budget cuts that resulted in hiring
21  freezes, staff lay-offs on the grounds section. The
22  waste transfer station was doing okay because it's
23  also a recycling station for campus so it was
24  bringing revenue in. The garage and car pool

Page 74

1 situation was -- as I recall was profitable. And the
2 transportation unit because of its organizational
3 structure was stable as well.
4    Q. Did the overall unit show a deficit when
5 you left in June of 2003?
6    A. I don't remember.
7    Q. So whoever took -- who did take your place?
8    A. No one. The transition team that I was on,
9 I tell people I was put on the transition team and
10 given the opportunity to work myself out of a job.
11 It was very clear from our early meetings that
12 because of the nature of that unit it would be broken
13 up, the position of director of operations would be
14 eliminated. So elements of that unit were sent to
15 the director of maintenance, the Director Of
16 Construction and the Director Of Campus Services.
17    Q. It's fair to say you didn't seek out the
18 job of Director of Printing Services, is it not?
19    A. I don't understand the question.
20    Q. You didn't seek the job, it wasn't posted,
21 you didn't go to anyone and say I want the job of
22 Director of Printing Services?
23    A. No, I didn't.
24    Q. Is it also fair to say you were told to

Page 75

1 take the job of Director of Printing Services?
2    MR. WAGNER: Objection as to form. Please
3 answer if you can.
4    A. I was assigned to be the Director of
5 Printing Services.
6    Q. A diplomatic response. And the reason I
7 want to ask you the way I said it, I just want to
8 make it relatively clear that a superior indicated to
9 you that you would take the job of director of
10 printing services, is that an accurate statement?
11    A. I was informed that I would be the Director
12 of Printing Services by a superior.
13    Q. Without input on your part.
14    A. That's correct.
15    Q. And in fact, that direction came after a
16 meeting three days before when you were told by that
17 same individual you were going to have a different
18 job; is that correct?
19    A. Yeah, I said three days earlier, it may
20 have been the previous week.
21    Q. I understand.
22    A. But in short time frame there. It happened
23 quickly.
24    Q. Because you thought you were going to be

Page 76

1 director of campus parking. And within we'll say
2 seven days that was changed by Dr. Dempsey to being
3 Director of Printing Services?
4    A. That's correct.
5    Q. Did you understand that you had any ability
6 to accept or reject the job of director of printing
7 services?
8    A. Would you restate that question, please?
9    (Whereupon the requested portion of the
10 record was read by the reporter.)
11    A. I never thought about that.
12    Q. Did you ever see a job description for
13 Director of Printing Services while you were
14 performing it or before or afterwards?
15    A. I don't remember. I think I helped write a
16 position description for my position, so I may have
17 referred to an old one, but I don't actually
18 remember.
19    Q. Which position?
20    A. Director of printing services.
21    Q. You helped rewrite the job description? I
22 mean is that what you said?
23    A. I think we worked on a position description
24 for it.

Page 77

1    Q. I want to ask you about a few individuals
2 you may have worked with. Did you work with Bob
3 Kelly?
4    A. My association with Bob Kelly was as a unit
5 director under Pam Voitik and he was the unit
6 director for Stores, Mail & Receiving. I want to
7 correct that. He was a unit director reporting to
8 Pam. I'm not exactly specific as to which
9 organization he had. I think it was Stores, Mail &
10 Receiving.
11    Q. Did you work with him, though, on a
12 day-to-day basis while you were director of printing
13 services?
14    A. No, I did not.
15    Q. So did you have any involvement with him?
16    A. The only involvement I had with Bob
17 relative to printing services was a brief discussion
18 to talk about the unit itself prior to going down
19 there. This would have occurred between the
20 announcement that I would be going there and my
21 arrival in July and my purpose in going to him was
22 just to try to get an initial flavor of the unit
23 because he had been an interim director there during
24 the transition period while the transition team was

Page 78

1 working.
2    Q. He was an interim director of printing
3 services?
4    A. That was my understanding.
5    Q. For how long?
6    A. I'm not exactly sure on the time period,
7 I'm going to say maybe six to nine months.
8    Q. So that would be the six to nine months
9 prior to July of 2003?
10    A. Yeah. There was -- there was another lady
11 that may have been serving in some interim basis
12 there.
13    Q. Barb Childers?
14    A. No, Sonya Chambers.
15    Q. Let me ask you about Barb Childers first.
16 Are you familiar with her?
17    A. Yes, I know Barb.
18    Q. And what was her position first with
19 printing services?
20    A. Barb was the unit head for the copying
21 services group within printing services.
22    Q. How would you describe her as an employee?
23    A. Barb is an excellent employee I think. She
24 has a very strong desire to serve the customer, turn

