IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

GEOFFREY W. BANT,

        Plaintiff,

    -vs-               No. 05-2132

BOARD OF TRUSTEES OF
THE UNIVERSITY OF ILLINOIS,

        Defendant.

DEPOSITION

The Deposition of VAN ANDERSON, a

citizen of the State of Illinois, a witness of

lawful age; produced, sworn, and examined upon his

corporeal oath, at the Law Offices of Heyl,

Royster, Voelker & Allen, Urbana, Illinois, on

June 23rd, 2006, before Deann K. Parkinson, CSR,

Notary Public in and for the County of Champaign

and State of Illinois, as a witness in a certain

suit and matter now pending and undetermined in

the United States District Court for the Central

District of Illinois.

        CSR License No. 84-002089

COPY

Exhibit "__F__"

Page 2

1  Appearances:

2  MR. ED WAGNER
   Heyl, Royster, Voelker & Allen
3  102 East Main Street
   PO Box 129
4  Urbana, IL 61801
   217-344-9295
5  Appearing on behalf of the Defendants

6  MR. NILE WILLIAMSON
   Attorney At Law
7  1926 Associated Bank Plaza
   Peoria, IL 61602-1104
8  309-677-5950
   Appearing on behalf of the Plaintiff

9  Also Present: Mr. Geoffrey Bant
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 3

                EXHIBIT INDEX
1  Exhibit No. 1...............Page 9
   Exhibit No. 2...............Page        39
2  Exhibit No. 3...............Page        50
   Exhibit No. 4...............Page        62
3  Exhibit No. 5...............Page        80
   Exhibit No. 6...............Page        83
4  Exhibit No. 7...............Page        92

5  Exhibit No. 8.............Page93

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1      MR. WILLIAMSON: Same stipulation, and
2  does your client waive signature?
3      MR. WAGNER: No, we will reserve
4  signature.
5      MR. WILLIAMSON: Normal stenographic
6  stipulations.
7          VAN ANDERSON,
8  the deponent herein, called as a witness, after
9  having been first duly sworn, testified as
10 follows:
11          DIRECT EXAMINATION
12          BY MR. WILLIAMSON:
13  Q.  Would you state your name, residence
14 address, and date of birth, please.
15  A.  Van Allen Anderson, I reside at 1504
16 Bridge Point Lane, Champaign Illinois, 61822. And
17 the date of birth is January 27th, 1956.
18  Q.  You are an employee of the University of
19 Illinois, is that correct?
20  A.  Yes.
21  Q.  Give a brief history of your educational
22 background.
23  A.  At which level?
24  Q.  Start with high school.

Page 5

1  A.  High school?  Graduated Sterling high
2  school in Sterling, Illinois.  I proceeded on to
3  Sauk Valley College in Dixon, Illinois where I
4  received an associate's in science degree.  I then
5  went on to Western Illinois University where I
6  received both bachelor's degrees, with a --
7  Q.  Could you give us the years on the
8  degrees at Western Illinois?
9  A.  Certainly.  It was 1979, December of '79
10 for the bachelor's degree; and then a Master's
11 degree in science from Western Illinois
12 University, and that was in 1982.  Then I came to
13 the University of Illinois for Ph.D. studies in
14 genetics, received my Ph.D. in 1987.  I then
15 received a Master's in business administration
16 from the University of Illinois in 2002.
17  Q.  When did your professional work career
18 begin then?
19  A.  Professional work career began in 1987
20 with a post-doctoral research associateship doing
21 research in plant biology.
22  Q.  Could you lead us then from 1987 up
23 until now as to your professional work career?
24  A.  Certainly.  In 1988 I accepted the

Page 6

1 position of biological safety officer with the
2 division of environmental health and safety at the
3 University of Illinois in Urbana-Champaign. I
4 then was promoted to director of environmental
5 health and safety in 1992. In 1999 I was promoted
6 to associate vice chancellor for administration in
7 human resources. In 2003 --
8    Q. When was that in 1999?
9    A. That was in August of 1999. In 2003 I
10 became the associate vice chancellor for research
11 at the University of Illinois at Urbana-Champaign.
12 And in 2004 I became the associate director of the
13 Beckman Institute, University of Illinois at
14 Urbana-Champaign.
15    Q. Going back to the appointment in August
16 of 1999, was that the first time that you assumed
17 authority or jurisdiction over the unit of
18 printing services at the University of Illinois?
19    A. Yes.
20    Q. Was that the only time you had any type
21 of authority or supervision for the unit of
22 printing services at the University of Illinois
23 between the appointment in 1999 and 2003?
24    A. I was responsible for printing services

Page 7

1 from August of 1999 to January 2003.
2    Q. Three-and-a-half years, or thereabouts?
3    A. Approximately.
4    Q. And what was that responsibility?
5    A. The unit reported to me.
6    Q. And that would be the director of the
7 unit?
8    A. That is correct.
9    Q. Does that mean that you had authority to
10 hire and fire all employees within the unit?
11    A. All the -- I had authority to approve
12 the hires and make recommendations on hires and
13 terminations for that unit throughout that period.
14    Q. In the unit itself, who reported
15 directly to you?
16    A. In the unit itself for that period of
17 time Geoff Bant reported directly to me, and we
18 also had a person with a dual reporting line who
19 reported to me, and that was Sonya Chambers.
20    Q. When did Sonya Chambers come on board at
21 the University of Illinois?
22    A. She began work on October 1, 2001.
23    Q. Who hired her?
24    A. The recommendation for hire went through

Page 8

1 my office.
2    Q. So you hired her?
3       MR. WAGNER: Object to the form. Answer
4 if you can.
5    A. I was responsible for making the
6 recommendation for her hire.
7    Q. Who did you make that recommendation to?
8    A. To my supervisor, Charles Colbert.
9    Q. And he followed your recommendation and
10 hired Miss Chambers?
11    A. He then forwarded that recommendation on
12 for action by the University.
13    Q. Who ultimately made the decision to hire
14 Miss Chambers then at the University of Illinois?
15    A. The Board of Trustees is responsible for
16 the hiring and firing of employees at the
17 University of Illinois.
18    Q. Who told you that?
19    A. That is my understanding.
20    Q. Does the Board of Trustees act on every
21 hire and fire at the University of Illinois, of
22 what, 15,000 employees?
23    A. To my understanding they have to approve
24 those, yes.

Page 9

1    Q. So, Miss Chambers was approved in the
2 same manner that everyone else is?
3    A. That is correct. Well, to the best of
4 my knowledge, I should say. I don't know the
5 hiring practices for all persons on campus, but
6 the procedure is certainly that.
7    Q. This will be Anderson exhibit 1.
8       (Whereupon, Deposition Exhibit No. 1 was
9 marked for identification.)
10    Q. Handing you what has been marked
11 Anderson Exhibit No. 1, would you tell us what
12 that is, please.
13    A. This is the job description for the
14 director, office of printing services.
15    Q. Is that the job held by Geoffrey Bant?
16    A. It was.
17    Q. And does it reference a date?
18    A. Yes, it does.
19    Q. And what would that be?
20    A. June 20th, 2000.
21    Q. And is that a document prepared by the
22 University of Illinois as a job description for
23 the job Mr. Bant was doing from 1999 on until his
24 termination?

Page 10

1  A. Not for the period until his
2  termination. It covers only the period when he
3  was director of the office of printing services.
4  This document is part of a review process, and so
5  it was part of the -- my recollection is this is
6  part of the June 2000 performance evaluation of
7  Mr. Bant.
8  Q. My question was, is that the job
9  description that Mr. Bant was performing in the
10 year, from the years 1999 until his termination?
11      MR. WAGNER: Well, he answered that
12 question, but answer to the best you can again,
13 please. So we object to the form. It's been
14 asked and answered.
15 A. The position describes the duties and
16 responsibilities of Mr. Bant during his time as
17 director of printing services, which ended in
18 December of 2002. So, it did not hold through his
19 period of notice of nonreappointment.
20 Q. Why is that?
21 A. Because all of those duties and
22 responsibilities were removed from Mr. Bant.
23 Q. But, as to the descriptive terminology
24 in job description for director of printing

Page 11

1  service goes, is Anderson Exhibit No. 1 a true and
2  accurate copy of that job description as it
3  existed through the time of Mr. Bant's
4  termination?
5      MR. WAGNER: Object to the form of the
6  question. It's been asked and answered, because
7  actually the termination date is when he left the
8  University, not when he left the job position.
9  Q. He can say that.
10      MR. WAGNER: He did say that. Answer
11 again if you can.
12 Q. I want to know if the job description
13 for director of printing services changed at all
14 between 1999 and 2003? That might be a better way
15 to tell him.
16 A. The position responsibilities did not
17 change during that period.
18 Q. The job description did not change
19 during that period, did it?
20 A. To the best of my recollection there
21 were no changes for that position itself. Not for
22 individuals.
23 Q. Now, did Mr. Bant have a contractual
24 agreement with the University of Illinois once he

Page 12

1  came under your supervision to perform the job of
2  director of printing services?
3  A. He was in that position. He was hired
4  for that position. And he had the responsibility
5  for these duties under me.
6  Q. No; did he have a written contract with
7  the University to perform that position?
8  A. He has a, like all academic
9  professionals on campus, a one-year contract with
10 the University that is renewable.
11 Q. And when he came under your supervision
12 in August of 1999 what was the procedure or
13 protocol at the University of Illinois for
14 renewing such one year contracts?
15 A. It's automatic unless recommendations
16 are made otherwise for either the termination of
17 an individual or an individual can end their
18 relationship on their own accord with the
19 University of Illinois.
20 Q. So, does that status of having automatic
21 renewal accrue after a certain period of time?
22 A. For an academic professional position it
23 is automatic from the initial term of employment,
24 unless there's an end date put in the appointment

Page 13

1  itself.
2  Q. I just want to understand, once the,
3  what was the term you used? Academic
4  professional?
5  A. Correct.
6  Q. And I take it Mr. Bant was so described
7  as an academic professional?
8  A. He was.
9  Q. And again, an academic professional that
10 signs the contract in the first year may expect
11 automatic renewal thereafter unless there is a
12 notice of nonrenewal or the employee himself
13 terminates the contract for any reason, is that an
14 accurate statement?
15 A. No, it's not an accurate statement
16 because employees do not sign a contract with the
17 University. When there is an offer that is made
18 to the individual, and there is an acceptance of
19 that offer, but there is not a contract, I don't
20 recall ever signing a contract with the University
21 of Illinois. I wrote a letter of acceptance, and
22 that's what academic professionals do.
23 Q. And then the University itself sends the
24 annual contract to the employee?

Page 14

1    A. They send a notice of appointment to the
2  employee.
3    Q. So the employee does not have to do
4  anything annually? Doesn't have to re-sign a
5  contract every year, is that correct?
6    A. That is correct. And now I should say
7  they sent in the past. They are electronic now.
8  So it's something that an individual can at any
9  time go on the University system and look at.
10   Q. Go on-line to do?
11   A. Correct.
12   Q. What I wanted to understand was there
13  isn't any period of time that has to resolve for
14  seniority for this automatic renewal then? In
15  other words, you don't have to be at the
16  University three years or ten years or any fixed
17  period of time? You immediately assume automatic
18  renewal status once you're an academic
19  professional, is that correct?
20   A. It's based on the offer that is given to
21  the individual because an offer letter can state a
22  specific term of employment for the individual.
23   Q. If the offer letter states a particular
24  term of employment, and then the notice of renewal

Page 15

1  is made at the end of that term of employment,
2  obviously there's a rollover in effect of the
3  initial contract?
4    A. I'm sorry. I don't understand your
5  question.
6    Q. Let me rephrase it. This is a written
7  contract of employment, isn't it? Year to year
8  written contract of employment?
9        MR. WAGNER: Objection as to form.
10  Answer if you can.
11   A. It's a notice of appointment that you
12  receive.
13   Q. But as you said, there is an automatic
14  renewal, and that's done in writing as well, is
15  that correct, or on-line?
16   A. It's an automatic renewal only if
17  actions are not taken to otherwise terminate that
18  appointment.
19   Q. I understand. If actions are taken to
20  terminate the employment, is that on a for-cause
21  basis?
22       MR. WAGNER: Objection as to form.
23  Answer if you can.
24   A. No, academic professionals are at-will

Page 16

1  employees.
2    Q. Why would you use that term?
3    A. Because in all the years of experience
4  that's what I've come to understand is my position
5  at the University.
6    Q. What is an at-will employee?
7    A. That means that I can be dismissed at
8  any time from the University of Illinois.
9    Q. Well, that's totally inopposite to what
10  you just told me, you can't be dismissed at any
11  time? You have to be given a notice of
12  nonrenewal, isn't that correct?
13       MR. WAGNER: Objection as to the form and
14  legal conclusions. Answer if you can.
15   A. And the notice of nonreappointment would
16  be the termination from the University that I
17  would be given.
18   Q. So you can't be terminated at any time?
19  You have to be terminated in accordance with a
20  notice of nonrenewal?
21   A. For academic professionals, but that is
22  a notice of termination.
23   Q. Yes, sir. But, do you understand that
24  that does not mean that an academic professional

Page 17

1  is an at-will employee then?
2        MR. WAGNER: Objection as to form. It's
3  argumentative. Answer if you can.
4    Q. Let me just elucidate then what an
5  at-will employee is in Illinois. That is an
6  employee that can be terminated at any time for no
7  reason or any reason, do you understand that
8  concept?
9        MR. WAGNER: Objection as to form.
10  Argumentative. Answer if you can.
11   A. I understand that.
12   Q. All right. Do you understand that
13  concept is different than what you've just
14  described for academic professionals at the
15  University of Illinois?
16   A. My understanding for my position, which
17  is an academic professional's position, is that at
18  any time I can be given notice that my appointment
19  is terminated.
20   Q. And if you have a year-to-year
21  appointment, that means the notice of nonrenewal
22  means it's for something less than a year, is that
23  correct?
24   A. Would you please read that back.

