Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 647718 (S.D.N.Y.)
**(Cite as: 2006 WL 647718 (S.D.N.Y.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
June ROBERTI, Plaintiff,
v.
SCHRODER INVESTMENT MANAGEMENT
NORTH AMERICA, INC., Defendant.
**No. 04Civ.2404(LTS)(THK).**

March 14, 2006.
Liddle & Robinson, L.L.P., By: James A. Batson, New York, NY, for Plaintiff.

Pillsbury Winthrop Shaw Pittman, LLP, By: Christine N. Kearns, PC, Washington, DC, for Defendant.

*OPINION & ORDER*
SWAIN, J.

*1 In this employment discrimination action, Plaintiff June Roberti ("Plaintiff" or "Roberti") alleges that Defendant Schroder Investment Management North America, Inc. ("Defendant" or "Schroder") discriminated against Plaintiff on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), as well as in violation of New York State and City Human Rights Laws. [FN1] Plaintiff further alleges that Defendant defamed her. Defendant moves for judgment on the pleadings, seeking dismissal of the complaint. The Court has jurisdiction of the Title VII claims under 28 U.S.C. § 1331, and has supplemental jurisdiction of Plaintiff's state and local law claims pursuant to 28 U.S.C. § 1367.

FN1. Specifically, New York Executive Law § 296 and the Administrative Code of the City of New York §§ 8-101 *et seq.*

The Court heard oral argument on Defendant's motion, and has considered carefully the arguments raised there, as well as in the parties' motion papers.

For the following reasons, the Court grants in part and denies in part Defendant's motion for judgment on the pleadings.

*BACKGROUND*
The following facts alleged in the Complaint are taken as true for the purposes of the instant motion for judgment on the pleadings. Plaintiff was a female employee in the New York office of Schroder, an investment management firm, "from 1979--1989, and from 1994 until May 19, 2003." (Compl.¶ 1.) Until December 2002, Roberti worked at Schroder's U.S. Equity-trading-desk, which was staffed by plaintiff and three other women--Nancy Picinic ("Picinic"), Melissa Plotkin ("Plotkin"), and Barbara Kalotkin ("Kalotkin"). (*Id.* ¶ 13.) The desk performed well. (*Id.* ¶ 14.) In December of 2002, Schroder fired Plotkin and Kalotkin, "stating that their jobs were 'redundant.' " (*Id.* ¶ 15.) As a consequence of Plotkin and Kalotkin's termination, Roberti and Picinic experienced a substantial increase in their workloads. (*Id.* ¶¶ 18, 21.) Shortly thereafter, Roberti had a performance review meeting with Steve Wood ("Wood"), Global Head of Training for Schroder. (*Id.* ¶ 19.) It was at this meeting that Roberti first informed her employer of her perceptions of an inequitable work environment, stating to Wood in the course of a discussion of Plotkin and Kalotkin's termination, that she "sense[d] discrimination." (*Id.* ¶ 20.)

In January of 2002, Picinic, who had been Head of Equity Trading for more than five years, was removed from that position and replaced with a male, Edward Savickas ("Savickas"). (*Id.* ¶¶ 22-23.) Savickas was a new hire and, although he "had very little experience in trading U.S. equities" and "[b]oth Picinic and Roberti were far more qualified to be head of Equity Trading," Schroder effectively demoted Picinic while failing to promote Roberti. (*Id.* ¶¶ 23- 25.)

In February of 2003, Roberti met with Wood for another performance review. (*Id.* ¶ 27.) During this meeting, Roberti highlighted the heavy workload following the loss of Plotkin and Kalotkin, and Wood assured her that "her team would remain intact, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.        Exhibit "2"

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 647718 (S.D.N.Y.)
**(Cite as: 2006 WL 647718 (S.D.N.Y.))**

Page 2

that there would be no further changes on the desk." (*Id.* ¶ 28.) Despite his assurances, however, Wood also informed Roberti that Savickas, after only one year on the job, was going to be replaced as Head of Equity Trading by Robert McGrath ("McGrath"), another male with "little experience trading U.S. equities." (*Id* . ¶ 29.) Wood also told Roberti that she would be responsible for " 'co-heading' the desk" with McGrath and that she " 'would remain number two." ' (*Id.* ¶¶ 30, 33.) In response to this news, Roberti asked why she had not been chosen for the position, and "stated that this looked 'like discrimination" ' and that "[t]his sounds like the old boys club." (*Id.* ¶¶ 30, 32.) Wood told Roberti that "McGrath was more qualified than [she]," and "that to make [her] number two was 'a stretch." ' (*Id.* ¶ 33.)