Page 79

1 out a quality product, hold her people accountable,
2 make on time deliveries, delivery schedules and stuff
3 like that. She is dedicated and knowledgeable.
4    Q. Did you supervise her while you were
5 director of printing services?
6    A. Yes, I did.
7    Q. Did you give her evaluations?
8    A. I believe I did.
9    Q. More than one?
10    A. I think just one.
11    Q. And again, how would you summarize your
12 evaluation of Barb Childers?
13    A. No specific recollection, but, you know, my
14 memory would say above average to exceptional.
15    Q. You mentioned Sonya Chambers. Was she also
16 an interim director of printing services?
17    A. I think that's correct. Sonya was at
18 printing services at the time my appointment was
19 announced. In fact I moved into the office that she
20 occupied.
21    Q. The director's office?
22    A. Yes. And I'm thinking she held an interim
23 director title. Part of her function in being there
24 because of her background was to work with -- I think

Page 80

1 there were five employee committees or work groups
2 that had been formed representing different elements
3 of the organization and this is in the fall of 2002
4 and because of her MBA and business background she
5 was there to develop strategic recovery plans, if you
6 will, for those units.
7       For example, one of the units was
8 photography. And -- or photo services. The question
9 was whether or not that is a profitable entity that
10 should be retained because of the change from film --
11 negative film technology to digital pictures. And so
12 each of these five groups had identified a series of
13 recommendations that they were making to I'll say
14 maybe the new director to Dr. Dempsey and, you know,
15 Pam Voitik to say, you know, we've taken a real close
16 look at each of these operations within printing
17 services and here are some initial thoughts on how
18 this unit can recover.
19       And that was -- I mean that was a report
20 that provided an initial framework for me getting
21 more information about it and then beginning to work
22 more closely with the people assigned there.
23    Q. What job was Sonya Chambers performing then
24 in June of 2003 at printing services?

Page 81

1    A. Well, she was not there in June of 2003.
2 She moved out probably by the start of June. In fact
3 she and I switched offices. She moved into my office
4 at the physical plant and I moved into her office at
5 printing services.
6    Q. So she was never at printing services the
7 exact same time you were director?
8    A. No, sir.
9    Q. It was simultaneous, when you came in she
10 moved out?
11    A. It was a mutual switch.
12    Q. Do you know what her job title was, you
13 know, the day before you moved into the office?
14    A. I do not know what her actual job title
15 was.
16    Q. And you didn't have any working involvement
17 with her then because, as you said, she went some
18 place else.
19    A. Right. I had -- I had a discussion with
20 her after my arrival at printing services to discuss
21 elements of the report that those work groups had
22 completed to maybe get a better understanding of it,
23 but that was all.
24    Q. How about Van Allen Anderson? Do you know

Page 82

1 him?
2    A. Yes, I do.
3    Q. And was he involved with printing services
4 at the time you were appointed director?
5    A. No.
6    Q. And he wasn't your supervisor at any point
7 in time?
8    A. No.
9    Q. Did you have any interaction with him once
10 you became director of printing services?
11    A. Yes.
12    Q. In what respect?
13    A. I don't remember the actual dates. Van was
14 in a new role or new position at the Beckman
15 Institute and I can't remember if -- we had a
16 conversation, the result of which I think resulted in
17 a delivery to my office of some boxes of records
18 related to the Xerox copy contracts I'll call them.
19    Q. Was that the only involvement you had with
20 him?
21    A. Relating to printing services.
22    Q. Other than a discussion he was going to
23 deliver the boxes of materials, did he discuss with
24 you the Xerox contracts at all?

Page 83

1    A. I don't remember if it was Van or not that
2 I had the conversation with. I did have a
3 conversation with somebody about the Xerox contracts.
4    Q. Do you recall any other involvement with
5 Mr. Anderson other than that?
6    A. Van was the individual who had performed
7 the emergency planning services for the University
8 under Charles Colbert's tenure. And when Charles
9 Colbert left and Van's role changed, Van's role
10 actually changed prior to, I think it was around
11 2003, I had at least one or two conversations with
12 Van related to emergency planning issues.
13    Q. Only relating to emergency planning?
14    A. Yes.
15    Q. When you left as Director of Printing
16 Services were you replaced by two females if I
17 recall?
18    A. When I left printing services my
19 understanding was that they would probably name an
20 interim director and then conduct a search for a
21 person to take my position. It was not going to be
22 as director of printing services. The transition
23 team had identified that the director title as it
24 would be used in F and S would be assigned only to

Page 84

1 direct reports to the executive director.
2    And in fact they -- I think they put an
3 asterisk on the organizational chart since they --
4 when we completed the transition work in 2003, which
5 indicated when I left printing services that position
6 would become, I think it was assistant director, it
7 might be associate director, but it was going to
8 change.
9    Q. That's what you were told. Do you know
10 what happened?
11    A. Yeah, my understanding is that they've
12 conducted the search and that Barb Childers has been
13 appointed to be the again associate or assistant
14 director for printing services.
15    Q. On a permanent basis?
16    A. On a permanent basis.
17    Q. When you had the discussion with
18 Dr. Dempsey in the spring of 2003 did he indicate to
19 you the duration of the time frame for you to serve
20 as director of printing services?
21    A. There was no -- there was no time limit
22 given.
23    Q. And it wasn't discussed then?
24    A. No, it wasn't.