Page 18

1    (At this point the court reporter read
2 the requested portion of the record.)
3    MR. WAGNER: Objection as to form.
4 Please answer if you can.
5    A.  Notice of nonreappointment, the length
6 of the notice of nonreappointment is based on the
7 employment history of the academic professional.
8 If you were there for less than four years, you
9 are given a six-month notice of nonreappointment.
10 If you were there for greater than four years, you
11 were given a 12 months notice of nonreappointment.
12 If you are in a contract year, so you've received
13 a notification of appointment from the University
14 for a 12 month period, and you are somewhere
15 within that 12 months, but for instance if it's
16 four months into that you have eight months
17 remaining, if a notice of nonreappointment was
18 given to an employee requiring 12 months notice of
19 nonreappointment, their appointment would be
20 extended to accommodate the term of the notice of
21 nonreappointment.
22    Q.  So, and this was the policy that was in
23 effect between 1999 and 2003 at the University of
24 Illinois?

Page 19

1    A.  Correct.
2    Q.  It was a policy you followed in
3 terminating Mr. Bant?
4    MR. WAGNER: Objection as to form.
5 Please answer if you can.
6    A.  I followed the policies of the
7 University in terminating Mr. Bant.
8    Q.  And you followed the policy you've just
9 described to me in terminating Mr. Bant, is that
10 correct?
11    A.  Which is recommending a notice of any
12 nonreappointment.
13    Q.  Again, so I understand it, if Mr. Bant
14 was in a one-year period of employment, and you
15 sent him the notice of reappointment six months
16 into that term, then because of his seniority he
17 would then be allowed to stay at the University
18 for 18 months from the notice of reappointment, is
19 that an accurate statement?
20    A.  It's a notice of nonreappointment, not
21 notice of appointment.  But, if he is six months
22 into the year, your statement is false from the
23 standpoint, if he's six months into the year and
24 he's given the notice of nonreappointment, at that

Page 20

1 date he has a 12 month notice of nonreappointment.
2 So, from the term, or from the time the notice of
3 nonreappointment is approved by the Board of
4 Trustees, it is a 12 month period for an academic
5 professional employed over four years at the
6 University of Illinois.
7    Q.  Thank you.  And in that hypothetical
8 then, in effect he would be given an additional
9 six months because he had six months left on his
10 contract, but he was, because of his seniority, he
11 was allowed to serve 12 months from the notice of
12 nonreappointment, which would extend him six
13 months beyond the time of his term of his
14 contract, is that accurate?
15    MR. WAGNER: Objection as to form.  That
16 has been asked and answered and that's not
17 accurate, but answer if you can.  Let's have it
18 reread for you.
19    (At this point the court reporter read
20 the requested portion of the record.)
21    MR. WAGNER: Same objection as to form.
22 And it's been asked and answered.  Answer if you
23 can.
24    A.  In a hypothetical where an academic

Page 21

1 professional is employed for greater than four
2 years was given a notice of nonreappointment after
3 serving six months of a notice of appointment, the
4 person would be given an extension of that
5 contract for six months to allow a 12 month notice
6 timing for that notice of nonreappointment.
7    Q.  I referred to that prior question as a
8 hypothetical because I didn't want to suggest that
9 that was Mr. Bant's actual situation.  I don't
10 think he was six months into the contract exactly.
11    A.  And I just answered for any academic
12 professional.
13    Q.  Thank you.  What was the basis then that
14 an employee would be given a notice of
15 nonreappointment in accordance with the policy
16 you've previously described between the years 1999
17 and 2003?
18    A.  Can you please read that back.
19    (At this point the court reporter read
20 the requested portion of the record.)
21    MR. WAGNER: Objection as to form.
22 Overbroad.  Answer if you can.
23    A.  It is an overbroad answer, and my
24 response is that a notice of nonreappointment

Page 18 - Page 21

## Page 22

1 would be issued if a recommendation for a notice
2 of nonreappointment on an employee was accepted by
3 the Board of Trustees.
4    Q. My question has to do with the substance
5 or basis for the notice of nonreappointment. What
6 did you understand the policy at that time to be
7 that would create a situation whereby an employee,
8 such as Mr. Bant, would be given a notice of
9 nonreappointment? What types of job-related
10 issues would be involved in that notice of
11 nonreappointment?
12    A. For academic professionals, notices of
13 nonreappointments can be given for several
14 different reasons. Notices of nonreappointment
15 can be given because funding is running out for a
16 position, and so the recommendation is made for a
17 notice of nonreappointment. That can happen both
18 on state funds, grant funds, when funds are
19 ending.
20        A notice of nonreappointment can be
21 recommended due to performance issues of the
22 employee. And so those are some of the ways,
23 different ways, that a notice of nonreappointment
24 can occur.

## Page 23

1    Q. I think that probably --
2    A. Excuse me. Another reason is if the job
3 ends, or the job duties are no longer required in
4 an organization, it doesn't have to be because
5 funds are ending, it could be just because those
6 duties are no longer required. So there's
7 multiple reasons why a notice of nonreappointment
8 could be issued.
9    Q. You delineated performance issues on the
10 job as one of the three bases I think for the
11 notice of nonreappointment. I take it, it could
12 also be personal issues involving the employee to
13 cause a notice of nonreappointment as well?
14    A. Personal issues such as --
15    Q. Alcoholism, committing a criminal act in
16 the workplace, drug issues, improper sexual
17 activity in the workplace, threatening assault to
18 fellow employees in the workplace? Trying to give
19 you some examples.
20    A. Sure. And I don't know the full range
21 of what those would be. I've not had to deal in
22 those areas.
23    Q. So there would be maybe a fourth
24 category then relating to personal issues of the

## Page 24

1 employee himself that may not be related to
2 performance issues, if you will? Would you agree
3 with that?
4    A. I don't know the full policy on that. I
5 just have never dealt in having to dismiss an
6 employee in those areas, so I don't know what the
7 procedure would be in those cases.
8    Q. I gave you that example to find out if
9 there was any other bases for the issuances of
10 nonrenewal other than the three you've given to
11 me, and maybe the fourth one I've suggested; can
12 you think of any other reason why a notice of
13 nonrenewal would be given by the University of
14 Illinois in accordance with the policy then in
15 force between 1999 and 2003?
16    A. The three that I have detailed are the
17 ones that I'm familiar with.
18    Q. Of the three that you detailed, which of
19 the three, if any, related to Mr. Bant?
20    A. I made a recommendation for the
21 nonreappointment of Mr. Bant based on performance.
22    Q. So, you didn't make a recommendation for
23 nonperformance of Mr. Bant because funding was
24 lost for his job position, is that correct?

## Page 25

1    A. That is correct.
2    Q. You didn't make a recommendation for
3 nonreappointment of Mr. Bant because his job was
4 being eliminated, did you?
5    A. Correct. I did not make a
6 recommendation for nonreappointment because his
7 position was ending.
8    Q. Your recommendation as to the
9 nonreappointment of Mr. Bant related only then to
10 performance issues on the job?
11    A. The notice of nonreappointment did refer
12 to performance deficiencies of Mr. Bant in the
13 job.
14    Q. And what were those performance
15 deficiencies?
16    A. Failure to manage the unit in a fiscally
17 responsible way. There were, I don't recall the
18 exact wording of the notice of nonreappointment.
19 But, fiscal management, personnel management of
20 the organization were major determining factors.
21    Q. Anything else?
22    A. I would have to look at the document to
23 give a full accounting of the points that were
24 listed.

Page 26

1   Q. By personnel management, what do you
2   mean?
3   A. On multiple occasions throughout the
4   time that I managed Geoff there were incidents
5   where I felt that Mr. Bant was slow to respond,
6   and was not managing the group in an effective
7   manner.
8   Q. Do you have the names of any individuals
9   you can identify that he didn't manage correctly?
10  A. There were issues with Jane Hannon.
11  Q. Can you spell the last name for us?
12  A. H-A-N-N-O-N.
13  Q. What issues with Jane Hannon?
14  A. There were problems with, as I recall,
15  this happened in the first year that, I believe
16  the first year that I oversaw printing services,
17  had to do with her interactions with other people
18  that were key to inventory control and other
19  issues related to printing services.
20  Q. In other words, she was not performing
21  her job correctly?
22  A. There were performance issues with Jane
23  Hannon, and also with group dynamics that I felt
24  Geoff was not managing.

Page 27

1   Q. And did you document this problem to Mr.
2   Bant at some point in time?
3   A. We did go over this problem, and
4   actually it was the subject of those discussions
5   that led to personnel actions being taken.
6   Q. Against Jane Hannon?
7   A. Within personnel services. And I don't
8   recall sitting here what the exact nature of the
9   actions were except for there was some
10  reorganizations trying to take care of the
11  problem.
12  Q. Was Jane Hannon terminated from the
13  University?
14  A. Not during the time I oversaw printing
15  services.
16  Q. What action was taken against her in
17  that first year then between 1999 and 2000?
18  A. I would have to look at the file to
19  refresh my memory on that.
20  Q. Who took the action against her?
21  A. Geoff was responsible for management.
22  And so it would have been his actions based on our
23  discussions.
24  Q. So, Mr. Bant did take action against

Page 28

1   Jane Hannon?
2   A. Not in the manner -- not in the manner
3   that I would expect of a director, which is to
4   identify the problems early and address them early
5   so that there wasn't a bigger impact on the unit.
6   Q. Did Mr. Bant advise you of the problem
7   with Jane Hannon?
8   A. I don't recall all of the specifics of
9   this case since it was a number of years ago, but
10  some of the information came from others within
11  printing services.
12  Q. So, your criticism of Mr. Bant related
13  to Jane Hannon was that he didn't take action
14  quickly enough?
15  A. It was an overall; that is one of the
16  complaints, and that the employment actions over
17  time did not seem to solve the problems.
18  Q. Was there anyone else other than Jane
19  Hannon you criticized Mr. Bant for not handling as
20  a personnel issue?
21  A. From the standpoint of being slow to
22  respond, there were issues in the business office,
23  and one of the issues there was with an employee
24  named Cheryl Cooley.

Page 29

1   Q. You will need to spell that one for us
2   too.
3   A. I believe the last name is spelled
4   C-O-O-L-E-Y.
5   Q. What were the problems with Miss Cooley?
6   A. My recollection at this point is
7   performance issues and interpersonnel issues.
8   Q. Was action eventually taken against Miss
9   Cooley?
10  A. Yes.
11  Q. By whom?
12  A. It again, went through Geoff Bant.
13  Q. So Geoff Bant took action against Miss
14  Cooley, however he didn't take it quickly enough,
15  is that what you are suggesting?
16  A. And without intervention on my part.
17  Q. So, you didn't have to intervene and he
18  took action?
19  A. No, I did have to intervene before.
20  Q. You said without intervention? You
21  meant the other way?
22       MR. WAGNER: No, he said it right. You
23  misunderstood it the other way.
24  Q. We continue to have a different

## Page 30

1 interpretation of answers, but that's fine. So I
2 guess you meant you had to intervene so that he
3 would take action?
4    A. Correct. That is my recollection.
5    Q. And you felt you shouldn't have to
6 intervene?
7    A. For a person at that level they are
8 supposed to be managing the business and insuring
9 that the employees that report to them are doing
10 their job.
11    Q. And when was that situation involving
12 Miss Cooley?
13    A. I don't recall the actual dates.
14    Q. Was it in the first year again?
15    A. I don't recall the dates.
16    Q. So when you recommended the termination
17 of Mr. Bant on December 2, 2002, you were going
18 back to the first year of your supervision of Mr.
19 Bant regarding personnel issues then, is that
20 correct?
21    A. What is correct is that it was his
22 period of management so that it went over a number
23 of years, but there were additional issues
24 throughout that period where we didn't feel that

## Page 31

1 there was acknowledgement of what his duties and
2 responsibilities should be, and I felt that he was
3 not carrying those responsibilities out.
4    Q. Was there any other employee that you
5 can specify that involves the so-called personnel
6 issue that Mr. Bant did not handle correctly?
7    A. I felt that in a case of violence in the
8 workplace involving Ray Tucker that that issue was
9 not handled to my satisfaction from the standpoint
10 of the satisfaction being that I had to
11 intervene in order to get action taken.
12    Q. When did that occur?
13    A. I don't recall the actual dates.
14    Q. I don't have to have the actual date;
15 the year would be sufficient.
16    A. I don't recall the year.
17    Q. So I guess it would be between 1999 and
18 the end of 2002?
19    A. Correct.
20    Q. And what happened?
21    A. A Xerox repair man was in one of the
22 printing services building. It was the building
23 on the South Farms. And the Xerox repair man,
24 they had called him because they were having

## Page 32

1 trouble with the machine jamming. The Xerox
2 repair man identified that somebody, they
3 loaded two different types of paper and the jams
4 were being caused by that, the paper that had been
5 loaded into the machine. It's my understanding at
6 that time Mr. Tucker picked up a pile of the paper
7 and threw it in the face of the Xerox employee.
8    Q. Mr. Tucker was a University of Illinois
9 employee employed by printing services?
10    A. That is correct.
11    Q. And you felt Mr. Bant did not handle
12 this situation properly?
13    A. That is correct. And there were
14 numerous times when I requested information from
15 Mr. Bant, time and time again, trying to get
16 specifics of what happened and --
17    Q. As to Mr. Tucker?
18    A. As what happened with the incident, that
19 is correct. And previous incidents of violence by
20 Mr. Tucker in the workplace.
21    Q. Was Mr. Tucker sanctioned or disciplined
22 in any way for this action?
23    A. I believe he was.
24    Q. By whom?