*2 One month later, Roberti met with Wood, McGrath, and Schroder's Head of Human Resources, Kathy Adams ("Adams"), and was told that Picinic was going to be let go. (*Id.* ¶ 34.) Wood wanted Roberti's support on the decision to fire Picinic. (*Id.*) Although Roberti protested Picinic's termination and refused to support Wood's decision, Picinic was fired. (*Id.* ¶ 35.) Wood told Roberti not to worry, as McGrath would pick up Picinic's responsibilities and Picinic's termination " '[was] not going to affect [her]." ' (*Id.* ¶ 36.) Nevertheless, in addition to performing the majority of Plotkin and Kalotkin's work, which included new duties for her, Roberti "also was forced to assume the majority of ... Picinic's duties, as.... McGrath failed to handle most of ... Picinic's trading responsibilities." (*Id.* ¶¶ 37-38.) "In addition, now that she was 'second' on the desk, [Roberti] had to fill in for ... McGrath when he was out of the office." (*Id.* ¶ 41.) Further, "[i]n March of 2003, another male, William Lishman, was transferred into [the trading desk]," but "he took over virtually none of the duties of the women whose employment had recently been terminated." (*Id.* ¶ 42.) Roberti's workload interfered with her "ability to provide the necessary level of care" to her duties, as she was in charge of approximately 35-50 trades a day," the volume of which "often exceeded $100 Million." (*Id.* ¶¶ 39-40.) McGrath, by contrast, averaged 4-5 trades a day. (*Id.* ¶ 40.)

Roberti's complaint includes additional allegations of disparate treatment. From 2002 until February of 2003, Schroder's portfolio manager, Ira Unschuld ("Unschuld"), "required the women on the desk to send him instant messages on the computer whenever they were using the bathroom, and commented on at least one occasion that the women used the ladies room entirely too much," yet Unschuld did not require the same reporting by the male members of the desk, who "could come and go as they pleased." (*Id.* ¶¶ 46-47.) In February of 2003, Peter Clark ("Clark") was hired as Schroder's new CEO and, although he "got acquainted very quickly with the men on the desk," Clark made no efforts to get acquainted with Roberti and "often mistakenly called her 'Julie'." (*Id.* ¶¶ 43-44.) Further, on at least two occasions, Clark only asked the men at the trading desk for information, despite the fact that Roberti was supposed to be "number two." (*Id.* ¶ 45.)

On May 14, 2003, Roberti made the second trading error of her 19-year career with Schroder, when she erroneously read the electronic U.S. Equity trading blotter as indicating a purchase order instead of a sale order. (*Id.* ¶¶ 48- 49.) On May 15, Wood initially spoke with McGrath regarding Roberti's error, and then later held a meeting regarding the error with McGrath, Adams, and Mark Hemenetz, Schroder's COO. (*Id.* ¶ 50.) Wood "refused to speak to [Roberti] concerning the error." (*Id.*) Subsequent to the meeting, McGrath told Roberti "that he thought 'the broker should take the hit." ' (*Id.* ¶ 51.) Roberti refused the suggestion and informed McGrath "that she would not let the broker take the blame for the trading error." (*Id.* ¶ 52.)

*3 On Friday, May 16, McGrath again requested that Roberti "lie about the circumstances of the trading error," but Roberti would not do so. (*Id.* ¶¶ 53-54.) Despite Roberti's "refusal to lie," McGrath informed members of Roberti's trading desk, who repeated it to others in the securities industry, "that Wood had issued a directive to the effect that J.P. Morgan was 'cut off world-wide,' implying that Roberti's counterpart at J.P. Morgan had made the error." (*Id.* ¶ 55; *id.* ¶ 98.) The implication that Roberti had lied about the trade "can reasonably be understood to cause harm in the context of the securities industry." (*Id.* ¶ 99.) Later that day, Roberti told McGrath that she was resigning. (*Id.* ¶ 56.) In response, McGrath called

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 3
Not Reported in F.Supp.2d, 2006 WL 647718 (S.D.N.Y.)
**(Cite as: 2006 WL 647718 (S.D.N.Y.))**

Roberti, saying " 'don't make any rash decisions, they weren't going to fire you--you know-- they were only going to give you a warning letter." ' (*Id.* ¶ 57.)