Page 85

1    Q. Prior to Barb Childers being named as
2 interim assistant director or whatever her title is
3 now, who served in the director's position after you
4 left?
5    A. Pam Voitik, who was the director of campus
6 services, took up residence, if you will, for a few
7 days a week in the office that I had occupied. She
8 indicated to me in a conversation she was going to do
9 that because she wanted to become more familiar with
10 the operation and get a better handle on things.
11    So I think she did that for a period of
12 maybe six to nine months before making an
13 announcement that Barb would be the interim director
14 and that they would then conduct this search for an
15 associate director, whatever it is.
16    Q. And did Pam Voitik take Van Anderson's
17 position?
18    A. No.
19    Q. They were two entirely different positions
20 then?
21    A. Yes.
22    Q. So even though the director of printing
23 services may have reported to Van Anderson, when
24 Mr. Van was serving in that position, you reported to

Page 86

1  Pam Voitik?

2      A. I never reported to Van Anderson.

3      Q. I know that.

4      A. My report was to Pam Voitik.

5      MR. WILLIAMSON: That's all I have right

6  now.

7  EXAMINATION CONDUCTED:

8      BY: MR. EDWARD WAGNER:

9      Q. Kip, since this is not a videotaped

10  deposition, just for the record, you are a white

11  Caucasian male?

12      A. That's correct.

13      MR. WAGNER: That's all I have.  We reserve

14  signature.  Thank you.

15      (Concluding at 11:00 AM)

16  AND FURTHER THE DEPONENT SAITH NOT

17      (Signature Reserved)

18

19

20

21

22

23

24

Page 87

1  STATE OF ILLINOIS         )
                             )
2  COUNTY OF VERMILION)

3

4      I, Amy L. Prillaman Neubaum, a Certified
   Shorthand Reporter, in and for the County of
   Vermilion, State of Illinois, do hereby certify that
5  KIPLING MEACHUM, the deponent herein, was by me first
   duly sworn to tell the truth, the whole truth and
6  nothing but the truth, in the aforementioned cause of
   action.
7      That the foregoing deposition was taken on
   behalf of the Plaintiff, at the Law Offices of Heyl,
8  Royster, Voelker & Allen, Urbana, Illinois, on the
   22nd of June, 2006;
9      That said deposition is a true record of the
   testimony given by the deponent and was taken down in
10  stenograph notes and afterwards reduced to
   typewriting under my instruction; and that it was
11  agreed by and between the witness and attorneys that
   said signature on said deposition would not be
12  waived.
      I do hereby certify that I am a disinterested
13  person in this cause of action; that I am not a
   relative of any party or any attorney of record in
14  this cause, or an attorney for any party herein, or
   otherwise interested in the event of this action, and
15  am not in the employ of the attorneys for either
   party.
16      IN WITNESS WHEREOF, I have hereunto set my hand
   this 27th day of June, 2006.
17  Amy Prillaman Neubaum, CSR

18      AMY L. PRILLAMAN NEUBAUM, CSR

19

20

21

22

23

24

Page 88

1

2      IN THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
              STATE OF ILLINOIS
3

4  GEOFFREY W. BANT,            )
                               )
5      Plaintiff,              )
                               )
6  -vs-                        )No. 05-2132
                               )
7  BOARD OF TRUSTEES OF THE    )
   UNIVERSITY OF ILLINOIS,     )
8                              )
       Defendant.              )
9

10      This is to certify that I have read the
11  transcript of my deposition taken in the
   above-entitled cause, and that the foregoing
12  transcript taken on June 22nd, 2006, accurately
   states the questions asked and the answers given by
13  me, with the exception of the corrections noted, if
   any, on the attached errata sheet(s).
14

15      KIPLING MEACHUM

16

17

   Subscribed and Sworn before me
18  this _____ day of
   _____, 2006.
19  _____
   Notary Public
20

21
   RETURN TO:
22
   AREA WIDE REPORTING
23  301 WEST WHITE ST.
   CHAMPAIGN, IL  61820
24