## Page 33

1    A. Again, the action came through Mr. Bant.
2    Q. And you feel that he didn't do it quick
3 enough again?
4    A. I feel that the action wouldn't have
5 been taken if I hadn't intervened, and it was not
6 quick enough. And more importantly when
7 information was requested, and requested
8 repeatedly, it was still difficult to get it from
9 Mr. Bant, up to the point where I actually had to
10 ask them to cancel a predisciplinary hearing with
11 Mr. Tucker and actually establish a time frame for
12 receipt of the documents and the time frame from
13 receipt of the documents to when a predisciplinary
14 hearing could be held, so that those documents
15 could be adequately reviewed.
16    Q. And a predisciplinary hearing was
17 necessary because Mr. Tucker was a member of a
18 collective bargaining unit, is that correct?
19    A. To the best of my recollection.
20    Q. What, did you tell Mr. Bant what action
21 to take involving Mr. Tucker?
22    A. I discussed the options and indicated
23 things that had to be done during that procedure.
24    Q. So, Mr. Bant made the decision on what

Page 34

1 action to take?
2    **A. With my input and direction.**
3    Q. Were you satisfied with the discipline
4 that he levied to Mr. Tucker?
5    **A. At the time I felt we got the result**
6 **that we could get.**
7    Q. So your answer would be yes?
8    **A. I wouldn't say that I was wholly**
9 **satisfied.**
10    Q. Was there any other employee other than
11 you've mentioned involving personnel issues of Mr.
12 Bant that caused you to issue the notice of
13 nonrenewal?
14    **A. Could you please read that back.**
15    (At this point the court reporter read
16 the requested portion of the record.)
17    **A. I would like to clarify that these are**
18 **examples of what I felt were deficiencies in Mr.**
19 **Bant's job skills. And deficiencies in his**
20 **performance that led to the notice of**
21 **nonreappointment. So these are what we've been**
22 **talking about, are examples over time of the types**
23 **of delays in dealing with actions and the fact**
24 **that I had to intervene on multiple occasions that**

Page 35

1 led to one of the reasons for me recommending a
2 notice of nonreappointment.
3    Q. Can you answer the question then? Were
4 there any other employees other than what you've
5 mentioned?
6    **A. There were other activities by Mr. Bant**
7 **regarding employee issues that caused me to**
8 **understand that, or led me to believe that Mr.**
9 **Bant was not effectively managing the work force.**
10    Q. Can you identify any names of other
11 employees that you would include in that
12 classification?
13    **A. From the standpoint of managing**
14 **employees effectively, and decisions made about**
15 **employees, and another employee over time that we**
16 **discussed that I felt was problematic was Barb**
17 **Childers.**
18    Q. And what action did you believe should
19 be taken against Barb Childers?
20    **A. I didn't believe a personnel action.**
21 **Geoff was recommending promotions for her that I**
22 **could not support.**
23    Q. Isn't Barb Childers presently the
24 director of printing services at the University of

Page 36

1 Illinois?
2    **A. She is to the best of my knowledge.**
3    Q. So you felt she should have been
4 terminated?
5    **A. I didn't say that.**
6    Q. Well, what did you say with respect to
7 action that should be taken against her?
8    MR. WAGNER: He didn't say that either,
9 but go ahead and answer.
10    **A. That's correct. What I did state was**
11 **that I did not support Mr. Bant's recommendations**
12 **for an appointment for her that would have been a**
13 **promotion.**
14    Q. Would you agree that other people in
15 administrative positions might have different
16 views of employees that might be more correct than
17 your own with respect to personnel issues?
18    MR. WAGNER: Object to form and
19 relevance. Please answer if you can.
20    **A. Could you please read back the question.**
21    (At this point the court reporter read
22 the requested portion of the record.)
23    MR. WAGNER: Same objections.
24    **A. I don't wholly agree with your**

Page 37

1 statement. I would agree that there would be
2 differences in opinions on employees.
3    Q. And in particular circumstances some
4 individuals might be more correct than others?
5    MR. WAGNER: Same objection as to form.
6    Q. Is that correct?
7    MR. WAGNER: Vagueness and relevancy.
8 Please answer if you can.
9    **A. I don't know how to answer that question**
10 **from the standpoint, without a situation, I have**
11 **nothing to judge that by.**
12    Q. Well, I mean it does seem to be curious,
13 you are criticizing Mr. Bant for wanting to
14 promote Barb Childers, and somebody else has taken
15 your place and in fact promoted Barb Childers to
16 director of printing services, doesn't it?
17    MR. WAGNER: Objection as to form. It's
18 argumentative. Answer if you can. Objection as
19 to form.
20    **A. Could you please read that back.**
21    (At this point the court reporter read
22 the requested portion of the record.)
23    MR. WAGNER: Further objection as to lack
24 of foundation. Answer if you can.

Page 38

1    A. From the standpoint of the situations
2 that were occurring when I was overseeing printing
3 services and the promotions that Geoff was trying
4 to or was recommending for Barb Childers and the
5 areas of responsibilities, that was one of the
6 problems with the promotions was the types of
7 duties that he was having, would have her do in
8 the organizational structure was one of the
9 reasons for my objections. The persons that are
10 managing or have managed the office of printing
11 services since the time that I did are managing
12 under different circumstances.
13    Q. Of course we're all more intelligent
14 when we can view things in hindsight, so with
15 hindsight do you realize now that you made an
16 error in your assessment of Barb Childers as an
17 employee when she was working at printing services
18 and you had authority over printing services?
19      MR. WAGNER: Objection as to form,
20 relevancy, lack of foundation. Answer if you can.
21    A. I disagree wholeheartedly with your
22 statement. And I --
23      MR. WAGNER: That is all you have to say.
24 That is an answer.

Page 39

1    Q. He can finish his answer.
2    A. That is my answer. Thank you.
3    Q. Was there any other personnel issue you
4 wanted to mention involving Mr. Bant that led to
5 your notice of nonrenewal to Mr. Bant other than
6 the individuals you've discussed.
7    A. At this time I don't wish to add others.
8      (Whereupon, Deposition Exhibit No. 2 was
9 marked for identification.)
10    Q. Handing you what has been marked as
11 Anderson Exhibit No. 2, do you recognize that
12 document?
13    A. It is a form of the performance
14 evaluation carried out in 2000, but it does not
15 have the signatures.
16    Q. Correct. Is that a true and accurate
17 copy of the first written evaluation you did on
18 Mr. Bant?
19    A. I can not verify that sitting here.
20    Q. Why is that?
21    A. Because it's not a signed copy.
22    Q. In other words, you don't know the
23 content of the evaluation you did on Mr. Bant in
24 the year 2000?

Page 40

1    A. What I'm stating is that I don't know
2 word for word that this is the document from 2000.
3    Q. What is it about the document that makes
4 you think it's not a true and accurate copy of
5 that evaluation?
6      MR. WAGNER: Objection as to the form.
7 Speculative. Answer if you can.
8    A. I didn't state that -- I'm sorry, would
9 you please reread his question.
10      (At this point the court reporter read
11 the requested portion of the record.)
12      MR. WAGNER: Plus it's been asked and
13 answered. Please answer again if you can.
14    A. I didn't state that it wasn't a true and
15 accurate copy. I just said I couldn't verify it
16 based on the document you handed me.
17    Q. Well, again, is it a true and accurate
18 copy of the evaluation you did for Mr. Bant in the
19 year 2000?
20      MR. WAGNER: It's been asked and
21 answered.
22    Q. Absent signatures?
23      MR. WAGNER: Objection, it's been asked
24 and answered. Answer again if you can.

Page 41

1    A. My answer remains the same.
2    Q. It's a different question. Absent the
3 signatures, is it an identical copy of the
4 evaluation you did for Mr. Bant in the year 2000?
5      MR. WAGNER: Same objection. He told you
6 before he couldn't verify it because he needed the
7 other copy to verify it.
8    Q. He is using the word verify, and I'm
9 asking if it's a true and accurate copy, and he
10 said yes.
11    A. I did not say yes.
12    Q. So you are saying it isn't a true and
13 accurate copy?
14    A. I did not say that.
15    Q. Let's get a straight answer from you.
16 Are you saying it's a true and accurate copy or
17 not?
18      MR. WAGNER: Nile, knock it off. Don't
19 say it's not a straight answer. Please don't say
20 that type of thing. Why are you doing that to
21 him?
22      MR. WILLIAMSON: Because I wanted the man
23 to answer the question.
24      MR. WAGNER: He is telling you he doesn't

Page 42

1 have the individual here to tell you about it.
2 Why don't you accept that from somebody?
3    MR. WILLIAMSON: I absolutely understand
4 that he says it's not signed. That does not mean
5 he can not give an answer under oath as to whether
6 that is a true and accurate copy of the evaluation
7 he did in the year 2000.
8    MR. WAGNER: Well, it's been asked and
9 answered. Answer it again if you can, please.
10    **A. I believe I have answered all questions**
11 **that you have put forward, and I don't know what**
12 **to add to those answers.**
13    Q. Just to clarify, are you suggesting that
14 there is anything on this evaluation that was not
15 done by you when you did the evaluation for Mr.
16 Bant in the year 2000?
17    MR. WAGNER: Same objection as to form
18 and speculative. Answer if you can.
19    **A. Without the original document I can not**
20 **verify anything about the typewritten text that is**
21 **on this document. The document that you have**
22 **handed to me has handwritten notes on here that**
23 **were not my notes.**
24    Q. Thank you. And there's no doubt that

Page 43

1 that is the case, so you've identified that those
2 aren't the handwritten statements on the documents
3 are not yours, is that correct?
4    **A. The handwritten statements on the**
5 **document are not mine.**
6    Q. Now, did you review the original
7 evaluation with your attorney or anyone else in
8 the 48 hours prior to this deposition?
9    MR. WAGNER: Don't answer anything about
10 what you did with me.
11    Q. I'm not asking any content of with Mr.
12 Wagner. I'm asking you if you have reviewed that
13 document in the last 48 hours, Mr. Wagner may have
14 been present, he may not have been. Did you
15 review the original evaluation you did in the year
16 2000 for Mr. Bant?
17    MR. WAGNER: You can answer that
18 question.
19    **A. I reviewed the document.**
20    Q. Was that in the last 48 hours?
21    **A. It was in the last 48 hours.**
22    Q. All right. Now, does your memory permit
23 you to tell us that absent the handwritten
24 statements on this evaluation as to whether the

Page 44

1 rest of the document is an accurate document as to
2 your evaluation of Mr. Bant in the year 2000?
3    **A. Absent the original document and not**
4 **being able to verify that everything here is**
5 **identical, it certainly represents my feelings of**
6 **Geoff Bant.**
7    Q. Thank you. And are there seven
8 different categories that you did an evaluation
9 regarding Mr. Bant at that time on the form? I
10 think I've counted correctly.
11    **A. There are seven categories on the form.**
12    Q. What is the first category?
13    **A. Knowledge.**
14    Q. And are there five separate types of
15 classifications that one can give an employee on
16 this form?
17    **A. There are five different performance**
18 **ratings.**
19    Q. Would you please describe them from
20 whatever order you prefer.
21    **A. Certainly. There's outstanding, which**
22 **is work is outstanding in nearly all areas. This**
23 **is the kind of person who will keep the department**
24 **and the institution successful. The employee's**

Page 45

1 **exemplary contributions are recognized and**
2 **appreciated.**
3    **Commendable. Work has been consistently**
4 **above the requirements in most areas, while the**
5 **employee has a few areas to work on, his or her**
6 **committment and contribution are appreciated.**
7    **Good. Work generally met or exceeded**
8 **the requirements in most areas, and is fulfilling**
9 **the requirements of the job. The employee should**
10 **continue his/her efforts, and the supervisor will**
11 **work with the employee to help him attain his/her**
12 **potential.**
13    **Improvement required. Work meets only**
14 **the most basic requirements of the position.**
15 **While the employee may have performed acceptably**
16 **in most areas, performance should be improved.**
17 **Failure to show improvement may result in**
18 **additional action.**
19    **And not acceptable. Work is below the**
20 **basic requirements in the critical aspects of the**
21 **job, and immediate improvement is required. As a**
22 **result of this evaluation the job description will**
23 **be reviewed with the employee, in addition to**
24 **written communication concerning expectations of a**

Page 46

1 job performance, of job performance on a regular
2 basis. He/she will have a period of blank months
3 in which to raise the evaluation. After this
4 interval another formal evaluation will be
5 conducted. Failure to improve will result in
6 notice of nonreappointment.
7    Q. Now, at the time you did this evaluation
8 was there a minimum score, if you will, for
9 employees at the University of Illinois to be
10 retained as an employee in assessing that type of
11 evaluation?
12    A. Could you read the question, please.
13        (At this point the court reporter read
14 the requested portion of the record.)
15    A. There is not a scoring system.
16 Recommendations for nonreappointment are based on
17 supervisor's recommendations. There is not a
18 guideline that goes along with this that says if
19 you score a certain level, then that would happen.
20 It's all based on the supervisor's assessment.
21    Q. And there aren't any numbers on that
22 form, I notice?
23    A. There is dates.
24    Q. Numbers, I meant evaluation numbers?