The following Monday, Roberti returned to Schroder to submit her letter of resignation. (*Id.* ¶ 58.) Adams and Wood met with Roberti, and informed her that there would be "no warning letter and asked her to stay on." (*Id.* ¶ 60.) Roberti rejected their request. (*Id.*) Adams again requested that Roberti continue in Schroder's employ, asking "her to work for the next three months for $10,000." (*Id.* ¶ 61.) Roberti again refused the offer and submitted her letter of resignation. (*Id.*) Adams would not accept the letter of resignation drafted by Roberti, and instead gave her "a different resignation letter to sign which omitted [Roberti's] complaints." (*Id.* ¶ 62.) Thereafter, Schroder damaged Roberti's professional reputation by misrepresenting the reasons behind Roberti's departure from the company and "told several brokers that [Roberti] had conducted business with ... that she had simply left in a 'hissy fit," ' which was untrue. (*Id.* ¶¶ 63-64.) Schroder took such action against Roberti "because she is a woman." (*Id.* ¶ 65.)

## DISCUSSION
*Standard of Review*

A court reviews a motion for judgment on the pleadings brought pursuant to Federal Rule of Civil Procedure 12(c) under the same standard as a Federal Rule of Procedure 12(b)(6) motion to dismiss. *King v. Am. Airlines, Inc.*, 284 F.3d 352, 356 (2d Cir.2002) (quoting *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999)). Thus, unless it is "beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief," the Court will not dismiss the complaint for failure to state a claim on a motion for judgment on the pleadings. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In making its determination, the Court must assume the truthfulness of the facts alleged in the complaint and draw all inferences in the non-moving party's favor. *European Cmty. v. RJR Nabisco, Inc.*, 355 F.3d 123, 130 (2d Cir.2004).

In her complaint, Plaintiff refers to the September 11, 2003, charge she filed against Schroder with the Employment Opportunity Commission ("EEOC"). (Compl. ¶ 5.) On a motion to dismiss or motion for judgment on the pleadings, the court may consider documents integral to or referred to in the complaint. *See, e.g., Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir.2005). In addition, a court may take judicial notice of administrative records in connection with the consideration of a motion for judgment on the pleadings, without converting it to a motion for summary judgment. EEOC filings constitute such administrative records and may be properly judicially noticed. *See, e.g., McBride v. Routh*, 51 F.Supp.2d 153, 155 (D.Conn.1999) (considering EEOC charges "as public records subject to judicial notice"); *Dollinger v. The State Ins. Fund*, 44 F.Supp.2d 467, 472 (N.D.N.Y.1999) (holding judicial notice of EEOC filings proper as "administrative complaints and findings [which] are matters of public record"); *see also Evans v. The New York Botanical Garden*, No. 02 Civ. 3591(RWS), 2002 WL 31002814, at *4 (S.D.N.Y. Sept. 4, 2002); *Thomas v. Westchester County Health Care Corp.*, 232 F.Supp.2d 273, 276 (S.D.N.Y.2002).

*4 The Supreme Court has made it clear that in an employment discrimination case, the complaint does not have to allege specific facts constituting a *prima facie* case of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002). Instead, the complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," as is required under Rule 8(a)(2) of the Federal Rules of Civil Procedure. *Id.* at 512 (quoting Fed.R.Civ.P. 8(a)(2)). The complaint must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* (quoting *Conley*, 355 U.S. at 47).

*Title VII Claim*

In her First Claim, Roberti asserts that Defendant has discriminated against her in violation of Title VII on the basis of gender by:
   (a) not paying compensation in an amount comparable to her male peers, (b) failing to promote her twice, instead choosing two men over her that were equally or less qualified, (c) subjecting her to discriminatory treatment, (d) refusing to correct discriminatory conduct after it was known, (e) taking

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

retaliatory actions for lawful complaints, including but not limited to increasing her workload, asking her to lie on a trading error in violation of securities law and regulations, reprimanding her severely for the trading error, and stating that she left in a "hissy fit" and (f) constructively terminating her employment by damaging her career and asking her to continue to engage in activities that threatened her license.
(Compl.¶ 74.) [FN2]

> FN2. Plaintiff also alleges that Schroder "systemically [sic] and pervasively discriminated against its female employees" in a number of ways. (*Id.* ¶ 75.) To the extent this paragraph is intended to assert claims on behalf of others, it is dismissed for lack of standing. *See, e.g., Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 158-59 (1982); *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1091 (2d Cir.1995).