Page 47

1    A. Correct. It's just the categories, the
2 performance ratings that I read are the only
3 ratings.
4    Q. What I wanted to understand is there's
5 seven different areas that the employee is
6 classified in, I believe, and I wondered if there
7 was any protocol or format at the University at
8 that time indicating an employee must be good or
9 better on all seven categories, or some such
10 scoring procedure if you know?
11    A. Not that I'm aware of.
12    Q. All right. Please then indicate what
13 descriptive terminology you gave Mr. Bant for the
14 first classification? You don't have to read it
15 out, if you give the descriptive word that you
16 used.
17    A. Outstanding.
18    Q. And that was for what?
19    A. Knowledge.
20    Q. What was the second category?
21    A. Judgment.
22    Q. What did you give him?
23    A. Good/commendable.
24    Q. Was that a combination of two

Page 48

1 classifications? In other words, good was one and
2 commendable was another, and you combined them
3 together for that particular category?
4    A. I rated qualities for both categories.
5    Q. What was the third classification?
6    A. Productivity.
7    Q. What did you rate Mr. Bant at?
8    A. Good/commendable.
9    Q. What was the next classification?
10    A. Professional relationships.
11    Q. What did you rate him at?
12    A. Good/commendable.
13    Q. And what was the next classification?
14    A. Organization.
15    Q. What did you rate him at?
16    A. Good.
17    Q. Was there a final classification?
18    A. There's two more classifications.
19    Q. Thank you. Can you tell us those?
20    A. Reliability and supervision.
21    Q. And what did you give him for
22 reliability?
23    A. Commendable.
24    Q. And supervision?

Page 49

1    A. Good.
2    Q. And so that was your evaluation for Mr.
3 Bant in June of 2000, I believe?
4        MR. WAGNER: I'm sorry, what was the
5 answer?
6    Q. Was it June of 2000? I don't have it in
7 front of me.
8    A. Yes, for the formal evaluation
9 procedure.
10    Q. You had evaluated Mr. Bant at that time
11 for a period of, I want to get my math right
12 again, about ten months?
13    A. Approximately ten months, yes.
14    Q. And did you also have the opportunity to
15 put on the evaluation any additional comments that
16 you wanted to?
17    A. From the standpoint of the person
18 filling out the form there's a category for
19 overall performance.
20    Q. Did you rate Mr. Bant on overall
21 performance?
22    A. Yes.
23    Q. What was that?
24    A. Good/commendable.

Page 50

1    Q. Did you write in anything on the form,
2 and I understand again this is not the signed
3 form. You've indicated that.
4    **A. I don't recall writing anything in on**
5 **the form.**
6    Q. Okay. Keep that in front of you if you
7 like.
8       (Whereupon, Deposition Exhibit No. 3 was
9 marked for identification.)
10    Q. Handing you what has been marked
11 Anderson Exhibit No. 3, would you tell us what
12 that is, please.
13    **A. I'm not quite sure what it is because**
14 **there's headers and things on here that are not --**
15 **it appears to be a copy of the performance**
16 **evaluation of Geoff Bant in 2001, but there's a**
17 **date of 11/7/2003, a confidential stamp and a**
18 **draft on here that would not have been, plus**
19 **numbers in the bottom left-hand corner, that would**
20 **not have been on an original document.**
21    Q. I'm going to represent to you that the
22 items you've referred to were put on by another
23 unit of the University of Illinois in producing
24 the documents to Mr. Bant at a later date. And

Page 51

1 for that matter, there are some handwritten
2 statements starting on what is marked 1866 as
3 well. I take it those are not your handwritten
4 statements?
5    **A. I don't recognize those.**
6    Q. And I want to clarify what I said
7 earlier. Mr. Wagner, aren't these Bates numbers
8 in the left-hand side of the page?
9       MR. WAGNER: I don't know. I don't know
10 why you are asking.
11    Q. They don't have the normal format.
12       MR. WAGNER: I have no idea.
13    Q. I was going to say these were produced
14 by your counsel, but I still think what I said
15 earlier was correct. I think these were produced
16 by an office of the University of Illinois to Mr.
17 Bant, maybe prior to the litigation. And that's
18 why they have confidential. That's why this date
19 is up here. And that's why the numbers are on the
20 left-hand side of the page.
21       Other than that --
22    **A. And the page numbers as well I didn't**
23 **mention. But the page numbers would not --**
24    Q. You mean where it says page five, page

Page 52

1 six?
2    **A. 57, 58, 59, 60 --**
3    Q. There are two page numbers, aren't
4 there? There is one on the left-hand side of the
5 page and one in the middle?
6    **A. Well, there's actually three when you**
7 **get to the second page because there's actually**
8 **the page number of the original document, what was**
9 **the original document.**
10    Q. All right. Other than the page numbers,
11 and the reference to confidential and the date at
12 the top of the page and the handwritten statements
13 I've referred to you on what is page five, one
14 reference, is it a true and accurate copy of the
15 evaluation that you did for Mr. Bant in June of
16 2001?
17    **A. And I'm sorry, I didn't catch if you**
18 **said whether or not the draft was part of that,**
19 **that was added. The draft was not part of the**
20 **original document.**
21       MR. WAGNER: The draft stamp.
22    **A. The draft stamp, the confidential, those**
23 **things you mentioned, but I didn't hear the draft,**
24 **and I don't know if that's when Geoff coughed or**

Page 53

1 **what, but with the things that you mentioned not**
2 **being part of the original document, the rest of**
3 **it looks like the original performance evaluation.**
4    Q. And you did sign this document on two
5 different occasions, two different pages, did you
6 not?
7    **A. Correct.**
8    Q. Mr. Bant initialed the document on those
9 same pages, did he not?
10    **A. He did.**
11    Q. Again, if we can go, the performance
12 ratings are the same on the Exhibit 3 as they were
13 on Exhibit 2, is that correct?
14    **A. That is correct.**
15    Q. The classifications are also the same?
16    **A. That is correct.**
17    Q. Again, what did you give Mr. Bant in
18 2001 for knowledge?
19    **A. Outstanding.**
20    Q. And that remained the same from the
21 prior year as I understand it? I think you still
22 have two in front of you.
23    **A. Correct.**
24    Q. What did you give Mr. Bant as to

## Page 54

1 judgment in 2001?

2　A.　Commendable.

3　Q.　And then that had improved from the

4 prior year, if I recall, because you gave him

5 good/commendable the prior year, is that correct?

6　A.　The rating did increase, yes.

7　Q.　And as to productivity in 2001, how did

8 you rate him?

9　A.　In 2001 he was rated as commendable.

10　Q.　And again, he had improved from the

11 prior year because you gave him good/commendable

12 the prior year, did you not?

13　A.　Correct.

14　Q.　And on professional relationships, what

15 was your rating in 2001?

16　A.　In 2001 it was commendable.

17　Q.　And what had you given him the prior

18 year for professional relationships?

19　A.　Good/commendable.

20　Q.　So, he had again improved on

21 professional relationships?

22　A.　Yes.　In some areas.

23　Q.　In organization, what did you give him

24 in 2001?

## Page 55

1　A.　Commendable.

2　Q.　What had you given him the prior year in

3 organization?

4　A.　Good.

5　Q.　So, he had improved in 2001 as to

6 organization?

7　A.　In some regards.

8　Q.　And in your rating, is that correct?

9　A.　In the rating and in some regards.

10　Q.　And as to reliability in 2001, what did

11 you give him?

12　A.　Commendable.

13　Q.　And what did you give him the prior year

14 in reliability?

15　A.　Commendable.

16　Q.　So, it remained the same?

17　A.　Correct.

18　Q.　And in supervision what did you give him

19 in 2001?

20　A.　2001 was commendable.

21　Q.　What had you given him in the prior year

22 for supervision?

23　A.　A good rating.

24　Q.　So he had improved in supervision in

## Page 56

1 2001, is that correct?

2　A.　In some regards.

3　Q.　Of the seven classifications, as I

4 understand it, in 2001, he had improved in five of

5 the seven classifications and remained the same in

6 the other two, is that correct, from 2000?

7　A.　Commendable.　Correct.　Five changed and

8 two remained the same.

9　Q.　And the five that were changed had

10 improved, is that correct?

11　A.　In some regards.

12　Q.　No, in your own classification system?

13 You had upgraded him on all five?

14　A.　Correct.

15　Q.　Under supervision for the 2001

16 evaluation, would you please read what you put in

17 for supervision?

18　A.　Over the past year Geoff has dealt more

19 effectively with personnel issues.　As a

20 supervisor Geoff needs to work to gain the

21 cooperation of those reporting directly to him to

22 translate the vision for printing services into

23 tangible results.

24　Q.　Now, I notice that both the 2000 and

## Page 57

1 2001 evaluation were done in June of the years, is

2 that correct?

3　A.　That is correct.

4　Q.　Did you do an evaluation in June of

5 2002?

6　A.　I did not.

7　Q.　Why is that?

8　A.　Because we were in the middle of

9 discovering problems within printing services, and

10 so those were delayed.　And it's important to note

11 that the performance evaluation system at the

12 University of Illinois, this is only one component

13 of it, which is the annual filling out of this

14 form.　Performance evaluations under the training

15 that I received under Kathleen Pecknold,

16 performance evaluations and discussions are an

17 ongoing process.　And so that process occurred

18 throughout the year.　And so there was feedback to

19 Mr. Bant throughout the year and throughout the

20 period of his entire employment where he reported

21 to me.　Except for the notice, or during the time

22 of the notice of nonreappointment, which he was

23 working in another unit.

24　Q.　Was each employee supposed to receive

Page 58

1 one annual written evaluation at the University of
2 Illinois between 1999 and 2003 if they were an
3 academic professional?
4    A. It's the process in the University to
5 give annual evaluations.
6    Q. And did you pick arbitrarily the time
7 you were going to give that annual evaluation for
8 Mr. Bant, or was there some procedure or protocol
9 for that as well?
10    A. The evaluations can occur at any time
11 throughout the year. The time frame is wholly
12 unit dependent and --
13    Q. What made you pick June to do Mr. Bant's
14 evaluations?
15    A. It was close to the end of the fiscal
16 year. And it was a time frame that we had been
17 adhering to in the office of the vice chancellor
18 for administration.
19    Q. And the fiscal year ran through June
20 30th, is that correct?
21    A. That is correct.
22    Q. So that would seem to be an appropo time
23 to do an evaluation of director of printing
24 services certainly; I take it you agree?

Page 59

1    A. I would agree that -- I would say,
2 excuse me, I wouldn't necessarily agree, I would
3 say that it could occur at any time during the
4 year for the director of printing services or any
5 other employee at the University and be just as
6 effective.
7    Q. I'm just saying that you did pick June
8 to do Mr. Bant's annual evaluation; you did that
9 in two consecutive years?
10    A. That is correct.
11    Q. Now, getting back to 2002, why didn't
12 you do an evaluation in June of 2002?
13       MR. WAGNER: It's been asked and
14 answered. But go ahead and answer again, please.
15    A. I continually evaluated Mr. Bant
16 throughout 2002. A formal evaluation was not done
17 due to ongoing findings within the office of
18 printing services of serious management issues.
19    Q. Did you ever do another written
20 evaluation of Mr. Bant after Anderson Exhibit No.
21 3?
22    A. Yes, I did.
23    Q. When was that?
24    A. December of 2002.