Defendant argues that none of these charges suffices to state a Title VII cause of action. Defendant also seeks dismissal of Plaintiff's defamation claim on the merits and, if the Court dismisses all of Plaintiff's Title VII claims, dismissal of her state law claims for lack of subject matter jurisdiction. For the following reasons, the Court grants Defendant's motion to the extent it seeks dismissal of Plaintiff's Title VII causes of action for compensation discrimination and for failure to promote the Plaintiff in 2002. Her discrimination claims are also dismissed to the extent they are premised on injuries allegedly suffered by others. The motion is denied in all other respects.

*Compensation Discrimination*

Defendant, pointing out that Roberti's EEOC charge [FN3] did not allege compensation discrimination, asserts that the Plaintiff's Title VII claim should be dismissed for failure to exhaust administrative remedies to the extent it charges compensation discrimination. (Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def.'s Mem."), 12.) A plaintiff must exhaust her administrative remedies with the Equal Employment Opportunity Commission ("EEOC") prior to bringing a Title VII lawsuit in federal court.

42 U.S.C. § 2000e-5(f); *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir.2001). The claims that are the basis for the subsequent lawsuit must have been included in the charge filed with the EEOC, or be "based on conduct subsequent to the charge which is 'reasonably related' to that alleged in the EEOC charge." *Pearson-Fraser v. Bell Atl.,* No. 01 Civ. 2343(WK), 2003 WL 43367, at *2 (S.D.N.Y. Jan. 6, 2003); *Benjamin v. New York City Dep't of Health,* No. 99 Civ. 12345(LTS)(AJP), 2002 WL 485731, at *3 (S.D.N.Y. Mar. 29, 2002), *aff'd in part, vacated in part* 144 Fed. Appx. 140 (2d Cir.2005).

> FN3. Plaintiff's EEOC charge was not attached as an exhibit to the Complaint, however, Defendant has proffered a copy of the charge as filed with the EEOC. (Mark G. Hanchet Decl. Ex. 4.)

*5 Here, Plaintiff's EEOC charge included neither allegations of compensation discrimination nor allegations "reasonably related" to such discrimination. Accordingly, the complaint will be dismissed, insofar as it asserts such a Title VII claim, for failure to exhaust administrative remedies.

*Failure to Promote*

Plaintiff asserts that she was improperly denied a promotion to Head of Equity Trading twice--in 2002, when Picinic was demoted and Savickas was brought in to head the desk, and in 2003, when Savickas was replaced by McGrath. (Compl.¶¶ 22-23, 27-29.) Dismissal of Plaintiff's failure to promote claim is warranted on statute of limitations grounds to the extent the claim is premised on the January 2002 failure to promote Roberti to Picinic's position. Plaintiff filed her charge of discrimination with the EEOC on September 12, 2003. (Hanchet Decl. Ex. 4.) The January 2002 promotion decision is thus well outside the 300- day Title VII limitations period. Nor can the claim be sustained as timely on a "continuing violation" theory, as Plaintiff contends. Promotion is treated as a discrete act for Title VII limitations purposes; such acts falling outside the statutory period may not properly be the basis of disparate treatment claims. *Nat'l R.R. Passenger Corp. v. Morgan,* 536

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 647718 (S.D.N.Y.)
(Cite as: 2006 WL 647718 (S.D.N.Y.))

Page 5

U.S. 101, 114 (2002); see also Petrosino, 385 F.3d at 227-28.

With respect to the merits of the claim, Defendant invokes the general rule that a person asserting a Title VII cause of action based on failure to promote must demonstrate that she, inter alia, "applied and was qualified for a job for which the employer was seeking applicants," [FN4] Defendant argues that the complaint must be dismissed insofar as it asserts failure to promote claims because Plaintiff nowhere alleges that she applied for the position of Head of Equity Trading. Plaintiff asserts, in response, that Schroder did not solicit internal applications for the position and that she was not aware of either opening before it was filled. (Oral Arg. Tr., 13-14, Dec. 10, 2004.)