Page 60

1    Q. And of course we're going to get to that
2 letter. When you say that was an evaluation, is
3 that done in the same form as Anderson Exhibits 2
4 and 3?
5    A. It is not done in the same format, but
6 in an acceptable format at the University of
7 Illinois.
8    Q. And why do you say that?
9    A. Because the directions for providing
10 performance evaluations provide multiple ways in
11 which they can be done. Whether you use a form or
12 whether you use a letter, and the form does not
13 have to be the form that is shown in Anderson
14 Exhibits 2 and 3. An individual can make up their
15 own set of performance categories specific to
16 jobs.
17    Q. Can you point to some rule or regulation
18 in the University that would indicate what you've
19 just testified to?
20    A. It's in the provost communications, I
21 believe.
22    Q. Can you be more specific as to what the
23 provost communications are?
24    A. Well, they're the implementation of the

Page 61

1 policies of the University, and they are guidance
2 on how to conduct business in a certain regard,
3 and there is a section on performance evaluations
4 for academic professionals.
5    Q. So what is the title of that document?
6    A. Off the top of my head, I couldn't tell
7 you.
8    Q. When was that document created?
9    A. I couldn't tell you the date it was
10 created. It's been in force most of the years
11 I've been at the University. At least in a
12 supervisory role.
13    Q. So it was in force August 1999 on?
14    A. To the best of my recollection and
15 knowledge.
16    Q. To create the document you're referring
17 to?
18    A. I don't know who created the document,
19 but it's under the provost's office.
20    Q. And again, do you have a better
21 statement, more definitive statement, as to the
22 name of the document relating to how evaluations
23 can be formatted for academic professionals at the
24 University of Illinois?

Page 62

1    A.  The document I'm referring to, I can not
2  tell you the exact title sitting here, but it's on
3  annual performance evaluations for academic
4  professionals and it provides guidelines for
5  conducting performance evaluations and provides
6  methods and templates to the best of my
7  recollection.
8    Q.  So this will be 4.
9       (Whereupon, Deposition Exhibit No. 4 was
10  marked for identification.)
11    Q.  Off the record for a second.
12    MR. WAGNER: Sure.
13       (At this point there was an off the
14  record discussion.)
15       (A break was taken, and the deposition
16  continued as follows:)
17  BY MR. WILLIAMSON:
18    Q.  Mr. Anderson, handing you what has been
19  marked Anderson Exhibit No. 4, is a document
20  you were talking about earlier, is that correct,
21  was the final evaluation you did on Mr. Bant?
22    A.  Yes, this is the 2001-2002 performance
23  evaluation.
24    Q.  Was that document also the notice of

Page 63

1  nonrenewal?
2    A.  No, it was not the notice of
3  nonreappointment.
4    Q.  So that is exclusively for the purpose
5  of doing the last evaluation on Mr. Bant, is that
6  correct?
7    A.  It was to provide my evaluation and to
8  inform Mr. Bant that I had lost all confidence in
9  his abilities to manage, and I felt that I had no
10  choice but to remove him as director of printing
11  services.
12    Q.  You didn't, on this document, go through
13  the classification process of the prior two
14  evaluations I note.
15    A.  No, this is another approved form of
16  performance evaluation.
17    Q.  So, you didn't rate him at all on those
18  seven classifications on that last occasion?
19    A.  Did not use the performance ratings used
20  in the previous performance evaluations.
21    Q.  Can I see that document a second? This
22  document requested Mr. Bant to give you a reply,
23  did it not?
24    A.  I believe it offered him the opportunity

Page 64

1  to reply.
2    Q.  Why did you do that?
3    A.  Wanted to put out the categories of the
4  types of problems that I had seen with Mr. Bant's
5  management of the office of printing services and
6  wanted to give him an opportunity to respond to
7  those thoughts.
8    Q.  Now, again, looking at Anderson Exhibit
9  No. 3, that was dated when?
10    A.  June 12th, 2001.
11    Q.  Would you say that on June 12th, 2001,
12  Mr. Bant was an employee in good standing in your
13  eyes as director of printing services at the
14  University of Illinois?
15    MR. WAGNER: Objection as to form.
16  Please answer.
17    A.  In June 2001 he was doing an acceptable
18  job, but there were performance deficiencies even
19  noted at that time.  And in the previous 2000
20  performance evaluation as well, as well as
21  throughout the period of time that I oversaw Mr.
22  Bant during the one-on-one meetings we had, which
23  again is part of the performance evaluation system
24  of the University of Illinois, which is an ongoing

Page 65

1  feedback to the employee.
2    Q.  And I guess what I wanted to ask you
3  then is as of June of 2001, was Mr. Bant's job in
4  jeopardy in your eyes?
5    A.  Not at that time.
6    Q.  So, the issues that caused Mr. Bant's
7  eventual notice of nonrenewal occurred after June
8  12th of 2001, is that an accurate statement?
9    A.  Could you please read that back.
10       (At this point the court reporter read
11  the requested portion of the record.)
12    A.  I would say that Mr. Bant's performance
13  throughout the period of time from the time I
14  started overseeing until the time that I
15  recommended his notice of nonreappointment were
16  taken into account, both from the standpoint of
17  deficiencies, and in some cases where improvements
18  were made.
19    Q.  And then when you sent Mr. Bant Anderson
20  Exhibit No. 4, and gave him the opportunity to
21  respond, was the determination already made that
22  he was going to be terminated?
23    A.  The determination that you have in front
24  of you as Anderson 4 was my thoughts on a

Page 66

1  recommendation for notice of nonreappointment.
2  There is a process in place where that has to go,
3  I could make the recommendation, that would have
4  to be affirmed by my supervisor, and it would go
5  on up to the Board of Trustees, who has to issue
6  the notice of nonreappointment.  That is not done
7  at the unit level.
8    Q.  Yes.  I understood you to say that
9  earlier.  My question was, when you gave Mr. Bant
10  an opportunity to respond in Anderson Exhibit No.
11  4, was his response going to change your own
12  recommendation that he not be renewed as director
13  of printing services?
14    A.  My expectation was at the time that that
15  letter was issued was that based on a response by
16  Geoff, it would be reevaluated at that time to
17  determine if I would go forward with the notice of
18  nonreappointment recommendation.
19    Q.  So his response could have altered his
20  situation, in terms of the notice of nonrenewal?
21    A.  That is correct.
22    Q.  Did you find his response to be
23  inadequate?
24    A.  Wholly inadequate.

Page 67

1    Q.  In what respect?
2    A.  The behaviors that he exhibited in his
3  response were some of the behaviors that were
4  problematic not only through his reporting to me,
5  but the prior supervisor, in that he took the
6  stance he blamed others for problems that the
7  director of the unit should have been the one
8  addressing and taking care of.
9    Q.  You referred to a prior supervisor; who
10  was that?
11    A.  Immediately preceding me was Kathleen
12  Pecknold.
13    Q.  In other words, you're including the
14  prior supervisor in this situation?
15    A.  I am not answering on her behalf at all.
16  It's the information from the file, the personnel
17  file, showing that these same kind of issues were
18  manifested by Mr. Bant.
19    Q.  Didn't Miss Pecknold always give Mr.
20  Bant excellent classifications when she was doing
21  his evaluation?
22    A.  I can't state that it was always
23  excellent.  I can not comment on the exact
24  ratings.

Page 68

1    Q.  In fact, aren't you the first person in
2  the 15 years or so that Mr. Bant was director of
3  printing services who did not give him entirely
4  excellent written evaluations?
5      MR. WAGNER:  Objection as to form and
6  relevance.  Please answer if you can.
7    A.  As I just answered, I don't recall if
8  Miss Pecknold rated him excellent in all
9  categories and areas.  And so I -- I can't answer
10  your question the way it was asked, but I can
11  answer that my recommendations did not give the
12  highest performance ratings for Mr. Bant.
13    Q.  So, you do recall that Miss Pecknold may
14  have made statements in the past that Mr. Bant
15  blamed other people for problems, but you can't
16  recall that she otherwise gave him excellent
17  classifications, is that an accurate statement?
18    A.  No, it's not accurate from the
19  standpoint that my statement was I do not recall
20  all areas of classification because there is a
21  number of years that she performed performance
22  evaluations, and I can not sit here and state that
23  all of those were excellent.
24    Q.  Your only recollection as to Miss

Page 69

1  Pecknold's evaluations of Mr. Bant then would be
2  for the very few derogatory comments that she
3  made?
4    A.  That is absolutely false.
5    Q.  Is there another copy of this?
6      MR. WAGNER:  What is that?
7    Q.  It's the December 2nd letter.
8      MR. WAGNER:  I can have one made real
9  quick.
10    Q.  Go ahead.  Oh, I got it.  Tell me, if
11  you would, what the reference to the Xerox
12  agreement is in the December 2, 2002 letter?
13      MR. WAGNER:  Would you read that, please.
14      (At this point the court reporter read
15  the requested portion of the record.   )
16    A.  Would you reread it for me, please.
17      (At this point the court reporter read
18  the requested portion of the record.)
19    A.  Paragraph two indicates that these are
20  related to the Xerox agreement.  And what was
21  found out, well, there was several different
22  levels of problems that came up with this, the
23  Xerox interactions.  And it says since March,
24  because one of the things that happened then was

Page 70

1 the continuous purchase orders for the coming
2 fiscal year at the time this was written, which
3 would have been, well, excuse me, for the time
4 that we are talking about, March 2002, the
5 continuous purchase orders needed to be in for the
6 following fiscal year.
7        And at a meeting with Xerox that I
8 attended because Geoff let me know, I believe it
9 was Geoff, let me know that one of their vice
10 presidents was coming down, wanted to meet me, and
11 so I asked Geoff what the meeting was about. And
12 it was about pricing, and Geoff had indicated that
13 they had been asking for pricing since December,
14 and they hadn't received anything.
15        And so I attended that meeting, and we
16 put on the table, based on printing services
17 information on pricing, the fact that we were
18 behind in our business because of them. It came
19 out in that meeting and subsequent to that meeting
20 that indeed we had not been requesting that
21 pricing information, and that Geoff had actually
22 met with them in January, and in the notes taken
23 by Barb Childers, there was not even any mention
24 that they were looking for pricing and requesting

Page 71

1 this information.
2        And so as we sat down with Xerox to try
3 to straighten out some of the problems that were
4 discussed in the meeting --
5    Q. Are these notes you have in your
6 possession?
7        MR. WAGNER: We object to the
8 interruption, but go ahead and answer the
9 question.
10   Q. I didn't want to interrupt. The notes
11 from Barb Childers, do you have those?
12   A. Yes, I do.
13   Q. And could you give them to Mr. Wagner
14 for production in the next seven to ten days?
15   A. Certainly.
16   Q. And these are notes of a particular
17 meeting?
18   A. Correct.
19   Q. What date?
20   A. It's in January of 2002. I don't recall
21 the exact date. It was in the documents that
22 printing services provided to me upon request in
23 May of 2002 when I asked for all documents
24 concerning the Xerox business.

Page 72

1    Q. Go ahead with your answer then. I did
2 interrupt.
3    A. Would you please read me the last part.
4        (At this point the court reporter read
5 the requested portion of the record.)
6    A. We had a meeting with the Xerox
7 representatives, and at that meeting we were
8 trying to straighten out agreement issues for why
9 billing was off so much. And it turns out that we
10 identified that, and prior to that meeting Sonya
11 Chambers had requested from, I believe Barb
12 Childers the agreements that we had in place with
13 the Xerox company. And so when we sat down with
14 Xerox to discuss these agreements, I had the
15 documents in front of me and was discussing those
16 with the Xerox representatives who were referring
17 me to places in the agreement that I could not
18 find. And what it turned out was when I gave them
19 the documents to look at and show us what they
20 were talking about, it turns out that the
21 documents Xerox had as their agreement were not
22 the same as the University documents.
23   Q. Did you fault Mr. Bant for that?
24   A. Over time after we did an investigation,

Page 73

1 and through conversations it was determined that
2 Mr. Bant was fully aware of the fact that two
3 separate sets of documents were being maintained;
4 one that would meet the requirements of the
5 University for a single year agreement, and then a
6 second set that would meet the Xerox business
7 purposes that was a five-year lease, which the
8 University could not enter into. It became clear
9 that there were two sets. That printing services
10 was fully aware of signing off on both sets. And
11 Geoff had signed both sets. So, that was one of
12 the things that again led to this letter.
13   Q. Did you deem that inappropriate?
14        MR. WAGNER: By this letter, you mean
15 Exhibit No. 4.
16   A. The statement, Exhibit No. 4, the
17 statement about the Xerox, because it's talking
18 about the ongoing discovery of problems at OPS,
19 especially those related to the Xerox agreement.
20 And that was a major finding.
21   Q. Did you deem that inappropriate that Mr.
22 Bant had signed two different sets of agreements?
23   A. What was inappropriate was the
24 management of two sets of agreements to