> FN4. Petrosino v. Bell Atl., 385 F.3d 210, 226 (2d Cir.2004) (quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir.1998)).

It is well established in the Second Circuit that "[a] specific application [for promotion] is [ordinarily] required to 'ensure[ ] that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer.' " Petrosino, 385 F.3d at 227 (quoting Brown, 163 F.3d at 710). Such application need not be formal; plaintiff may informally notify her superiors of her interest in the higher position. Id. "The law [also] recognizes[, however,] that 'the facts of a particular case' may sometimes make 'a specific application a quixotic requirement.' " Id. (quoting Brown, 163 F.3d at 710). The specific application requirement is thus excused where an employee can "demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer. Id.

*6 Here, Plaintiff alleges that she was told of vacancies in the Head of Equity Trading position only after the male replacement candidates had been selected. Nothing in the complaint suggests that she knew of either vacancy before it was filled. Thus, it cannot be said at this stage that Roberti cannot demonstrate an entitlement to relief with respect to the 2003 failure to promote claim.

Accordingly, Defendant's motion is denied to the extent it is directed to the failure to promote Plaintiff to Head of Equity Trading in 2003.

*Retaliation*

Plaintiff claims that Defendant retaliated against her in violation of Title VII by "increasing her workload, asking her to lie on a trading error in violation of securities law and regulations, reprimanding her severely for the trading error, and stating that she left in a 'hissy fit.' " (Compl.¶ 74.) These retaliatory actions were, according to Plaintiff, taken in response to her "lawful complaints" to her superior during her performance reviews, in which she stated "I sense discrimination here" and "This sounds like the old boys club." (Id. ¶¶ 20, 30.) In order to make out a *prima facie* claim for retaliation, a plaintiff must prove "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) adverse employment action; and (4) a causal connection between plaintiff's protected activity and the adverse employment action." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 113 (2d Cir.2000).

Defendant asserts that the supposed retaliatory actions Plaintiff cites are not sufficiently adverse to support a retaliation claim and that, even if they were, they lack the appropriate causal connection to her complaints, for purposes of properly pleading a *prima facie* case of retaliation. (Def.'s Mem., 14-16.) However, in light of the Supreme Court's ruling in *Swierkiewicz* and the liberal pleading standards of Rule 8(a), it is not necessary for the Plaintiff to plead specific facts supporting each element of a *prima facie* case of retaliation. To survive a dismissal motion, Roberti's complaint need only provide Defendant with "fair notice of the basis for [her retaliation] claims" and provide "the grounds upon which they rest." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002). Here, Plaintiff has alleged causation, albeit generally, and has specified at least two types of employer actions-- overburdening the Plaintiff with work and sullying her reputation--that the Second

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 647718 (S.D.N.Y.)
(Cite as: 2006 WL 647718 (S.D.N.Y.))

Page 6

Circuit has recognized as potentially sufficient to constitute adverse employment actions. *See, e.g., Feingold v. New York,* 366 F.3d 138, 152-53 (2d Cir.2004) ("Feingold's allegations, if true, would show that he experienced two adverse employment actions: the assignment of a disproportionately heavy workload, and termination."); *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997) (citing *Pantchenko v. C.B. Dolge Co., Inc.,* 581 F.2d 1052, 1054-55 (2d Cir.1978)) ("[P]laintiffs may be able to state a claim for retaliation .... if, for example, the company ... sullies the plaintiff's reputation.").

*7 Accordingly, Defendant's motion for judgment on the pleadings as to Plaintiff's retaliation claim is denied.

*Constructive Discharge*

Roberti also asserts a claim of constructive discharge under Title VII. In *Pennsylvania State Police v. Suders,* the Supreme Court held that "Title VII encompasses employer liability for a constructive discharge." 542 U.S. 129, 143 (2004). The Court explained that

> Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes.... The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?