Page 74

1 purposefully skirt the policies of the University
2 of Illinois.
3    Q. Well, again, I would like you to answer
4 my question. Did you fault Mr. Bant for signing
5 two different sets of agreement with Xerox?
6    A. The documents that were -- what Mr. Bant
7 was faulted for signing the Xerox agreements is
8 he is not an authorized signatory for agreements
9 going to outside entities. And that was based on
10 information from the purchasing department. And
11 actually no one in printing services was allowed
12 to sign those types of agreements on behalf of the
13 University of Illinois. The University of
14 Illinois didn't even know those agreements existed
15 until May of 2002 when we sat down at the table
16 with Xerox.
17    Q. When had the agreements been signed?
18    A. Over a period of time, I believe it
19 began in 1999. I'm not sure. I would have to
20 look at the documents. And it occurred up to May
21 of 2002.
22    Q. How many times were they signed? In
23 other words, were they annual agreements?
24    A. There was a single master agreement, and

Page 75

1 then there was changes to that master agreement
2 that occurred on an ongoing basis. I mean, these
3 were, I can't tell you the number of times it was
4 signed, but there was, at the time in May, I
5 believe there was 26 or 27 amendments that had
6 been processed on that agreement.
7    Q. And you're saying it was first signed in
8 1999?
9    A. I can not verify that sitting here. I
10 said I would have to look at the documents. I
11 believe it started somewhere in 1999, around that
12 time frame.
13    Q. And Mr. Bant signed them?
14    A. He signed some of the documents. He did
15 not sign all of them.
16    Q. Did anyone else at printing services
17 sign the documents?
18    A. Yes.
19    Q. Who?
20    A. I recall Lisa Emerson and Barb Childers,
21 and I don't recall if there may have been others.
22 Those were the principals.
23    Q. And you're suggesting that no one
24 outside of printing services knew these documents

Page 76

1 had been signed other than those individuals that
2 had signed them? Is that correct?
3    A. That is not correct. I did not make
4 that statement. Because these were Xerox
5 personnel also involved in signing dual documents.
6    Q. Oh, I didn't mean Xerox persons. I
7 meant at the University of Illinois?
8    A. Well, I'm sorry, you said external to
9 printing services, so I was answering external to
10 printing services. I don't know if there was
11 anybody else outside that knew that there were two
12 sets of agreements. The individuals at purchasing
13 where the University compliance set was taken
14 after they were signed did not know until May of
15 2002 that there were two sets of documents. I
16 don't know if there was anybody outside of
17 printing services other than -- I can't answer
18 that because I don't know.
19    Q. So in the meeting you had with the Xerox
20 representatives they showed you the other set of
21 documents?
22    A. That is correct.
23    Q. That was the first time you saw them?
24    A. That is correct.

Page 77

1    Q. Okay. And you then negotiated with them
2 based on both sets of agreements?
3    A. That is not correct.
4    Q. How was it resolved then?
5    A. These documents that Xerox had that were
6 signed by persons  at the office of printing
7 services were not valid documents because they
8 were not signed by authorized signatories for the
9 University of Illinois. It was resolved by the
10 set of agreements that purchasing had in their
11 possession. And it was through extensive
12 negotiations with Xerox.
13    Q. Now, I'm a little bit confused on the
14 dates of the meeting. Did you say the meeting
15 occurred in March of 2002?
16    A. The original meeting with Xerox where I
17 first met the vice president I said occurred in
18 March of 2002. The meeting at which it was
19 discovered that there were two sets of documents
20 occurred in May of 2002.
21    Q. Okay. That is when you first discovered
22 it?
23    A. That's the first time I had knowledge
24 that there was two sets of document, that is

Page 78

1 correct.

2    Q.  Did you take any disciplinary action

3 against Mr. Bant at that time?

4    A.  From the standpoint of it was an ongoing

5 investigation and it took many months to resolve

6 all of the issues.  And so there was not a

7 specific action that was taken against him except

8 for the fact that he was removed from interactions

9 with Xerox except for the day-to-day management of

10 the program, any of the contract negotiations, any

11 of the negotiations going on with Xerox, yes, he

12 was removed from those discussions.

13    Q.  So, you took no specific action against

14 Mr. Bant from May of 2002 up until December 2nd of

15 2002 regarding the Xerox matters?

16       MR. WAGNER:  Objection as to form.  That

17 has been asked and answered, what he did.  And

18 that's not a fair representation of what he

19 testified to, but answer if you can.

20    A.  Again, immediate action was taken to

21 remove Geoff from the interactions with Xerox.

22 And an investigation ensued that took many months

23 to complete.

24    Q.  I was talking about disciplinary action.

Page 79

1 You didn't take any disciplinary action against

2 Mr. Bant between May of 2002 up until December

3 2nd, 2002, did you?

4       MR. WAGNER:  Objection as form, again

5 it's been asked and answered.  You may answer

6 again if you want.

7    A.  I disagree from the standpoint that

8 there was duties removed from Mr. Bant because of

9 this.

10    Q.  That was a disciplinary action in your

11 mind?

12    A.  Correct.

13    Q.  Was there any written documentation of

14 that made by you at any point in time?

15    A.  I believe there may have been an e-mail.

16 Well, there was an e-mail.  I believe it was May

17 4th that not only prevented Mr. Bant, but other

18 members of the office of printing services from

19 interacting with Xerox personnel on specific

20 issues.

21    Q.  Your letter also mentions, the December

22 2nd letter also mentions worsening financial

23 condition.  What did you mean by that?

24    A.  Well, one of the things we found out,

Page 80

1 and this is a problem that went on for years, they

2 always complained about Xerox not being able to

3 bill properly for the equipment that we had.

4       The worsening financial position points

5 to the fact that these continuous purchase orders

6 were not in place not only for the fiscal year

7 that was upcoming at the March meeting, but it

8 wasn't -- they weren't even completed for fiscal

9 year 2002 is what we found out.

10       So, what was happening was we were

11 booking revenue based on the copiers, but we were

12 not booking the expenses for the copiers.  So the

13 worsening financial condition refers to the fact

14 that as we found out that these were not in place,

15 and as we sought these in place, then all of the

16 expenses for that equipment hit the account, and

17 we were able to better determine what the true

18 deficit of the organization was.

19    Q.  Can you mark this as 5.

20       (Whereupon, Deposition Exhibit No. 5 was

21 marked for identification.)

22    Q.  Handing you what has been marked as

23 Anderson Exhibit No. 5.  Do you recognize that

24 document?

Page 81

1    A.  Today is the first time I've seen this

2 document.

3    Q.  I understand that.  But do you recognize

4 the document after you've seen it today?

5    A.  I recognize it as a spreadsheet for the

6 office of printing services.

7    Q.  Was that a document, a spreadsheet, that

8 would have been formulated by employees of the

9 University of Illinois?

10    A.  I have no knowledge of where this came

11 from.

12    Q.  I see.  Do you have any knowledge of the

13 content of the document, in terms of the

14 references on the spreadsheet itself?  Cash

15 balance?  Fund balance?  Spread between cash and

16 fund balance?  Etc.?

17    A.  I understand those categories, yes.

18    Q.  Do you recognize the substance of the

19 dates, references and numbers on the document as

20 being authentic as to the office of printing

21 services between 1998 and June of 2003?

22    A.  I have no knowledge of the business of

23 the office of printing services after January of

24 2003.

Page 82

1    Q. Well, with that understanding, stopping
2 then at January of 2003, do you recognize the word
3 reference, date reference, and numerical reference
4 on the document as accurately reflecting the
5 financial status of the office of printing
6 services during that time frame, between August of
7 1999 and January of 2003?
8    A. What I recognize is the cash balance
9 especially in the area of December '01, January
10 '02, that reflects the magnitude of the deficits
11 that were encountered by printing services, and --
12    Q. So do you believe the figures are
13 accurate as to the time and date references on the
14 document itself relating to printing services?
15    A. For those that I have stated, I
16 recognize those in the area or the realm of the
17 numbers that we were looking at, which is a
18 deficit in excess of one million dollars.
19    Q. What was the effective date of Mr.
20 Bant's termination then?
21    A. I believe it was January 9th, 2004.
22    Q. And this document does not go to January
23 9th of 2004, does it?
24    A. No, it does not.

Page 83

1    Q. It ends in terms of fund balance on
2 April of 2003, correct?
3    A. Correct.
4    Q. What does it indicate at that time?
5    A. A cash balance of negative $85,133.
6    Q. What does it indicate as to the spread
7 between cash and fund balance?
8    A. Could you read the question, please.
9       (At this point the court reporter read
10 the requested portion of the record.)
11    A. The Column I, which is cash minus funds
12 spread between cash in fund balances indicates a
13 deficit of $446,745 as of April of '03.
14    Q. And what does that figure represent?
15    A. As it states, it's just the cash
16 balance, minus the fund balance.
17       (Whereupon, Deposition Exhibit No. 6 was
18 marked for identification.)
19    Q. Handing you what has been marked
20 Anderson Exhibit No. 6, would you tell us what
21 that document is, please?
22    A. It appears to be an e-mail from me to
23 Geoff Bant copied to Sonya Chambers on Thursday
24 January 24th, 2002, 5:25 PM.

Page 84

1    Q. You don't have to read it. What is the
2 subject of the e-mail?
3    A. It's a deficit reduction plan, and I
4 must state that this is not the entire -- this is
5 actually a part of an e-mail where the last or
6 where part of an e-mail is shown, that is what the
7 symbols on the left-hand side indicate, that this
8 is the trail end of an e-mail, not the original
9 e-mail. And so this is -- this is part of an
10 e-mail, so this is something that I sent, but
11 there must have been a reply or something that
12 somebody had to get those symbols on there.
13    Q. Yes, but are you saying that your own
14 e-mail is incomplete in that document?
15    A. No, not at all. I just wanted to make
16 clear that this is not -- this is not a complete
17 e-mail. This is part of an e-mail string.
18    Q. Again, I didn't suggest there weren't
19 responses or attachments or anything else, I'm
20 just saying that there wasn't a second or third
21 page to your own e-mail, was there?
22    A. No, I believe this was a one-page
23 e-mail.
24    Q. So --

Page 85

1    A. In printing it up.
2    Q. So, the substance is deficit reduction?
3    A. That's correct.
4    Q. And a figure is given for the deficit
5 reduction? A figure is given as to the deficit?
6    A. As of 12/31/2001.
7    Q. What was that figure?
8    A. In this e-mail it was $845,808.
9       MR. WAGNER: I'm sorry, could you repeat
10 that figure.
11    A. $845,808.
12    Q. What is the date of that figure again?
13    A. 12/31/2001.
14    Q. And how are you arriving at that amount
15 in the deficit?
16    A. As it states in the first sentence
17 there, I met with Sonya Chambers to go over the
18 office of printing services deficit as of that
19 date, and that was the amount that I was given
20 during that meeting.
21    Q. Okay. Looking again at Anderson Exhibit
22 No. 5, would you refer to December of '01 on that
23 exhibit.
24    A. Certainly.

Page 86

1  Q. Do you see any figures that comport to
2 your own deficit reference on Anderson Exhibit No.
3 5?
4  A. No.
5  Q. Do you see anything close to it?
6  A. No, but I wouldn't necessarily expect
7 to.
8  Q. Why is that?
9  A. Well, because even at the end of
10 December of '01 they were still coming up with the
11 deficit. That was a changing figure. So there
12 was revisions time and time again as to what the
13 real number was as they went through and cleaned
14 up all of the accounts and cleaned up the business
15 with Xerox.
16    And so over time the numbers that we
17 were reporting for the different months would
18 change based on the new information, and when that
19 information would have affected the accounts.
20  Q. As you look at Anderson Exhibit No. 5,
21 what column do you believe most accurately
22 represents a deficit at the office of printing
23 services from A through L?
24  A. From the standpoint in these different

Page 87

1 categories there are accurate representations of
2 what the deficits are. The cash balance deficit
3 is in column C. The fund balance for December '01
4 is what I'm referencing is in column G.
5  Q. So, the reference you would make on that
6 document would have a figure of $793,511 on it?
7  A. That would be the fund balance deficit.
8 The cash balance deficit was $1,097,612.
9  Q. And in January of '02 what were those
10 two figures?
11  A. The cash balance was $1,186,600. The
12 fund balance was a deficit of $219,937.
13    MR. WAGNER: When you gave the
14 $1,186,600 figure.
15  A. That is January '02.
16    MR. WAGNER: Okay. It has parentheses
17 around it.
18  A. That's because it's a deficit number.
19 It's an overdraft. In other words, spending money
20 that is not there. There is no cash in the
21 account.
22    MR. WAGNER: Did you explain that for the
23 other two figures you mentioned?
24  A. I indicated that those were deficit

Page 88

1 numbers, I believe.
2  Q. Can you reference your own exhibit, on
3 Exhibit No. 6, can you reference your deficit
4 reference to Exhibit No. 5? I may have asked you
5 that in a different way, but --
6  A. And sitting here with this exhibit, I
7 don't know if this was cash or fund balance
8 deficit. This is the number that was reported to
9 me during that meeting that was stated in here.
10 And so it accurately reflects what the person
11 responsible for the accounting in that unit said
12 was the deficit of the printing services on 12 --
13  Q. That was Sonya Chambers?
14  A. On 12/31/2001, and that individual is
15 Sonya Chambers responsible for producing the
16 number.
17  Q. At what point in time did the deficit in
18 the office of printing services become an issue
19 with respect to Mr. Bant's job position?
20  A. Deficits are a problem no matter when
21 they occur. And this was something that was an
22 ongoing issue with the office of printing
23 services, was the deficits. And so that's always
24 a performance issue.