*Id.* at 141 (citations omitted). Notwithstanding the *Suders* majority's seemingly exclusive focus on the objective reasonableness of the employee's reaction to the conditions as opposed to the employer's intent in creating them, [FN5] this Circuit continues to recognize a second prong of the cause of action for constructive discharge: that the "employer, rather than discharging [the employee] directly, [has] *intentionally* create[d] a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft,* 336 F.3d 128, 151-52 (2d Cir.2003) (emphasis supplied); *see also, e.g., Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983); *Conway v. Microsoft Corp.,* ___ F.Supp.2d ___, No. 04 Civ. 3346(RJH), 2006 WL 346068, at *15 (S.D.N.Y. Feb. 14, 2006); *Petro v. Outback Steakhouse of Florida,* No. 3:04-CV-928(TJM), 2006 WL 273133, at *2 (N.D.N.Y. Jan. 31, 2006); *Chanval Pellier v. British Airways, PLC.,* No. Civ.A. 02-CV-4195(DGT), 2006 WL 132073, at *5 (E.D.N.Y. Jan. 17, 2006); *Johnson v. Potter,* No. 04-CV-6634(CJS), 2005 WL 2257436, at *12 (W.D.N.Y. Sept. 16, 2005). Schroder argues that the Second Circuit standard requires a showing that the employer intended to induce the employee to resign, and that Roberti's complaint must be dismissed because her acknowledgment that Schroder's representatives sought to dissuade her from resigning [FN6] negates the intent prong of her constructive discharge claim. It is not entirely clear, however, what type of showing of "intent" is necessary in this context. The Second Circuit has "not expressly insisted on proof of specific intent," and has characterized the minimum required showing as one "that the employer's actions were 'deliberate' and not merely 'negligent or ineffective[ ].' " *Petrosino v. Bell Atl.,* 385 F.3d 210, 230 (2d Cir.2004) (quoting *Whidbee v. Garzarelli Food Specialities, Inc.,* 223 F.3d 62, 74 (2d Cir.2000)); *see also Dean v. Westchester County Dist. Attorney's Office,* 119 F.Supp.2d 424, 431 (S.D.N.Y.2000) ("Although the Second Circuit has declined to state whether deliberateness on the part of the employer requires specific intent to force the employee to resign, it has stated that deliberate conduct requires more than mere negligence or ineffectiveness.").

> FN5. *Cf. Suders,* 542 U.S. at 154 (Thomas, J., dissenting) ("Thus, as it is currently conceived, a 'constructive' discharge does not ... require that the act be undertaken with the same purpose as an actual discharge.").

> FN6. (*See* Compl. ¶¶ 60-61.)

*8 Here Plaintiff alleges, and there appears to be no dispute, that Schroder deliberately took a position regarding responsibility for the trading error that was contrary to Plaintiff's version of the events. Plaintiff bases her allegation of constructive discharge on that decision and the publication of its implementation. Her allegation of intentional conduct is thus sufficient to survive the instant motion for judgment on the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pleadings. The cases cited by Schroder are not to the contrary. While in both *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62 (2d Cir.2000) and *Pena v. Brattleboro Retreat*, 702 F.2d 322 (2d Cir.1983), for instance, the court took into account the employer's effort to retain the plaintiff in denying a claim for constructive discharge, neither was a determination at the pleadings stage, and both decisions focused on whether the employee had proffered sufficient facts to demonstrate that the employer had intentionally created working conditions that were intolerable, rather than specifically on whether the employer's intent was to compel the employee to resign. Nor can it be said with certainty at this stage of the proceedings that Plaintiff will be unable to prove that Schroder's actions with regard to the trading error were discriminatory and could have compelled a reasonable employee to resign. [FN7] Schroder's motion for judgment on the pleadings is therefore denied with respect to the constructive discharge claim.

> FN7. Defendant also urges the Court to take "judicial notice" in connection with the instant motion practice of Plaintiff's failure to appeal a determination, made prior to the commencement of this lawsuit in connection with unemployment compensation proceedings, that she had voluntarily resigned from her employment with Schroder. Defendant does not, however, proffer that the doctrines of res judicata and/or collateral estoppel apply, and provides no other basis for the relevance of the prior proceedings at this pleading stage. (Oral Arg. Tr., 11-12.) The Court declines Defendant's invitation.