Page 89

1  Q. Was this the first time you told Mr.
2 Bant that the deficit had to be lowered within a
3 specific period of time?
4  A. Each year when there are deficits in
5 accounts there is a deficit reduction plan that
6 has to be constructed.
7  Q. Prior to this exhibit, had you ever told
8 Mr. Bant that he had to reduce the deficit in
9 printing services within a specific period of
10 time, or in a specific amount?
11  A. For each deficit reduction plan it was
12 done in each year for accounts in deficit when we
13 received the information from the provost office.
14 Those accounts had to have a deficit reduction
15 plan that specified the period of time that they
16 were to be reduced within.
17  Q. And again, I have not found any other
18 e-mail where you did that prior to the exhibit
19 which is marked number 6. Do you know of any such
20 written communication between yourself and Mr.
21 Bant that would indicate that type of deficit plan
22 as you've directed in Exhibit 6?
23  A. The deficit, there are deficit plans for
24 each account each year that is in deficit. And so

Page 90

1 there are plans that were submitted to the office
2 of the provost for years in which printing
3 services was in deficit for which they requested
4 and we provided deficit reduction plans. So this
5 is not the first year that a deficit reduction
6 plan was requested. All units have to do this at
7 the University on an annual basis for accounts
8 that are in deficit.
9     Q. So, you're saying that it was not
10 unusual to send Exhibit No. 6? That is done
11 throughout the University on a very regular basis?
12    A. My statement is that deficit reduction
13 plans are done on a regular basis; how supervisors
14 handle that could be any number of ways. This
15 happens to be the way that I sent the e-mail, so
16 that we could have very specific information
17 communicated and understood.
18    Q. Why did you give 36 months?
19    A. That is the maximum allowable under the
20 provost deficit reduction plans. They tell you
21 you have up to 36 months for your deficit
22 reduction plan without special approval from the
23 provost.
24    Q. And who determines the amount of the

Page 91

1 deficit reduction? I mean, you take a number that
2 the deficit exists at a point in time, and is it
3 always determined it has to go down to zero within
4 that 36 months, or who determines that?
5    A. The idea of the deficit reduction plans
6 is to get to either a zero balance or a positive
7 cash balance at the end of 36 months maximum.
8 That is the requirement. That is not -- that is
9 what the instructions said.
10    Q. Did Mr. Bant do that?
11    A. Do what?
12    Q. Get to zero within 36 months? You can
13 refer to Exhibit 5 again if you like.
14    A. Mr. Bant was only head of printing
15 services for an additional 11 months.
16    Q. Did he do it in the 11 months?
17    A. No, he did not.
18    Q. And again, you're referencing Exhibit 5?
19    A. I'm not referencing that exhibit at all.
20    Q. And so you are speaking of your personal
21 knowledge?
22    A. That is correct.
23    Q. In the interim, the time frame he was
24 given had been cut in half, was that also correct?

Page 92

1    A. The plan for reducing the deficit in
2 this e-mail states that we need to insure that the
3 deficit will be retired within 36 months, which
4 was by December 31, 2004. Subsequent to this, and
5 in the month of February, that timing was reduced
6 to eliminate the deficit by the end of fiscal year
7 2000, well, within a 12 month period, I believe,
8 from --
9    Q. Was that done by somebody else?
10    A. That came out of discussions between
11 Charles Colbert, who I reported to, and myself.
12    Q. So this is 7.
13        (Whereupon, Deposition Exhibit No. 7 was
14 marked for identification.)
15    Q. And those discussions are reflected in
16 Anderson Exhibit 7, are they not?
17    A. Yes, this is an e-mail that I sent to
18 Geoff and Sonya after I met with Dr. Colbert on
19 February 5th, 2002.
20    Q. What was Sonya Chamber's responsibility
21 in this situation for involving herself in the
22 reduction of the deficit from January -- can I see
23 number 6? From January 24th of 2002 on?
24    A. And please state again, you were asking

Page 93

1 what her role --
2        (At this point the court reporter read
3 the requested portion of the record.)
4    A. Sonya was -- she didn't involve herself.
5 This was part of her job responsibilities for that
6 portion of the job that reported through the
7 office of printing services. She was functioning
8 basically as a business manager for that group in
9 charge of their financial services. And so it was
10 Sonya and Geoff's work to put together the deficit
11 reduction plan.
12    Q. So, both were responsible for the
13 deficit reduction plan?
14    A. We were asking both to be responsible
15 for the deficit reduction plan.
16    Q. This is 8.
17    A. I was asking.
18        (Whereupon, Deposition Exhibit No. 8 was
19 marked for identification.)
20    Q. Is Exhibit 8 a true and accurate copy of
21 the document prepared by you indicating the job
22 responsibilities for Sonya Chamber when she
23 became, Chambers, when she became a University of
24 Illinois employee?

Page 94

1  A. It appears to be, yes.
2  Q. Was there any alteration or amendment in
3 those job responsibilities for Sonya Chambers up
4 through January of 2003 that you are aware of?
5  A. No, there were not.
6  Q. And referencing the bottom of that page,
7 what involvement did she have with the office of
8 printing services?
9  A. The specific areas of responsibilities
10 of office of printing services, 80 percent of her
11 time was going to be assigned there as the
12 director of financial services.
13  Q. Now, at the time she was hired --
14  A. Well, actually excuse me. That's not a
15 completely accurate statement. Her title was
16 director of financial services, administrative
17 services. Her duties within printing services was
18 to serve as a member of the management team, with
19 responsibilities for the oversight and direction
20 of the business and financial systems.
21      And that included the cash flow
22 management, compliance, analysis budgeting,
23 reporting, project management and continuous
24 improvements, and this was under the direction of

Page 95

1 Mr. Bant.
2  Q. Did you say that 80 percent of her time
3 was to be spent with the office of printing
4 services?
5  A. That's the way the appointment was
6 designed, yes.
7  Q. And as you said, there was no change or
8 alteration in that job description from the time
9 of its inception until January of 2003, was there?
10  A. That is correct.
11  Q. Now, at the time that Sonya Chambers
12 became a University of Illinois employee, did she
13 ever have any experience with printing services to
14 your knowledge?
15  A. To my knowledge, no, but it was Geoff
16 Bant who brought me the resume and wanted to look
17 into hiring Sonya Chambers. It was a
18 recommendation from his group that actually led to
19 her being interviewed, and then subsequently
20 hired.
21  Q. So, did Mr. Bant train Sonya Chambers?
22  A. Mr. Bant, as this letter clearly states,
23 was to be her supervisor for those 80 percent
24 duties, and so therefore he had responsibilities

Page 96

1 for areas of oversight within printing services.
2  Q. And forget that document, in terms of
3 what the description is. I'm asking you on a
4 factual basis did Mr. Bant in fact train Sonya
5 Chambers from October 2001 up until the time Mr.
6 Bant was no longer an employee of the University
7 in the office of printing services?
8  A. He was her direct supervisor.
9  Q. So he trained her?
10  A. I would expect that there was some
11 training that occurred, but that was one of the
12 performance deficiencies as well, was the fact
13 that we didn't -- there was a lack of meetings and
14 things that we were expecting.
15  Q. So you didn't feel that Sonya Chambers
16 was properly trained by Mr. Bant?
17  A. Sonya got the proper training in the
18 University systems and she worked with the other
19 people within the office of printing services very
20 directly within the team managed by Geoff in order
21 to secure the training needed. And she also,
22 because of the 20 percent time devoted to
23 administrative services, which these same
24 functions were to be performed for on a wider

Page 97

1 scale, she also received direction and training
2 throughout the University system.
3  Q. Did you or did you not believe that Mr.
4 Bant provided proper training to Sonya Chambers?
5      MR. WAGNER: Objection as to form; it's
6 been asked and answered. Please answer.
7  A. I believe there was deficiencies there.
8  Q. Yet, you offered Miss Chambers the job
9 of director of printing services?
10      MR. WAGNER: Same objection as to form.
11 It's argumentative. Please answer.
12  Q. Is that correct?
13  A. Your question is not correct in the
14 statement that you are alluding that she did not
15 have the wherewithal to be the manager of the
16 printing services, when she had the appropriate
17 training to carry out that function and that job.
18  Q. My question to you was, did you offer
19 her the job of director of printing services?
20      MR. WAGNER: Objection as to form. That
21 is not the position that was offered, but answer
22 if you can.
23  A. No, I never offered her the position of
24 director of office of printing services. At the

Page 98

1 time of the recommendation for termination, the
2 recommendation for notice of nonreappointment of
3 Mr. Bant, she was offered the interim position of
4 director of office of printing services. It was
5 not a permanent position.
6    Q. So you are saying that you offered her
7 the interim position of director of printing
8 services?
9    A. She was offered the position of interim
10 director of office of printing services.
11    Q. Was this a promotion at that point in
12 time?
13    A. It was interim duties, so it was not a
14 promotion because it's not permanent. A promotion
15 is a permanent position.
16    Q. Did you offer her a pay raise at the
17 time you offered her the job of director of
18 printing services?
19    A. I don't recall if there was a -- there
20 would not be a pay raise, so that is inaccurate.
21 Any time a person steps up into an interim
22 position taking on additional duties, there can be
23 an administrative increment that would be
24 provided.

Page 99

1    Q. When did you offer her that job?
2    A. After the decision was made to go
3 forward in the process of the notice of
4 nonreappointment for Mr. Bant.
5    Q. When was that?
6    A. In the fall of 2002.
7    Q. September of 2002?
8    A. I didn't say September of 2002.
9    Q. I know you didn't. That is what I'm
10 asking you?
11    A. I don't recall the actual time line of
12 that, but it was in the fall of 2002 as the
13 process was started. But the decision was already
14 made to go forward in the process of the notice of
15 any nonreappointment for Mr. Bant.
16    Q. So, let's go through the months and you
17 can give me your best answer. Did you offer her
18 the job in September of 2002?
19    A. I don't believe I did, but I can not
20 say.
21    Q. Did you offer her the job in October of
22 2002?
23    A. I don't believe -- I don't know, I can't
24 answer that really because I don't know the actual

Page 100

1 timing sitting here today.
2    Q. Did you offer her the job in November of
3 2002?
4    A. I don't recall.
5    Q. Did you offer her the job in December of
6 2002?
7    A. I don't remember.
8    Q. So your best recollection is that you
9 offered her the job somewhere between September
10 1st of 2002, and December 31st of 2002, is that
11 correct?
12    A. That is not correct.
13    Q. What isn't correct about it? Did you
14 want to go back into the summer months?
15    A. No, I did not, and I did not offer any
16 time in there when the actual offer may have been
17 made.
18    Q. You said it was the fall of 2002, which
19 I construed to be December 1st on; if that is not
20 what you mean, you can certainly correct your
21 answer. Maybe you meant August? I just want to
22 get the time frame correct.
23    A. Absolutely not. This whole process took
24 place in the fall of 2002. And my recollection is

Page 101

1 October on, but I don't know a specific time.
2    Q. All right. And that is helpful because
3 that would mean that you are limiting it to the
4 time frame between October 1st and December 31st
5 of 2002, is that correct?
6    A. I'm not making any limitations in that
7 answer.
8    Q. Well, we're talking about the whole time
9 frame. You think you offered her that job in that
10 time frame, is that correct?
11        MR. WAGNER: Objection, it's been asked
12 and answered. Do the best you can.
13    A. Again, I'm not stating specific dates.
14 My recollection is some time in the time frame
15 October to December.
16    Q. Thank you. And did you offer her the
17 job more than once?
18    A. I don't recall.
19    Q. Where was the job offer made?
20    A. I believe it would have been in
21 one-on-one meetings and in my office that I held
22 regularly with all of my direct reports.
23    Q. So one-on-one would mean nobody else was
24 present?