*New York Law Failure to Promote Claims*

Although Roberti's 2002 failure to promote claim was brought outside of the 300-day statute of limitations period under Title VII, it remains well within the 3-year limitations period governing failure to promote claims brought pursuant to the New York State and City Human Rights Laws. *See, e.g., Horsford v. Salvation Army*, No. 99 Civ. 5721(WHP), 2001 WL 1335005, at *8 (S.D.N.Y. Oct. 29, 2001) (citing N.Y. C.P.L.R. § 214(2) (McKinney 2003)). Failure to promote claims brought under the New York State and City Human Rights Laws are evaluated under the same standards as a Title VII failure to promote claim. *See, e.g., Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n. 1 (2d Cir.2000) ("The identical standards apply to employment discrimination claims brought under Title VII, Title IX, New York Executive Law § 296, and the Administrative Code of the City of New York."). The Court finds that, despite Roberti's failure to apply for the Head of Equity Trading position filled in 2002 by Savickas, she has adequately alleged that (a) the vacancy was not posted, and (b) she had no knowledge of the opening at her desk before it was filled. *See Petrosino*, 385 F.3d 227. Accordingly, Defendant's motion is denied with respect to Plaintiff's 2002 New York law failure to promote claims.

*Defamation Claim*

Plaintiff alleges that she was slandered by implication when McGrath stated that J.P. Morgan was "cut off world-wide," following her trading error. (Compl. ¶ 93.) The implication, Plaintiff claims, was that she had "lied about the trade" in violation of unspecified securities laws and industry regulations and had blamed the broker for her mistake. (*Id.*) A defamation claim under New York law requires a showing of "a false statement, published without privilege or authorization to a third party, constituting fault ... and it must either cause special harm or constitute defamation per se." *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 166 (2d Cir.2003).

*9 The parties agree that the underlying statement is truthful. "Defamation by implication involves 'false suggestions, impressions and implications arising from otherwise truthful statements.'" *Levin v. McPhee*, 119 F.3d 189, 196 n. 5 (2d Cir.1997) (quoting *Armstrong v. Simon & Schuster, Inc.*, 649 N.E.2d 825, 829 (N.Y.1995)). Although both the New York State Court of Appeals and the Second Circuit have recognized the viability of the doctrine, neither has yet articulated a standard for evaluating such a claim in the context of a motion to dismiss. *See id.; Armstrong*, 649 N.E.2d at 829-30.

In the absence of Circuit guidance the Court, mindful

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2006 WL 647718 (S.D.N.Y.)
**(Cite as: 2006 WL 647718 (S.D.N.Y.))**

of its obligation to construe all allegations of the complaint in the light most favorable to the Plaintiff as well as of the liberal pleading standard set by Rule 8(a)(2) of the Federal Rules of Civil Procedure, finds that Plaintiff's allegation that Schroder published an account of the error that suggested that its own participant in the erroneous transaction must have blamed the counterparty is sufficient to withstand the instant motion for judgment on the pleadings.

Defendant's alternative argument that it is entitled to dismissal of the defamation claim on qualified privilege grounds must also be rejected at this stage of the litigation. Defendant asserts that Plaintiff's claim fails because the communication was made by her interested superior to co-workers who had a corresponding interest in Schroder's conduct of its business, thus warranting recognition of a qualified privilege. *See Peters,* 320 F.3d at 169. However, such a claim of qualified privilege may be rebutted by a showing that the statement, or the implication thereof, was "made with 'spite or ill will' or 'with a high degree of awareness of [its] probable falsity." ' *Id.* at 170 (quoting *Liberman v. Gelstein,* 605 N.E.2d 344, 350 (N.Y.1992)). Here, Plaintiff alleges that she repeatedly informed her superior before he made the statement that she would not blame the broker; dismissal of the defamation claim on qualified privilege grounds thus is inappropriate because the allegations of the complaint, construed in the light most favorable to Plaintiff, could support a finding that the statement was made with the requisite high degree of awareness that it was probably false. (*See* Compl. ¶¶ 51-54.)

Accordingly, the Court denies Defendant's motion to the extent it is directed to Plaintiff's defamation claim.

*CONCLUSION*

For the foregoing reasons, Defendant's motion for judgment on the pleadings is granted, and the complaint is dismissed, to the extent Plaintiff asserts Title VII claims in her First Claim for compensation discrimination and a failure to promote her in 2002. Plaintiff's Title VII and state and local law discrimination claims asserted in her First and Second Claims are also dismissed to the extent they are premised on injuries to others. The motion is denied in all other respects.

**\*10** Discovery may proceed on the remaining claims. The parties shall confer, prepare a joint preconference statement, and appear for a pretrial conference in accordance with the scheduling order issued herewith.

SO ORDERED.

Not Reported in F.Supp.2d, 2006 WL 647718 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:04cv02404 (Docket) (Mar. 26, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.