Page 102

1  A. Correct.
2  Q. Were notes taken?
3  A. I don't recall having any notes that I
4 took.
5  Q. Did Miss Chambers take any notes?
6  A. I have no idea if she took notes or not.
7  Q. Because you don't remember?
8  A. I don't recall.
9  Q. Because you would have every opportunity
10 to see it, wouldn't you, with a one-on-one meeting
11 you could see if she was writing notes?
12  A. But I don't recall whether or not she
13 took notes on that specific topic.
14  Q. Just wanted to clarify that. So you
15 could have offered her the job more than once, and
16 you don't recall?
17  A. I didn't say that. I don't recall
18 offering her the job more than once.
19  Q. Your recollection is that you only
20 offered it to her once?
21  A. My recollection is that I don't recall
22 offering it to her more than once.
23  Q. And when did you determine you were
24 going to offer Sonya Chambers the job of director

Page 103

1 of printing services?
2  A. I considered offering her the interim
3 position of director of office of printing
4 services after the decision had been made to
5 initiate the procedure for notice of
6 nonreappointment for Mr. Bant.
7  Q. When was that?
8  A. I believe it was sometime in the October
9 time frame.
10  Q. October of 2002?
11  A. That's the process that I initiated,
12 that process, and started. I don't recall exactly
13 when in that process that Sonya Chambers was
14 offered the interim position. But the process, as
15 I recall, began in October of 2002.
16  Q. Why did you pick Sonya Chambers to make
17 the offer to?
18  A. I offered her the interim post office of
19 printing services because at that time looking
20 over the talent pool that was available within
21 printing services she was the most capable for
22 running that business operation.
23  Q. Were you limited to the talent pool in
24 printing services in making that choice at that

Page 104

1 point in time?
2  A. I was not limited to that pool only.
3  Q. You could hire anyone, couldn't you?
4  A. For an interim, you don't really hire
5 people for an interim post because it is by the
6 very nature of being interim is a short term
7 position.
8  Q. Did you believe that your reference to
9 interim posting of the director of printing
10 services meant you did not have to follow posting
11 guidelines or affirmative action guidelines
12 relating to the University of Illinois for that
13 position?
14  A. Could you read that, please.
15    (At this point the court reporter read
16 the requested portion of the record.)
17  A. Could you read it again, please.
18    (At this point the court reporter read
19 the requested portion of the record.)
20  A. Thank you very much. The position was
21 not posted. The offer of an interim position as
22 the director of the office of printing services
23 does not, or any position on campus, does not go
24 through a formal search process, which the second

Page 105

1 part, which is what you were referencing in the
2 second part of your question, that process does
3 not hold for interim positions. Interim positions
4 are used so that a unit can determine what needs
5 to be done for the permanent solution, and at that
6 time then determinations are made on searches for
7 a position, because there is no open position for
8 posting at that time. And that's why interim
9 positions are used.
10  Q. What is the difference between the
11 contractual status of an interim director and a
12 so-called permanent director then?
13  A. An interim position is a temporary
14 assignment for increased -- a temporary assignment
15 of increased duties.
16  Q. Does that mean the interim director is
17 not given the year-to-year employment contract you
18 earlier talked about that Mr. Bant had?
19  A. There's two different issues there. The
20 person that is selected for the interim position,
21 and in this case an academic position, already has
22 their 12 month, in this case, their 12 month
23 appointment as an academic professional to the
24 University of Illinois. That is what is renewed.

Page 106

1 **The interim position is a temporary assignment, in**
2 **addition to their regular duties for which they**
3 **get their notice of appointment annually.**
4 Q. Now, did Sonya Chambers start obtaining
5 annual written renewals of her employment status
6 after Exhibit No. 7, I believe it's your letter to
7 her? I don't have it in front of me.
8 A. Exhibit Anderson 8? You are referring
9 to the letter?
10 Q. 8, that's right.
11 A. And the question is? Did she start
12 receiving annual notices?
13 Q. Yes.
14 A. After this letter was sent, it's dated
15 September 18th.
16     MR. WAGNER: Of 2001.
17 A. Of 2001, she accepted the position,
18 started, by accepting the position the paperwork
19 was filed to get the position approved by the
20 Board of Trustees. That was approved. She
21 started work on October 1, 2001, I believe, and
22 from that point forward then she would be in the
23 system for an annual notice of appointment in the
24 academic year. The academic year at the

Page 107

1 University of Illinois has changed. It is now
2 August 16th through August 15th of the following
3 year, and that is when the appointments run. So
4 her appointment would have run through August, and
5 I believe in 2001 we were still under the old
6 system, and I'm sorry, it's kind of confusing when
7 they change. It used to be August 20th and 21st.
8 They backed it up five days to make the University
9 of Illinois system consistent across the campuses.
10 So, she would have received an appointment from
11 October 1, 2001, through the end date of the
12 academic year in 2002.
13     And following that she would have gotten
14 a notice of appointment automatically because
15 there was no end date on her appointment.
16 Q. So you offered Sonya Chambers the job of
17 director of printing services when she had only
18 been a University of Illinois employee for one
19 year, and knowing she had no prior experience in
20 printing services, is that correct?
21     MR. WAGNER: Object to the form of the
22 question. He didn't say he offered her the job of
23 director. He said he offered her the position of
24 interim director of printing services. Please

Page 108

1 answer if you can. We object to the form and its
2 argumentative nature. Please answer.
3 A. Could you read back the question.
4     (At this point the court reporter read
5 the requested portion of the record.)
6 A. What is correct is that after the
7 decision was made to recommend a notice of
8 nonreappointment, she was offered the interim
9 position. She had the knowledge base to fulfill
10 the obligations of the interim position of
11 director of printing services.
12 Q. Well, again, to get you to answer my
13 question, did you offer her the position of
14 interim director, as you refer to it, of printing
15 services after she had only been an employee for
16 one year at the University of Illinois?
17     MR. WAGNER: Same objection as to form
18 and argumentative nature. Please answer.
19 A. I don't recall the exact date that I
20 offered it, so I can't state as to what the actual
21 number of months she had been in the employment of
22 the University of Illinois at that time.
23 Q. Well, you did testify under oath that
24 she began working on October 1st of 2001, and your

Page 109

1 window of when you offered her the job began on
2 October 1st of 2002, is that correct?
3 A. No, I said October of 2002.
4 Q. I thought I just said that. What did I
5 say?
6     MR. WAGNER: Why don't you just restate
7 it to include that. It's just a suggestion.
8 Q. You have testified that you know she
9 began work on October 1st, 2001, and that the
10 window in which you offered her the job of interim
11 director of printing services began on October 1st
12 of 2002, is that correct?
13 A. Again, I did not specify October 1. I
14 said October, so it's sometime within the month of
15 October. I don't know the exact date, the start
16 date for that period. So, that statement, that
17 part of the statement is incorrect. But during --
18 it happened sometime October to December of 2002.
19 Q. Let's make it 13 months then as
20 including the October month. That means you
21 offered her the job of interim director of
22 printing services while she had been a University
23 of Illinois employee for approximately 13 months,
24 is that correct?

Page 110

1    A. Again, I don't recall exactly the date
2 that the offer was made. I just know the time
3 frame for this process that we went through. And
4 so at some period from the October to December
5 time frame that she was offered the interim
6 position, after starting October 1 of 2001 in her
7 position of director of financial affairs,
8 administrative services.
9    Q. Let's rephrase the question then. Did
10 you offer Sonya Chambers a job of interim director
11 of printing services when she had been a
12 University of Illinois employee no more than 15
13 months?
14    A. She would have been offered the position
15 of interim director after being there no more than
16 15 months.
17    Q. And at the time you knew she had no
18 prior experience with printing operations, is that
19 correct, other than the time frame she had been a
20 University of Illinois employee under the
21 direction of Geoff Bant?
22    A. It's correct that that is my
23 understanding, that that is her only window into
24 printing services. But she had a master's in

Page 111

1 business administration, and was extremely
2 competent in the business field and managing.
3    Q. Did the fact that Sonya Chambers was an
4 African American woman come into play in your
5 decision to offer her the job of interim director
6 of printing services?
7    A. Absolutely not.
8    Q. Did you offer the job of interim
9 director of printing services or a permanent
10 director of printing services to anyone else
11 between October 1st of 2002 and June of 2003?
12    A. Sometime after the process, after Sonya
13 Chambers declined to be interim director of the
14 office of printing services, the position was
15 offered to Robert Kelly.
16    Q. When was that done?
17    A. Again, in the time frame that I've
18 already stated.
19    Q. Did you do that?
20    A. Yes, I did.
21    Q. Why did you offer that interim job to
22 Mr. Kelly?
23    A. It was my opinion that there was not
24 another person within the office of printing

Page 112

1 services that at that time that I would feel
2 confident that could run the business. Bob Kelly
3 was the director of the campus stores mail and
4 receiving operation on campus. It was the other
5 major, or other large service unit that I oversaw.
6    Q. Had he had any prior experience with
7 printing services?
8    A. His operation worked very closely with
9 printing services. And he had a mail operation
10 that dovetailed with printing services in order to
11 provide service to the campus. And he was very
12 much aware of the operation of such a large unit.
13    Q. Had he ever worked in printing services
14 prior to that time?
15    A. I don't recall.
16    Q. How long did Mr. Kelly serve in his
17 position as interim director of printing services?
18    A. I don't know, because I don't know the
19 official date that Kit Mecum was appointed as the
20 permanent director.
21    Q. You don't have to know the exact date,
22 just asking --
23    A. After, in January of 2003 the service
24 divisions were all in a major campus

Page 113

1 reorganization. The ones that I oversaw were
2 pulled under facilities and services, so from that
3 point forward I don't know the timing of personnel
4 actions.
5    Q. Did Mr. Bant actually work for a year
6 after you sent him the December 2, 2002
7 correspondence?
8    A. It was actually over a year that he was
9 on the payroll of the University of Illinois.
10    Q. Did he do the work?
11    A. We arranged for work within the library
12 that he was doing.
13    Q. So when did he stop working as director
14 of printing services?
15    A. I believe it was December of -- well, I
16 don't believe; it was on December 18th, 2002 when
17 those responsibilities were removed.
18    Q. And given to Bob Kelly?
19    A. At that point in time Bob Kelly assumed
20 those duties as an interim position.
21    Q. And at whose direction did that action
22 occur?
23    A. It was based on my recommendation, that
24 was approved by the vice chancellor and others up

Page 114

1 the line for that appointment to go through.
2    Q. So, Mr. Bant stopped working as director
3 of printing services on December 18th, 2002 at
4 your direction and recommendation?
5        MR. WAGNER: I'm sorry, at your what?
6 Would you repeat that.
7        (At this point the court reporter read
8 the requested portion of the record.)
9        MR. WAGNER: Objection as to form.
10 Please answer if you can.
11    A. I was the one that informed Mr. Bant
12 that those duties were no longer his.
13    Q. Is that date correct?
14    A. On December 18th, 2002.
15    Q. Are you aware that he performed any
16 duties as director of printing services after
17 December 18th, 2002?
18    A. He maintained the title, but did not
19 have any duties or responsibilities for the office
20 of printing services.
21    Q. And just so we're clear, he would not
22 have been allowed to perform those duties after
23 December 18th, 2002 because of your
24 recommendation, is that also correct?

Page 115

1    A. That is correct. If my recommendation
2 was upheld.
3    Q. And it was upheld?
4    A. And it was upheld.
5    Q. That recommendation was subsequently
6 investigated and reversed by CAP, was it not?
7    A. No, it was not.
8    Q. You are saying they did not investigate
9 it?
10    A. I did not state that.
11    Q. What is CAP?
12    A. Council of Academic Professionals.
13    Q. What is the purpose of CAP?
14    A. CAP is an organization for academic
15 professionals on campus.
16    Q. For what purpose?
17    A. I don't know the full range of
18 responsibilities or purposes for the CAP.
19    Q. Does CAP have investigatory powers
20 relating to termination of academic professionals
21 at the University of Illinois?
22    A. CAP can receive and investigate
23 grievances.
24    Q. Filed by academic professionals?

Page 116

1    A. Correct.
2    Q. Is that the only mechanism at the
3 University of Illinois that was in place from 2002
4 on for an employee to internally contest their
5 termination to your knowledge?
6        MR. WAGNER: Object to the form and
7 scope. You mean of Mr. Bant's classification as
8 an academic professional?
9    Q. As an academic professional.
10        MR. WAGNER: I don't think that was in
11 there, so that would include union people
12 technically, so we object to the overbroad form,
13 but answer if you can.
14    Q. We are not including union people.
15    A. Academic professionals would have the
16 opportunity to go above, in other words anybody
17 that reported to me could take their arguments to
18 the vice chancellor that I reported to, so I
19 believe there is several mechanisms that they
20 could.
21    Q. In terms of legal mechanism, is the
22 grievance procedure whereby CAP does an
23 investigation the only intra-university method for
24 contesting a job action such as termination when

Page 117

1 the person is an academic professional?
2    A. I don't know the full range of options
3 that are available.
4    Q. Are you aware of any other option?
5    A. I know that a person can go up the line
6 of command to contest.
7    Q. On an informal basis?
8    A. I don't know what the formal procedure
9 is.
10    Q. Well, there isn't any formal procedure,
11 is there?
12        MR. WAGNER: Well, object to the form.
13 It's argumentative. Answer if you can.
14    A. I don't know if there's a formal
15 procedure.
16    Q. Other than that, are you aware of any
17 procedure other than the grievance procedure with
18 CAPs?
19    A. If a person -- depends on why a person
20 feels they're being issued a notice of
21 nonreappointment. In other words, they could go
22 to the office of equal opportunity and access if
23 they felt there was a discrimination.
24    Q. That is an informal procedure as well,